**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | **NO. 06-124 (MAK)** |
| SAMSON ADEYEMI. | : | |

**DEFENDANT SAMSON ADEYEMI'S REPLY IN SUPPORT OF HIS EMERGENCY
MOTION FOR COMPASSIONATE RELEASE**

Acknowledging that Mr. Adeyemi's concerns are "understandable," the government nevertheless opposes his motion for compassionate release on two grounds: (1) that Mr. Adeyemi's asthma is not sufficiently severe; and (2) that in the government's opinion, this Court cannot on this motion consider the fact that Mr. Adeyemi is serving a sentence that is much longer than is legal under current law. Both arguments fail for the reasons below. The government does not dispute the other aspects of Mr. Adeyemi's motion.  Notably, the government concedes that its decision to oppose this motion "does not rest on current conditions" at Fort Dix (10, 12), and also concedes, by not addressing, that Mr. Adeyemi has met the exhaustion requirement, that he is not a danger to others, and that none of the § 3553 factors bar his release.

I.     **Undisputed evidence of Mr. Adeyemi's asthma warrants his compassionate release.**

As discussed further below, the government's attack upon Mr. Adeyemi's credibility regarding the use of his albuterol inhaler is unwarranted, and the government's own diagnosis of Mr. Adeyemi's asthma as "intermittent" is unsupported and improper. It remains undisputed that Mr. Adeyemi suffers from asthma. But in the government's opinion, Mr. Adeyemi's motion must fail because his asthma is not "moderate to severe."

*First*, that Mr. Adeyemi suffers from asthma is amply supported by his medical records and not disputed by the government.  The government disputes only the severity of Mr. Adeyemi's disease. The DOJ recently issued internal guidance that the government should *concede* that

1

"moderate to severe" asthma (and other health conditions) can establish extraordinary and compelling reasons warranting COVID-19 compassionate release.[1] The DOJ's guidance does not preclude a court (or the government) from finding that less severe asthma, or asthma for which severity is not qualified, can establish extraordinary and compelling reasons. Defendant cites several cases where compassionate release was granted to asthma sufferers even if their disease was not qualified as "moderate to severe." (Mot. at 8.) More such cases exist, not limited to the following. *United States v. Echevarria*, 2020 WL  2113604 (D. Conn. May 4, 2020) (49 years old defendant compassionately released where asthma was evidenced by prescribed inhalers, despite lack of evidence that asthma was "moderate to severe" or that defendant suffered from other health issue, and despite defendant having served only 9 months of 48-month sentence and having "substantial criminal record"); *United States v. Tran*, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020) (Hobbs Act robbery defendant who had "suffered from asthma since childhood" compassionately released,  despite lack of evidence that asthma was "moderate to severe" or that defendant suffered from other health issue); *United States v. Hernandez*, 2020 WL 1684062 (S.D.N.Y. Apr. 2, 2020) (defendant compassionately released because "COVID-19 presents a heightened risk for incarcerated defendants . . . with respiratory ailments such as asthma," despite lack of evidence that asthma was "moderate to severe" or that defendant suffered from any other health issue); *United States v. Schafer*, 2020 WL 2519726 (W.D.N.Y. May 18, 2020) (defendant with "asthma requiring regular use of an Albuterol inhaler" compassionately released, despite government's opposition on the basis that medical condition was "well controlled" and lack of evidence that asthma was "moderate to severe" or that defendant suffered any other health issue, and despite defendant's repeated violations of his conditions of pretrial release that had resulted in his remand into custody).

---

[1] Ex. 1, *United States v. Firebaugh*, No. 16-cr-20341, Gov't Supp. Resp., ECF Dkt. 43, at 1 (S.D. Fl. June 1, 2020).

*Second*, the government focuses on Mr. Adeyemi's current health condition but fails to consider the risk he faces if he were to contract COVID-19 at Fort Dix given his asthma.  Fort Dix, which has seen a significant outbreak of COVID-19, is not a hospital, and it is a challenge even for hospitals to care for asthma patients with COVID-19.  Relatedly, a recent study from Rush University Medical Center in Chicago has shown that asthma is associated with longer time on ventilators for younger COVID-19 patients—without any indication that this applies only to patients with "moderate to severe" asthma.  Ex. 2 ("Our findings suggest that younger individuals with asthma may require extra attention, as they could develop a sustained pulmonary failure with COVID-19 infection, leading to prolonged mechanical ventilation.").

*Finally*, it is the combination of Mr. Adeyemi's unique circumstances, which are not limited to his asthma, that warrant his compassionate release.  Cases that the government cites (at 17, fn. 5) that denied compassionate release to "mild" asthma sufferers hardly stand for the proposition that a bright line rule is applied based on the severity of a defendant's asthma. Instead, they support the view that the totality of circumstances must be considered, which in those cases included facts like a long criminal history, a history of violence, and a failure to comply with the exhaustion requirement. Mr. Adeyemi has no criminal history or history of violence (aside from this case), has shown rehabilitation, has paid restitution in full, has complied with the exhaustion requirement, is not dangerous, has a specific plan for his release, and is serving a staggering 32-year sentence that would be illegal under current law.  His asthma, his incarceration at Fort Dix, and COVID-19, in addition to the totality of his circumstances, amount to a unique combination of extraordinary and compelling reasons that warrant his compassionate release.

Even though they are not particularly relevant to the outcome of this motion—given the undisputed fact that Mr. Adeyemi is an asthma suffer—defendant would be remiss not to address the government's particular arguments pertaining to his health.

The government seeks to cast doubt (at 16) on Mr. Adeyemi's credibility for his statement that he uses an albuterol inhaler "a few times per week": that seems to be, at best, a mistake on the government's part. The government states (at 16-17) that if Mr. Adeyemi "took only 6 puffs per week"—*i.e.* a "few times per week"—"the [albuterol] inhaler would only last 33 weeks." But 33 weeks from his last refill of albuterol on October 22, 2019 (Gov. at 16) is June 9, 2020, *i.e.,* the 33 weeks have not yet expired. Further, Mr. Adeyemi renewed his albuterol prescription in May 2020.[2] He has since received a new albuterol inhaler, as confirmed by Mr. Adeyemi's medical records, which—contrary to what the government asserts in its brief —show that as of May 27, 2020, he had refilled his albuterol inhaler *twice* in the prior 219 days (and not once in 228 days as the government alleges at 16).[3]

The government looks at Mr. Adeyemi's most recent medical appointments (Jan. 2020 and Oct. 2019) and, seemingly decreeing itself a medical expert, opines that "SaO2 oxygen saturation level"— reported at 98% and 100% for Mr. Adeyemi in the last year— is "a pertinent finding for asthmatics" (15); that "Wright peak flow test results [is] another key test of lung function"; and that Mr. Adeyemi's "Wright peak flow test results" of "500, 600, and 600" are considered "excellent" (16).  The interpretation of this data comes solely from the prosecutor in this case, not from a BOP (or other) medical professional, and as such is wholly improper. Based on its own medical diagnosis, the government declares (at 13-14) that "it is clear" that Mr. Adeyemi "suffers from what medical authorities term 'intermittent' asthma, which is less significant than 'mild'." Even the BOP disagrees with this assessment, qualifying Mr. Adeyemi's asthma of "mild to intermittent" and "progressive."[4]  Importantly, the government fails to mention that Mr. Adeyemi's

---

[2] ECF Dkt. 180-2 (Samson Adeyemi Decl.) at ¶12.

[3] Ex. 3 (BOP Medical Records, "Medication Summary," generated 05/27/2020).

[4] Ex.4 (Warden letter responding to Mr. Adeyemi's compassionate release request).  Although this letter is dated May 15, 2020 on its face, Mr. Adeyemi received it on May 27, 2020 after filing this motion. A copy of the letter was later provided to defense counsel by the government.

medical records include several reports of bronchospasms, coughs and chest pains in the past.[5] The government also does not address Mr. Adeyemi's argument that safe exercising, which is part of his asthma self-care routine, is nearly impossible at Fort Dix, given the risk of contracting COVID-19 and the lock down.

## II.   The Court can and must consider the extraordinary and compelling fact that Mr. Adeyemi is serving a 32-year sentence that would be illegal under current law.[6]

Mr. Adeyemi's textbook case of extraordinary and compelling circumstances warranting his compassionate release include the fact that if he were sentenced today, he would be subject to mandatory minimum imprisonment of, at most,[7] 14 years,[8] instead of the 32-year sentenced he is currently serving. Mr. Adeyemi has already served 13 years and 8 months (Gov. at 5), and thus with good time credit, would have been released by now.[9] The government's view that a defendant serving a mandatory minimum sentence that is now considered by Congress to be unjust, despite not having been made retroactive, could *never* be considered by a court as an "extraordinary and compelling" reason warranting compassionate release defies common sense, is contrary to what

---

[5] Ex. 5 (BOP Medical Records, "Health Problems," generated 05/27/2020).

[6] The government was limited to a 25-page opposition and its incorporation by reference to its own brief in *United States v. Clausen*, No. 00-291-02, ECF no. 271 (May 15, 2020) is improper.  Respectfully, the Court should consider only the parties' briefs in this case.  To the extent the Court is inclined to consider the government's brief in *Clausen*, it should also consider defendant's briefs in the same case.

[7] Under current law, the government must establish the "brandishing" element of § 924(c)(1)(A)(ii) before a jury. *Alleyne v. United States*, 133 S.Ct. 2151, 2155-58 (2013) (any fact that increases the mandatory minimum is an "element" that must be submitted to the jury and proven beyond a reasonable doubt).  That was not the case in October 2006, when Mr. Adeyemi was tried in this case.  Under current law, failure to establish the "brandishing" element would have resulted in a mandatory minimum sentence of at most 10 years, instead of 14 years, for Mr. Adeyemi. 18 U.S.C. § 924(c)(1)(A)(i). Mr. Adeyemi previously filed a § 2241 motion based on the ruling in *Alleyne*, but it was denied for lack of jurisdiction.  The court held that the motion should have been brought under § 2255, but Mr. Adeyemi had already filed a § 2255 motion, and the court found that the motion did not fall within § 2255's savings clause allowing a second § 2255 motion. *Adeyemi v. Meeks*, No. 13-cv-216, 2014 U.S. Dist. LEXIS 13315 (W.D. Pa. Feb. 4, 2014).

[8] Defendant mistakenly stated in his motion (at 17-18) that he would at most have been sentenced to 135 months, and concedes that the current mandatory minimum could have been 168 months. *See* Gov. at 18.

[9] Judge Davis sentenced Mr. Adeyemi to a nominal one-month sentence on his Hobbs Act counts and nothing in the record suggests that Judge Davis would have done otherwise if the mandatory minimum of the time would have been 14 years instead of 32 years.

the majority of district courts have found, and is not supported by the legislative history.

The government first argues (at 19) that because the amendment of the stacking statute was not made retroactive by Congress, it bars this Court from considering it on this motion. If Congress had made retroactive § 403 of the FSA (which amended the stacking statute), Mr. Adeyemi—and all others similarly situated—would have been *categorically* released, without consideration from a federal court. Mr. Adeyemi is not seeking categorical release. He is seeking compassionate release under § 3582(c)(1)(A) because a unique combination of extraordinary and compelling reasons, including the stacking amendment, warrant it. It is the very statute that amended § 924(c)-stacking, the FSA, that *simultaneously* expanded the courts' powers to grant compassionate release under § 3582(c)(1)(A).  Mr. Adeyemi cites in his motion (at 12-13) several cases where courts have held that the stacking amendment, in addition to other circumstances in those cases, warranted compassionate release, despite the fact that the amendment was not retroactive.  Mr. Adeyemi deserves no less.  The Third Circuit case relied upon by the government (*Hodge*, at 19) is irrelevant as it did not involve a motion under § 3582(c)(1)(A).

The rest of the government's arguments hinge on § 3582(c)(1)(A)'s requirement that re-sentencing be "consistent with applicable policy statements issued by the Sentencing Commission" (language that existed prior to the FSA), where the policy statement (which has not been amended since the FSA) provides that *the BOP* can determine "other reasons"—*i.e.* other than those related to health, age or family circumstances—for compassionate release.  The government argues that *only* the BOP has discretion to determine "other reasons" that could warrant compassionate release. There are several reasons why these arguments must be rejected.

The BOP's compassionate release program is not faithful to what Congress and the Commission have always intended, *i.e.,* that reasons other than health, age and family circumstances can warrant compassionate release. Congress never defined "extraordinary and

compelling reason" for resentencing under § 3582(c) except to state that "[r]ehabilitation ... alone" does not suffice. 18 U.S.C. § 994(t). When it enacted § 3582(c) in 1984 through the Comprehensive Crime Control Act, which also abolished federal parole, Congress recognized that parole historically played a key role in responding to changed circumstances, and the Senate Committee stressed how some individual cases may still warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by *changed circumstances*. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence*, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment.[10]

The Sentencing Commission decreed the same flexible and individual approach in Application Note 1(D) of its policy statement by providing that an "extraordinary and compelling reason *other than, or in combination with*" reasons of health, age and family circumstances can warrant compassionate release, thereby "implicitly recognizing that it is impossible to package all 'extraordinary and compelling' circumstances into three neat boxes, [and]. . . creating a catchall that recognized that other 'compelling reasons' could exist." *United States v. Rodriguez*, No. 03-cr-271, 2020 WL 1627331, *3 (E.D. Pa. Apr. 1, 2020). But the BOP's compassionate release program statement fails to implement Application Note 1(D) and provides that compassionate release can be granted only for reasons relates to health, age, and family circumstances.[11]

The BOP has long failed to implement the compassionate release program as it was intended by Congress. From 1984 to 2013, only 24 inmates on average were released each year

---

[10] S. Rep No. 98-225, at 55–56 (1983) (emphasis added).

[11] Ex. 6 (BOP Program Statement 5050.50). This is not the only way in which the BOP Program Statement is contrary to the policy statement. *E.g.* Ex. 6 (BOP Policy Statement 5050.50 provides that "[a]n inmate may initiate a request for consideration under . . . 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances *which could not reasonably have been foreseen by the court at the time of sentencing*."); *compare* U.S.S.G. § 1B1.13, Application Note 2 (provides that "an extraordinary and compelling reason *need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment*.").

through BOP-filed motions. *Rodriguez,* 2020 WL 1627331 at *2.  In 2013, the Office of the Inspector General criticized the BOP's underuse of the statute which led the Commission to amend its policy statement. *Id.*[12] But things still did not improve. A chilling 2018 New York Times investigation reported that between 2013 and 2017, of the 5,400 compassionate release applications received by BOP Wardens, approximately 300 were granted, only 50 of which were for nonmedical reasons, and 266 inmates died while awaiting compassionate release.[13]  In 2018, Congress sought to fix what the BOP had broken.

Through the FSA, Congress wanted to return to the judiciary the authority in compassionate release re-sentencing matters. Not only was § 3582(c)(1)(A) amended to allow defendants to bring motions directly to federal courts (whereas before only the BOP could bring these motions), but it incorporated what is potentially one of the least demanding administrative exhaustion requirements in the books, permitting a defendant to bring a motion even if the BOP has not considered the request at all, provided the defendant waits 30 days. This very limited exhaustion requirement is "extremely unusual (if not unprecedented)" and "reflects acknowledgement that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing." *United States v. Russo*, No. 16-cr-441, 2020 U.S. Dist. LEXIS 65390, at *15-16 (S.D.N.Y. Apr. 14, 2020). Congress labeled the changes to the compassionate release statute at § 603(b) of the FSA: "Increasing *the Use* and *Transparency* of Compassionate Release."[14] Senator Cardin noted that the FSA "expands compassionate release" and "expedites compassionate release applications," and Representative Nadler noted the FSA's "very positive change" of "improving application of compassionate release."[15] In fact, § 603(b)

---

[12] *See also* U.S. Dep't of Justice Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013), available at: https://oig.justice.gov/reports/2013/e1306.pdf.
[13] Ex.7 (The New York Times, *Frail, Old and Dying, but Their Only Way Out of Prison Is a Coffin*, Mar. 7, 2018).
[14] *Rodriguez,* 2020 WL 1627331 at *2; 164 Cong. Rec. H10346, H10358 (2018) (emphasis added).
[15] 164 Cong. R. 199, at S7774 (Dec. 18, 2018); 164 Cong. Rec. H10346-04, H10362 (Dec. 20, 2018).

was initially a standalone bill that "explicitly sought to improve the compassionate release process of the Bureau of Prisons." *Rodriguez*, 2020 WL 1627331 at *2 (internal citations omitted).

The Commission's policy statement has not been updated to account for the changes imposed by the FSA.[16] It still provides that a compassionate release motion can be brought only "upon motion of the Director of the Bureau of Prison," which is no longer good law.  Application Note 1(D)'s provision that "other reasons" warranting compassionate release are those "determined by the Director of the Bureau of Prisons" made sense only when the BOP was the exclusive gatekeeper of these motions.  It is now outdated.  "Accordingly, a majority of district courts have concluded that the old policy statement provides helpful guidance, but does not constrain a court's independent assessment of whether extraordinary and compelling reasons warrant a sentence reduction under § 3852(c)(1)(A)." *Rodriguez,* 2020 WL 1627331 at *4 (internal citations and quotation marks omitted) (collecting cases).

The government claims (at 21) that "[e]ven if BOP no longer has sole authority to file a motion, that is no reason that BOP may still not be called upon to provide an expert opinion on which circumstances should qualify for compassionate release."  Because the BOP's compassionate release program statement does not comply with the Commission's policy statement, and because it was the BOP's years of misuse of the program that led to its amendment by Congress in 2018, one can doubt the BOP's expertise in this matter.  But even putting that aside, the government fails to mention that here, BOP *was called upon* to provide its opinion on whether Mr. Adeyemi's staggering 32-year sentence under a now-defunct statute warrants his compassionate release, and chose not to provide its opinion. Mr. Adeyemi's compassionate release request to the Warden was explicitly based on, among other reasons, the amendment of § 924(c),[17]

---

[16] *See* U.S.S.G. § 1B1.13, historical note.
[17] ECF Dkt. 184, Ex. A to Declaration of Mary Adeyemi at 2.

and yet the Warden did not address it.  *See* Ex. 4 (Warden letter).

The government claims (at 22) that the "remedy sought by the defendant would mark a profound alteration of the sentencing scheme carefully designed by Congress" because it "would afford individual judges the authority to, in effect, exercise a parole power that Congress specifically acted in 1984 to abolish." That is not so, because Mr. Adeyemi does not seek release based on rehabilitation alone, 28 U.S.C. § 994(t), and because § 3582(c), as amended in 2018, specifically empowers courts to grant the remedy sought here. In addition, the government's perceived problem of creating "a parole power" would not be cured either way: the ability to grant release for "other reasons" would remain within the BOP's discretion, even if not in the sentencing courts' discretion.  This is contrary to what Congress intended with the FSA.

The government's hypothetical scenario (at 22-23) that "[a] judge could [] impose a mandatory sentence as dictated by Congress, and then after the judgment became final act to reduce it, upon a declaration that imposition of the sentence in the particular case is "extraordinary" and unwarranted" is of no moment because this is not such a case.  Here, *Congress* decided *in 2018* that the stacking provision pursuant to which Mr. Adeyemi was sentenced *in 2007* was unjust.

Finally, what the government asks of this Court is impossible in practice.  The Court cannot close its eyes to the fact that Mr. Adeyemi is serving a sentence that is years longer than current law mandates, because the Court is required to consider "the need for the sentence imposed" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3582(c)(1)(A)(requires consideration of § 3553(a) factors).  For that, the Court must consider that *even Congress* no longer believes that the sentence imposed upon Mr. Adeyemi in 2007 is needed, and that *all* similarly situated defendants are now receiving drastically shorter sentences than the one Mr. Adeyemi received.

**SCHLAM STONE & DOLAN LLP**

By:  _/s/ Andrew J. Frisch____
     Andrew J. Frisch
     Jolene F. LaVigne-Albert
     26 Broadway
     New York, New York 10004
     Tel: 212-344-5400
     afrisch@schlamstone.com
     jlavignealbert@schlamstone.com


**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:  __/s/ Julie A. Busta_____
     Julie A. Busta
     Two Commercial Square
     2001 Market Street, Suite 4100
     Philadelphia, PA 19103-7013
     T +1 215.965.1260
     jbusta@akingump.com

# Exhibit 1

Samson Adeyemi June 8, 2020 Reply in Support
of his Motion of Compassionate Release

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-20341-CR-UU

**UNITED STATES OF AMERICA**

**vs.**

**ALBERT M. FIREBAUGH IV,**

    **Defendant.**

_____/

## GOVERNMENT'S SUPPLEMENTAL RESPONSE

    The United States, by and through the undersigned Assistant United States Attorney, respectfully submits this supplemental response to amend the Government's initial response [DE 39] to Defendant's *pro se* motion for compassionate release pursuant to 18 U.S.C. § 3582 [DE 32].

    On May 18, 2020, the Department of Justice issued internal guidance which directs that the Government concede that Defendants who have certain CDC risk factors, including:

1. Asthma (moderate to severe)
2. Chronic kidney disease being treated with dialysis
3. Chronic lung disease, such as chronic obstructive pulmonary disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis, and cystic fibrosis
4. Diabetes, including type 1, type 2, or gestational
5. Hemoglobin disorders, such as sickle cell disease and thalassemia
6. Immunocompromised, including from cancer treatment, bone marrow or organ transplantation, immune deficiencies, HIV with a low CD4 cell count or not on HIV treatment, and prolonged use of corticosteroids and other immune weakening medications
7. Liver disease, including cirrhosis
8. Serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension; and/or
9. Severe obesity, defined as a body mass index (BMI) of 40 or above

can establish that "extraordinary and compelling reasons" warrant the reduction in sentence. In other words, in the Government's view, during the COVID-19 pandemic, this Defendant Firebaugh's documented COPD and Type II diabetes present " serious physical or medical

Case 2:96-cr-00184-MAK Document 189 Filed 06/08/20 Page 14 of 54

condition(s) . . . that substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he … is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).[1]

Based on Title 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, the Court still must consider whether a reduction in the Defendant's sentence is appropriate under "the 3553(a) factors to the extent they are applicable" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." As part of the U.S. Sentencing Guidelines Section 1B1.13(2), the Court must find that the defendant is "not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Government can submit any additional filings by June 5, 2020 as directed by the Court.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Dated:    June 1, 2020                    By:    Timothy J. Abraham
                                                 TIMOTHY J. ABRAHAM
                                                 ASSISTANT U.S. ATTORNEY
                                                 Florida Bar No. 114372
                                                 99 N. E. 4th Street, 4th Floor
                                                 Miami, Florida 33132-2111
                                                 Tel. No. (786) 877-4964
                                                 Fax No. (305) 530-7976
                                                 **Email: Timothy.Abraham2@usdoj.gov**

---

1  The undersigned advised defense counsel on May 26, 2020 of the substance of this supplemental response.

2

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on June 1, 2020, I electronically filed the foregoing document

with the Clerk of the Court which sent notice to counsel of record.

.

/s/Timothy J. Abraham
Timothy J. Abraham, AUSA

# Exhibit 2

Samson Adeyemi June 8, 2020 Reply in Support
of his Motion of Compassionate Release

As we begin to reopen Rush University Medical Center for elective procedures and in-person care, we are putting your safety (/patients-visitors/covid-19-resources/safely-getting-care-rush) first. For information about COVID-19, see the latest updates (/patients-visitors/coronavirus-covid-19-information-and-resources). Rush accepts donations (/patients-visitors/covid-19-resources/coronavirus-donations) to support our response effort, staff, and patients and families.

---

# Asthma Associated With Longer Time on Ventilators for Younger COVID-19 Patients

May 15, 2020



(/news/press-releases/asthma-associated-longer-time-ventilators-younger-covid-19-patients)
New data suggests that asthma is associated with longer time on ventilators for hospitalized younger patients with COVID-19. Patients with COVID-19 between the ages of 20 and 59 years old who also had asthma (/services/conditions/asthma) needed a ventilator to assist with

breathing for five days more on average than non-asthmatic patients with COVID-19, according to researchers at Rush University Medical Center, who published their findings today in The Journal of Allergy and Clinical Immunology: In Practice.

"Among the patients who developed severe respiratory symptoms requiring intubation (the use of a ventilator), asthma was associated with a significantly longer intubation time in the younger group of patients who would seemingly have a better disease course than patients over the age of 65," said Dr. Mahboobeh Mahdavinia (https://doctors.rush.edu/Details/659), chief of allergy and immunology in the Department of Internal Medicine (/services/internal-medicine) at Rush University Medical Center.

"Our findings suggest that younger individuals with asthma may require extra attention, as they could develop a sustained pulmonary failure with COVID-19 infection, leading to prolonged mechanical ventilation."

Some signs and symptoms of COVID-19 are similar to worsening of asthma, which can lead to a late diagnosis of COVID-19 in asthmatics. "Therefore, we looked at a large group of patients to understand the impact of preexisting asthma on the outcome of patients with COVID-19," Mahdavinia said.

"We found that asthma and obesity are connected in COVID-19 patients, which means that obesity coupled with asthma puts a patient at a significantly higher risk. This is the first report, to our knowledge, to study the role of asthma on the outcome of COVID-19 patients."

Mahdavinia's team of physician-scientists, medical residents, basic scientists and students used an electronic medical record algorithm created by the information services team at Rush to identify patients with asthma and COVID-19 who were either hospitalized or tested for COVID-19 at Rush between the dates of March 12 and April 3.

IBM SPSS Statistics for Windows was used for analysis of COVID-19 outcomes in association with asthma and were adjusted for demographic variables and body mass index (BMI).

Initially, data emerged for 1,003 patients who tested positive for COVID-19. Complete data on demographic variables, asthma, and COVID-19 management was available in 935 patients, who were used for analysis. Overall, 241 were found to have an established diagnosis of asthma, which were broken into three groups by age range.

Asthma was significantly associated with longer intubation time in patients between 18 and 49 years of age and between 50 and 64 years of age, but not in the age group 65 years of age and older. Duration of hospitalization was longer among patients with a history of asthma compared to those without this history in patients aged 50 to 64 years, but not in the younger or older age groups. The patients aged 50 to 64 on average spent two more days in the hospital than the non-asthmatics in this age group.

Asthma was not associated with a higher rate of death or with acute respiratory distress syndrome among COVID-19 patients.

"In other studies, both obesity and gender have been shown to affect COVID-19 hospitalization," said Mahdavinia. "In our study, asthma was also associated with female gender and higher BMI."

The analysis, which was adjusted for both obesity and gender, indicates that asthma is independently linked to the amount of time patients needed to be on ventilators.

"We were able to confirm asthma in prior clinical documentation among 73% of patients, but some cases were self-reported upon screening. We think that patients with a history of asthma may have sought out COVID-19 testing more than others due to concern and overlapping symptoms," Mahdavinia said.

# MEDIA CONTACT



**Nancy Di Fiore**
Associate director, media relations
(312) 942-5159 (tel:(312) 942-5159)
nancy_difiore@rush.edu (mailto:nancy_difiore@rush.edu)

# Sign up now for medical news and free health tips.

Sign up now for medical news and free health tips.

Enter email address    SIGN UP

 Clinical Trials (/news-topic/clinical-trials)

/

# Exhibit 3

Samson Adeyemi June 8, 2020 Reply in Support
of his Motion of Compassionate Release

# Bureau of Prisons
## Health Services
## Medication Summary
## Historical

| | | | | | |
|---|---|---|---|---|---|
| **Complex:** FTD--FORT DIX FCI | | | **Begin Date:** 05/27/2019 | | **End Date:** 05/27/2020 |
| **Inmate:** ADEYEMI, SAMSON OLUMWSEU | | | **Reg #:** 60450-066 | | **Quarter:** C02-154L |

**Medications listed reflect prescribed medications from the begin date to end date on this report.**

**Allergies:**                             Denied

## Active Prescriptions

Albuterol Inhaler HFA (8.5 GM) 90 MCG/ACT

Don't use daily. Inhale 2 puffs by mouth 4 times a day as needed to prevent/relieve asthma attack (inhaler to last 90 days. If need more, make sick call)

**Rx#:**   442510-FTD        **Doctor:** Patel, Pradip MD

**Start:** 10/26/18        **Exp:** 10/26/19      **D/C:** 10/22/19      **Pharmacy Dispensings:** 8.5 GM in 580 days

Albuterol Inhaler HFA (8.5 GM) 90 MCG/ACT

Don't use daily. Inhale 2 puffs by mouth 4 times a day as needed to prevent/relieve asthma attack (inhaler to last 90 days. If need more, make sick call)

**Rx#:**   478221-FTD        **Doctor:** Patel, Pradip MD

**Start:** 10/22/19        **Exp:** 10/21/20        **Pharmacy Dispensings:** 17 GM in 219 days

Amitriptyline  25 MG Tab

***pill line*** Take one tablet (25 MG) by mouth at bedtime for pain ***pill line***

**Rx#:**   478222-FTD        **Doctor:** Patel, Pradip MD

**Start:** 10/23/19        **Exp:** 04/20/20      **D/C:** 01/21/20      **Pharmacy Dispensings:** 29 TAB in 218 days

DULoxetine HCl Delayed Rel 20 MG Cap

Take one capsule (20 MG) by mouth each day for pain

**Rx#:**   457145-FTD        **Doctor:** Patel, Pradip MD

**Start:** 03/29/19        **Exp:** 09/25/19        **Pharmacy Dispensings:** 30 CAP in 426 days

Mometasone Furoate Inhal 220 MCG/Inh [ 30 doses]

Inhale 2 puffs by mouth each evening - rinse mouth after use

**Rx#:**   442503-FTD        **Doctor:** Patel, Pradip MD

**Start:** 10/26/18        **Exp:** 10/26/19      **D/C:** 10/22/19      **Pharmacy Dispensings:** 0 ea in 580 days

Mometasone Furoate Inhal 220 MCG/Inh [ 30 doses]

Inhale 2 puffs by mouth each evening - rinse mouth after use

**Rx#:**   478223-FTD        **Doctor:** Patel, Pradip MD

**Start:** 10/22/19        **Exp:** 10/21/20        **Pharmacy Dispensings:** 2 ea in 219 days

# Exhibit 4

Samson Adeyemi June 8, 2020 Reply in Support
of his Motion of Compassionate Release

**ADEYEMI, Samson Olumwseu**
Register No. 60450-066
Unit: 5711

## INMATE REQUEST TO STAFF RESPONSE

This is in response to your Inmate Request to a Staff Member
dated April 12, 2020, in which you request consideration for a
Compassionate Release/Reduction in Sentence (RIS) in accordance
with Program Statement 5050.50. Specifically, you request a
Compassionate Release as an inmate with a Debilitated Medical
Condition.

In accordance with Program Statement 5050.50, Compassionate
Release/Reduction in Sentence: Procedures for Implementation of
18 U.S.C. §§ 3582 and 4205(g), an inmate may initiate a request
for consideration only when there are particularly extraordinary
or compelling circumstances which could not reasonably have been
foreseen by the court at the time of sentencing. In order to
meet the criteria as an inmate with a Debilitated Medical
Condition, an inmate must be completely disabled, meaning the
inmate cannot carry on any self-care and is totally confined to
a bed or chair, or capable of only limited self-care and is
confined to a bed or chair more than 50% of waking hours.

A review of your current medical status reveals you are a 33-
year old male, diagnosed with mild to intermittent asthma. You
are not considered at high risk for severe illness from
complications associated with COVID-19 per current CDC guidance.
Your condition is controlled with medication. Based on your
last medical review, you have the ability to perform activities
of daily living independently and are able to fully function in
a correctional environment. While your condition is
progressive, there is no evidence that your current medical
condition substantially diminishes your ability to function in a
correctional facility. Accordingly, your request for a
compassionate release is denied.

If you are dissatisfied with this response, you may appeal the
decision through the Administrative Remedy process.


David E. Ortiz                    5/15/20
Warden                            Date

# Exhibit 5

Samson Adeyemi June 8, 2020 Reply in Support
of his Motion of Compassionate Release

# Bureau of Prisons
# Health Services
# Health Problems

Reg #:  60450-066                    Inmate Name:  ADEYEMI, SAMSON OLUMWSEU

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|

## Current

**Asthma, unspecified**

| | | | | | | |
|---|---|---|---|---|---|---|
| 09/28/2016 12:12 EST  Pedersen, P. MD | III | ICD-9 | 493.90 | 06/23/2011 | Current | 09/28/2016 |

    Seasonal, Fall/Winter is worst.  Monotherapy has been effective to date

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/26/2013 14:10 EST  Coyne, Nicolette PA-C | III | ICD-9 | 493.90 | 06/23/2011 | Resolved | 11/26/2013 |

    Seasonal, Fall/Winter is worst.  Monotherapy has been effective to date

| | | | | | | |
|---|---|---|---|---|---|---|
| 06/23/2011 13:19 EST  Walt, Michael J. D.O  Clinical Director | III | ICD-9 | 493.90 | 06/23/2011 | Current | 06/23/2011 |

    Seasonal, Fall/Winter is worst.  Monotherapy has been effective to date

**Tooth eruption, disturbances in**

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/27/2010 09:06 EST  Fleming, Linsey DMD | III | ICD-9 | 520.6 | 10/27/2010 | Current | 10/27/2010 |

**Cervical disc disorder, unsp, unspecified cervical region**

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/26/2018 10:35 EST  Patel, Pradip MD | | ICD-10 | M5090 | 10/26/2018 | Current | |

**Low back pain**

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/23/2019 10:47 EST  Elias, Vicente MLP | | ICD-10 | M545 | 01/23/2019 | Current | |

**Neuralgia and neuritis, unspecified**

| | | | | | | |
|---|---|---|---|---|---|---|
| 01/29/2019 10:47 EST  Patel, Pradip MD | | ICD-10 | M792 | 01/29/2019 | Current | |

    L5-S1 , L4-L5 distribution. Will give patient exercises to do.

**Injury of nerve at shoulder/upper arm**

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/24/2017 10:56 EST  Elias, Vicente MLP | | ICD-10 | S4490X | 10/24/2017 | Current | |

## Remission

**Bronchospasm, exercise induced**

| | | | | | | |
|---|---|---|---|---|---|---|
| 11/04/2016 09:26 EST  Patel, Pradip MD | III | ICD-9 | 493.81 | 11/26/2013 | Remission | 11/04/2016 |
| 11/26/2013 10:21 EST  Coyne, Nicolette PA-C | III | ICD-9 | 493.81 | 11/26/2013 | Current | 11/26/2013 |

## Resolved

**Helicobacter pylori (H. pylori)**

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | 041.86 | 04/04/2014 | Resolved | 01/14/2015 |
| 01/14/2015 09:11 EST  Coyne, Nicolette PA-C | III | ICD-9 | 041.86 | 04/04/2014 | Resolved | 01/14/2015 |

Reg #:  60450-066                      Inmate Name:  ADEYEMI, SAMSON OLUMWSEU

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| 04/04/2014 09:19 EST  Coyne, Nicolette PA-C | III | ICD-9 | 041.86 | 04/04/2014 | Current | 04/04/2014 |
| **Cellulitis and abscess of leg, except foot** | | | | | | |
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | 682.6 | 01/26/2009 | Resolved | 02/23/2012 |
| 02/23/2012 08:46 EST  Walt, Michael J. D.O  Clinical Director | III | ICD-9 | 682.6 | 01/26/2009 | Resolved | 02/23/2012 |
| 01/26/2009 13:21 EST  Glenn, Judy NP | III | ICD-9 | 682.6 | 01/26/2009 | Current | 01/26/2009 |
| **Cough** | | | | | | |
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | 786.2 | 10/18/2010 | Resolved | 02/23/2012 |
| 02/23/2012 08:46 EST  Walt, Michael J. D.O  Clinical Director | III | ICD-9 | 786.2 | 10/18/2010 | Resolved | 02/23/2012 |
| 10/18/2010 09:55 EST  Asp, Eric PA-C | III | ICD-9 | 786.2 | 10/18/2010 | Current | 10/18/2010 |
| **Other chest pain** | | | | | | |
| 02/23/2016 07:20 EST  SYSTEM | III | ICD-9 | 786.59 | 03/20/2014 | Resolved | 06/29/2015 |
| 06/29/2015 10:47 EST  Walt, Michael J. D.O  Clinical Director | III | ICD-9 | 786.59 | 03/20/2014 | Resolved | 06/29/2015 |
| 03/20/2014 09:51 EST  Coyne, Nicolette PA-C | III | ICD-9 | 786.59 | 03/20/2014 | Current | 03/20/2014 |

## Current

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| ~~**Asthma, unspecified, with (acute) exacerbation**~~ | | | | | | |
| ~~06/23/2011 13:19 EST  Walt, Michael J. D.O  Clinical Director~~ ~~old ICD code~~--OLD ICD CODE | ~~III~~ | ~~ICD-9~~ | ~~493.92~~ | ~~12/21/2010~~ | ~~Current~~ | ~~12/21/2010~~ |
| 12/21/2010 10:33 EST  Asp, Eric PA-C | III | ICD-9 | 493.92 | 12/21/2010 | Current | 12/21/2010 |

**Total:** 12

# Exhibit 6

Samson Adeyemi June 8, 2020 Reply in Support
of his Motion of Compassionate Release



**U.S. Department of Justice**
Federal Bureau of Prisons

P R O G R A M   S T A T E M E N T
OPI              OGC/LCI
NUMBER      5050.50
DATE           January 17, 2019

# Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)

/s/
*Approved*: Hugh J. Hurwitz
Acting Director, Federal Bureau of Prisons

1.  **PURPOSE AND SCOPE**

**§571.60  Purpose and scope.**

**Under 18 U.S.C. 4205(g), a sentencing court, on motion of the Bureau of Prisons, may make an inmate with a minimum term sentence immediately eligible for parole by reducing the minimum term of the sentence to time served. Under 18 U.S.C. 3582(c)(1)(A), a sentencing court, on motion of the Director of the Bureau of Prisons, may reduce the term of imprisonment of an inmate sentenced under the Comprehensive Crime Control Act of 1984.**

**The Bureau uses 18 U.S.C. 4205(g) and 18 U.S.C. 3582(c)(1)(A) in particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.**

18 U.S.C. 3582 was amended by the First Step Act of 2018, revisions noted below in Summary of Changes.

For the purposes of this Program Statement, the terms "compassionate release" and "reduction in sentence" are used interchangeably.

**Federal Regulations from 28 CFR are in this type.**
Implementing information is in this type.

In deciding whether to file a motion under either 18 U.S.C. 4205(g) or 18 U.S.C. 3582, the Bureau of Prisons (BOP) should consider whether the inmate's release would pose a danger to the safety of any other person or the community.

Under 18 USC 3582 (d)(2)(3), the Bureau ensures that all facilities regularly and visibly post, including in prisoner handbooks, staff training materials, and facility law libraries and medical and hospice facilities, and make available to prisoners upon demand, notice of—

(i) a defendant's ability to request a sentence reduction pursuant to subsection (c)(1)(A);

(ii) the procedures and timelines for initiating and resolving requests described in clause (i); and

(iii) the right to appeal a denial of a request described in clause (i) after all administrative rights to appeal within the Bureau of Prisons have been exhausted.

## §572.40  Compassionate release under 18 U.S.C. 4205(g).

**18 U.S.C. 4205(g) was repealed effective November 1, 1987, but remains the controlling law for inmates whose offenses occurred prior to that date.  For inmates whose offenses occurred on or after November 1, 1987, the applicable statute is 18 U.S.C. 3582(c)(1)(A).  Procedures for compassionate release of an inmate under either provision are contained in 28 CFR part 571, subpart G.**

a. **Program Objectives.**  The expected results of this program are:

■   A motion for a modification of a sentence will be made to the sentencing court only in particularly extraordinary or compelling circumstances that could not reasonably have been foreseen by the court at the time of sentencing.
■   The public will be protected from undue risk by careful review of each compassionate release request.
■   Compassionate release motions will be filed with the sentencing judge in accordance with the statutory requirements of 18 U.S.C. 3582 or 4205(g).

b. **Summary of Changes**

*Policy Rescinded*

P 5050.49 CN-1  Compassionate Release/Reduction in Sentence: Procedures for Implementation
          of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)

The following have been added to this version of the Program Statement:

- Requirements of section 603(b) of the First Step Act, codified at 18 USC § 3582:
  - ➢ Requiring inmates be informed of reduction in sentence availability and process;
  - ➢ Modifying definition of "terminally ill;"
  - ➢ Requiring notice and assistance for terminally ill offenders;
  - ➢ Requiring requests from terminally ill offenders to be processed within 14 days;
  - ➢ Requiring notice and assistance for debilitated offenders; and
  - ➢ Specifying inmates may file directly to court after exhaustion of administrative remedies, or 30 days from receipt of a request by the Warden's Office.

2. **INITIATION OF REQUEST – EXTRAORDINARY OR COMPELLING CIRCUMSTANCES**

**§ 571.61  Initiation of request – extraordinary or compelling circumstances.**

**a.  A request for a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden.  Ordinarily, the request shall be in writing, and submitted by the inmate.  An inmate may initiate a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.  The inmate's request shall at a minimum contain the following information:**

**(1)  The extraordinary or compelling circumstances that the inmate believes warrant consideration.**

**(2)  Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.**

**b.  The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request.  Staff shall refer a request received at the Central Office to the Warden of the institution where the inmate is confined.**

A request for a RIS is considered "submitted" for the purposes of 18 USC §3582 (c)(1), when received by the Warden in accordance with this section.

3.  **REQUESTS BASED ON MEDICAL CIRCUMSTANCES**

The criteria for a reduction in sentence (RIS) request may include the following:

a.  **Terminal Medical Condition**.  RIS consideration may be given to inmates who have been diagnosed with a terminal, incurable disease and whose life expectancy is eighteen (18) months or less, and/or has a disease or condition with an end-of-life trajectory under 18 USC § 3582(d)(1).  The BOP's consideration should include assessment of the primary (terminal) disease, prognosis, impact of other serious medical conditions of the inmate, and degree of functional impairment (if any).  Functional impairment (e.g., limitations on activities of daily living such as feeding and dressing oneself) is not required for inmates diagnosed with terminal medical conditions; however, functional impairment may be a factor when considering the inmate's ability or inability to reoffend.

Pursuant to 18 U.S.C. § 3582(d)(2)(A), in the case of a diagnosis of a terminal illness, the Bureau of Prisons shall, subject to confidentiality requirements:

> (i) not later than 72 hours after the diagnosis notify the defendant's attorney, partner, and family members of the defendant's condition and inform the defendant's attorney, partner, and family members that they may prepare and submit on the defendant's behalf a request for a sentence reduction pursuant to subsection (c)(1)(A);

> (ii) not later than 7 days after the date of the diagnosis, provide the defendant's partner and family members (including extended family) with an opportunity to visit the defendant in person;

> (iii) upon request from the defendant or his attorney, partner, or a family member, ensure that Bureau of Prisons employees assist the defendant in the preparation, drafting, and submission of a request for a sentence reduction pursuant to subsection (c)(1)(A); and

> (iv) not later than 14 days of receipt of a request for a sentence reduction submitted on the defendant's behalf by the defendant or the defendant's attorney, partner, or family member, process the request.

The statutory time frames of section 3582(d)(2)(A), begin once the Clinical Director of an institution makes a terminal diagnosis.  Once the diagnosis is made, the Clinical Director will inform the Warden and the appropriate Unit Manager as soon as possible so as to ensure requirements are met.

If the inmate is physically/psychologically able, the inmate should consent to notifications above using Form BP-A0192, Release of Information Consent, or equivalent written authorization.

If a visit is denied for security concerns, as reflected in 18 U.S.C. § 3582(d)(3)(J), the reasons should be documented.

The Warden will forward the information indicated in Section 8 of this policy, below, to Central Office within 14 days.

b. **Debilitated Medical Condition**.  RIS consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover.  The BOP should consider a RIS if the inmate is:

- Completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or
- Capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.

The BOP's review should also include any cognitive deficits of the inmate (e.g., Alzheimer's disease or traumatic brain injury that has affected the inmate's mental capacity or function).  A cognitive deficit is not required in cases of severe physical impairment, but may be a factor when considering the inmate's ability or inability to reoffend.

Pursuant to 18 U.S.C. § 3582(d)(2)(B), in the case of an inmate unable to submit a request for a RIS BOP institution staff shall:

(i) inform the defendant's attorney, partner, and family members that they may prepare and submit on the defendant's behalf a request for a sentence reduction pursuant to subsection (c)(1)(A)

(ii) accept and process a request for sentence reduction that has been prepared and submitted on the defendant's behalf by the defendant's attorney, partner, or family member under clause (i); and

(iii) upon request from the defendant or his attorney, partner, or family member, ensure that Bureau of Prisons employees assist the defendant in the preparation, drafting, and submission of a request for a sentence reduction pursuant to subsection (c)(1)(A).

All RIS requests should be assessed using the factors outlined in Section 7.

4.  **REQUESTS BASED ON NON-MEDICAL CIRCUMSTANCES – ELDERLY INMATES**

The criteria for a RIS request may include the following:

a.  **"New Law" Elderly Inmates.**  Inmates sentenced for an offense that occurred on or after November 1, 1987 (e.g., "new law"), who are age 70 years or older and have served 30 years or more of their term of imprisonment.[1]

b.  **Elderly Inmates with Medical Conditions.**  Inmates who fit the following criteria:

- Age 65 and older.
- Suffer from chronic or serious medical conditions related to the aging process.
- Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility.
- Conventional treatment promises no substantial improvement to their mental or physical condition.
- Have served at least 50% of their sentence.

Additionally, for inmates in this category, the BOP should consider the following factors when evaluating the risk that an elderly inmate may reoffend:

- The age at which the inmate committed the current offense.
- Whether the inmate suffered from these medical conditions at the time the inmate committed the offense.
- Whether the inmate suffered from these medical conditions at the time of sentencing and whether the Presentence Investigation Report (PSR) mentions these conditions.

The BOP Medical Director will develop and issue medical criteria to help evaluate the inmate's suitability for consideration under this RIS category.

c.  **Other Elderly Inmates.**  Inmates age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced.

---

[1] These criteria are different from those provided in 18 U.S.C 3582(c)(1)(a)(ii), which states that a court, upon motion of the BOP Director, may reduce a sentence term if it finds that "the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)."

Elderly inmates who were age 60 or older at the time they were sentenced ordinarily should not be considered for RIS if their current conviction is listed in the Categorization of Offenses Program Statement.

All RIS requests should be assessed using the factors outlined in Section 7.

## 5.  REQUESTS BASED ON NON-MEDICAL CIRCUMSTANCES – DEATH OR INCAPACITATION OF THE FAMILY MEMBER CAREGIVER.

The criteria for a RIS request may include the death or incapacitation of the family member caregiver of an inmate's child, e.g., RIS requests from inmates whose biological or legally adopted child or children ("child") are suddenly without a family member caregiver due to that caregiver's death or incapacitation.

For these requests, "child" means a person under the age of 18 and "incapacitation" means the family member caregiver suffered a severe injury (e.g., auto accident) or suffers from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child.

In reviewing these requests, BOP should assess, based on the information provided, whether release of the inmate to care for the inmate's child is in the best interest of the child.

a.  **First Stage of the Warden's Review.**  The following information should be provided by the inmate to the Warden in writing for RIS requests based on the death or incapacitation of the family member caregiver:

■   A statement that explains that the inmate's family member caregiver has died or become incapacitated and that person was the caregiver for the inmate's biological or legally adopted child.
■   A statement that this person was the only family member capable of caring for the inmate's child.
■   The name of the deceased or incapacitated family member caregiver and the relationship of that person to the inmate (e.g., spouse, common-law spouse, mother, sister) and statement that the caregiver is a family member of the child.
■   For requests based on a deceased family member caregiver, an official copy of the family member caregiver's death certificate.
■   For requests based on an incapacitated family member caregiver, verifiable medical documentation of the incapacitation.
■   Verifiable documentation that the inmate is the parent of the child.  Acceptable documentation includes birth certificates, adoption papers, or verification of the inmate's paternity.

- Verifiable documentation providing the name and age of the child.
- A clear statement and documentation that the inmate has a release plan, including housing, and the financial means to care for the child immediately upon the inmate's release.
- Authorization from the inmate for the BOP to obtain any information or documents from any individual, medical entity or doctor, or any government agency about the inmate, family members, and minor child.

The Warden may deny the inmate's request at the institution level of review if the Warden finds that the inmate has not provided adequate information and documentation as set forth above.

b. **Second Stage of the Warden's Review.**  Even if the inmate provides adequate and sufficient information and documentation set forth above regarding the RIS request, further investigation is appropriate.  At this stage, the Warden should convene a committee consisting of the inmate's unit manager, correctional counselor, and any other relevant staff (social worker, physician, psychologist, etc.) to investigate the facts and circumstances provided by the inmate and to review supporting letters and documents before the Warden makes a recommendation to approve or deny the RIS request.  The additional information and supporting documentation gathered by the committee for the Warden's review should include:

- A general description of the child's physical and mental condition.
- A description of the nature of the child's care both during the inmate's pre-arrest and pre-sentence period, and during the inmate's current incarceration.
- Letters or documentation that the deceased/incapacitated family member was and still is the only family member caregiver capable of caring for the inmate's minor child.  These letters or documentation should include:

  ➢ Information indicating whether this family member was, in fact, caring for the child during the inmate's incarceration and immediately prior to the family member's death or incapacitation.
  ➢ An explanation of who has been caring for the child since the family member's death or incapacitation.
  ➢ If the child is in foster care, documentation verifying that the inmate will be able to immediately obtain custody of the child.

All RIS requests should be assessed using the factors outlined in Section 7 as well as the following factors.

- Has the inmate committed violent acts before or during the period of incarceration as reflected in the PSR, institutional disciplinary records, or other appropriate documentation?
- Did the inmate have drugs, drug paraphernalia, firearms, or other dangerous substances in the home while caring for the child prior to incarceration?

- To what degree has the inmate had contact with or cared for the child prior to arrest, pretrial or pre-sentence, and during incarceration?  Staff should review institution records for evidence of contact (telephone, mail, email, visiting log, etc.).
- Is there any evidence of child abuse, neglect, or exploitation in the PSR or other documents?
- Are there any documents regarding the inmate's parenting skills or obligations (e.g., child support orders, restraining orders for physical or emotional abuse of spouse, registered partner or children, certificates for classes in anger management or other types of counseling, removal of child from the home for any reasons)?
- Are there records regarding the termination of parental rights or loss of custody of the inmate's (other) child?
- Does the inmate have a detainer as a deportable alien to a country other than where the child resides?
- Has the inmate received public funding or had a job with a living wage for any period of time prior to incarceration?
- Has the inmate engaged in programming (e.g., parenting, anger management) during incarceration that would indicate efforts to improve parenting skills or that would indicate a commitment to caring for the child upon release?

Wardens should also consider any additional reliable documentation (e.g., letters of support from family members, neighbors, doctors, hospitals, and state or local agencies).  Documentation may be obtained with the assistance of the Office of Probation and Pretrial Services.  Wardens should also consider whether the inmate participated in the Inmate Financial Responsibility Program and any information relating to the inmate's substance abuse treatment, physical/mental/ emotional health, and work evaluations during incarceration.

The care of a child may be requested to be a condition of the inmate's release to a supervised release term.  Thus, failure to care for the child may result in a finding of a supervised release violation and return to custody.

## 6.  REQUESTS BASED ON NON-MEDICAL CIRCUMSTANCES – INCAPACITATION OF A SPOUSE OR REGISTERED PARTNER

The criteria for a RIS request may include the incapacitation of an inmate's spouse or registered partner when the inmate would be the only available caregiver for the spouse or registered partner.

For these requests, "spouse" means an individual in a relationship with the inmate, where that relationship has been legally recognized as a marriage, including a legally-recognized common-law marriage.  "Registered partner" means an individual in a relationship with the inmate, where that relationship has been legally recognized as a civil union or registered domestic partnership.

The relationship should have been established before the inmate's offense date of arrest, and should be verified by information in the PSR or other administratively acceptable documentation (e.g. marriage certificate).

For these requests, "incapacitation" means the inmate's spouse or registered partner has:

- Suffered a serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse or registered partner is completely disabled, meaning that the spouse or registered partner cannot carry on any self-care and is totally confined to a bed or chair; or
- A severe cognitive deficit (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the spouse's or registered partner's mental capacity or function), but may not be confined to a bed or chair.

For these requests, the inmate should demonstrate that the inmate is the only available caregiver for the spouse or registered partner, meaning there is no other family member or adequate care option that is able to provide primary care for the spouse or registered partner.

a. **First Stage of the Warden's Review.** The following information should be provided by the inmate to the Warden in writing for RIS requests based on the incapacitation of the spouse or registered partner:

- Statement that explains that the inmate's spouse or registered partner has become incapacitated.
- Statement that the inmate is the only family member capable of caring for the spouse or registered partner.
- Verifiable medical documentation of the incapacitation of the spouse or registered partner.
- A clear statement and documentation of the inmate's release plan, including housing, and the financial means to care for the spouse or registered partner immediately upon release.
- Written authorization from the inmate and others (as needed) for the BOP to obtain any information or documents from any individual, medical entity or doctor, or any government agency about the inmate, the spouse or registered partner, or other family members.

The Warden may deny the inmate's request at the institution level of review if the Warden finds that the inmate has not provided adequate information and documentation as set forth above.

b. **Second Stage of the Warden's Review.** Even if the inmate provides adequate and sufficient information and documentation set forth above regarding the RIS request, further investigation is appropriate. At this stage, the Warden should convene a committee consisting of the inmate's unit manager, correctional counselor and any other relevant staff (social worker, physician, psychologist, etc.) to investigate the facts and circumstances provided by the inmate and to

review supporting letters and documents before the Warden makes a recommendation to approve or deny the RIS request.  The information and supporting documentation gathered by the committee for the Warden's review should include:

■  A general description of the spouse's or registered partner's physical and mental condition.
■  A description of the nature of the spouse's or registered partner's care, as relevant, during the inmate's pre-arrest and pre-sentence period, and during the inmate's current incarceration.
■  Letters or documentation indicating whether the inmate is the only family member caregiver capable of caring for the spouse or registered partner.  This should include an explanation of who has been caring for the spouse or registered partner during the inmate's period of incarceration, as relevant.
■  Letters or documentation indicating the spouse or registered partner is, or would be, supportive of the inmate's release, and of the inmate assuming the role of the primary caregiver.

All RIS requests should be assessed using the factors outlined in Section 7 as well as the following factors.

■  Has the inmate committed violent acts before or during the period of incarceration, as reflected in the PSR, institution disciplinary records, or other appropriate documentation?
■  To what extent would the inmate and spouse or registered partner be relying on publicly available resources (e.g., financial or medical) to provide care to the spouse or registered partner?
■  Has the inmate ever been charged with, or convicted of, a crime of domestic violence?
■  Did the inmate share a residence with the spouse or registered partner prior to the period of incarceration?
■  Did the inmate have drugs, drug paraphernalia, firearms, or other dangerous substances in the home shared with the spouse or registered partner prior to incarceration?
■  To what degree has the inmate had contact with (or cared for) the spouse or registered partner prior to arrest, pretrial or pre-sentence, and during incarceration?  Staff should review institution records for evidence of contact (telephone, mail, email, visiting log, etc.).
■  Is there any evidence of abuse or neglect involving the spouse or registered partner in the PSR or other documents?
■  Are there any documents regarding the inmate's custodial skills or obligations (e.g., child support orders, restraining orders for physical or emotional abuse of spouse or registered partner or children, certificates for classes in anger management or other types of counseling, removal of children from the home for any reasons)?
■  Does the inmate have a detainer as a deportable alien to a country other than where the spouse or registered partner resides?
■  Has the inmate received public funding or had a job with a living wage for any period of time prior to incarceration?

■ Has the inmate engaged in programming (e.g., anger management, financial responsibility program) during incarceration that would indicate efforts to improve custodial skills and/or that would indicate a commitment to the inmate's spouse or registered partner upon release?

Wardens should also consider any additional reliable documentation (e.g., letters of support from family members, neighbors, doctors, hospitals, and state or local agencies). Documentation may be obtained with the assistance of the Office of Probation and Pretrial Services.

The care of the spouse or registered partner may be requested to be a condition of the inmate's release to a supervised release term. Thus, failure to care for the spouse or registered partner may result in a finding of a supervised release violation and return to custody.

## 7. FACTORS AND EVALUATION OF CIRCUMSTANCES IN RIS REQUESTS

For all RIS requests, the following factors should be considered:

■ Nature and circumstances of the inmate's offense.
■ Criminal history.
■ Comments from victims.
■ Unresolved detainers.
■ Supervised release violations.
■ Institutional adjustment.
■ Disciplinary infractions.
■ Personal history derived from the PSR.
■ Length of sentence and amount of time served. This factor is considered with respect to proximity to release date or Residential Reentry Center (RRC) or home confinement date.
■ Inmate's current age.
■ Inmate's age at the time of offense and sentencing.
■ Inmate's release plans (employment, medical, financial).
■ Whether release would minimize the severity of the offense.

When reviewing RIS requests, these factors are neither exclusive nor weighted. These factors should be considered to assess whether the RIS request presents particularly extraordinary and compelling circumstances.

Overall, for each RIS request, the BOP should consider whether the inmate's release would pose a danger to the safety of any other person or the community.

## 8. APPROVAL OF REQUEST

## §571.62  Approval of request.

**a.  The Bureau of Prisons makes a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only after review of the request by the Warden, the General Counsel, and either the Medical Director for medical referrals or the Assistant Director, Correctional Programs Division for non-medical referrals, and with the approval of the Director, Bureau of Prisons.**

**(1)  The Warden shall promptly review a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A).  If the Warden, upon an investigation of the request determines that the request warrants approval, the Warden shall refer the matter in writing with recommendation to the Office of General Counsel.**

The Warden's referral at a minimum must include the following:

a. The Warden's written recommendation as well as any other pertinent written recommendations or comments made by staff during the institution review of the request.

b.  A complete copy of Judgment and Commitment Order or Judgment in a Criminal Case and sentence computation data.

c.  A progress report that is not more than 30 days old.  All detainers and holds should be resolved prior to the Warden's submission of a case under 18 U.S.C. 3582 (c)(1)(A) or 4205(g).  If a pending charge or detainer cannot be resolved, an explanation of the charge or conviction status is needed.

d.  *All* pertinent medical records if the reason for the request involves the inmate's health. Pertinent records include, at a minimum, a Comprehensive Medical Summary by the attending physician, which should also include an estimate of life expectancy, and all relevant test results, consultations, and referral reports/opinions.

e.  The referral packet must include, when available, a copy of the Presentence Investigation and Form U.S.A. 792, Report on Convicted Offender by U.S. Attorney, Custody Classification form, Notice of Action forms, Probation form 7a, information on fines, CIM Case Information Summary (BP-A0339), and any other documented information that is pertinent to the request.  In the absence of a Form U.S.A. 792, the views of the prosecuting Assistant U.S. Attorney may be solicited; those views should be made part of the Warden's referral memo.

f.  If the inmate is subject to the Victim and Witness Protection Act of 1982 (VWPA), confirmation of notification to the appropriate victim(s) or witness(es) must be incorporated into the Warden's referral.  A summary of any comments received must also be incorporated into the referral.  If the inmate is not subject to the VWPA, a statement to that effect must be in the referral.

g.  For a request under 18 U.S.C. 3582(c)(1)(A), when a term of supervised release follows the term of imprisonment, confirmation that release plans have been approved by the appropriate U.S. Probation Office must be included in the referral.   If the inmate will be released to an area outside the sentencing district, the U.S. Probation Office assuming supervision must be contacted. If no supervision follows the term of imprisonment, release plans must still be developed.

h.  The development of release plans must include, at a minimum, a place of residence and the method of financial support, and may require coordination with various segments of the community, such as hospices, the Department of Veterans Affairs or veterans' groups, Social Security Administration, welfare agencies, local medical organizations, or the inmate's family.

i.  Because there is no final agency decision until the Director has reviewed the request, staff at any level may not contact the sentencing judge or solicit the judge's opinion through other officers of the court.

**(2)  If the General Counsel determines that the request warrants approval, the General Counsel shall solicit the opinion of either the Medical Director or the Assistant Director, Correctional Programs Division depending upon the nature of the basis for the request.  With this opinion, the General Counsel shall forward the entire matter to the Director, Bureau of Prisons, for final decision.**

**(3)  If the Director, Bureau of Prisons, grants a request under 18 U.S.C. 4205(g), the Director will contact the U.S. Attorney in the district in which the inmate was sentenced regarding moving the sentencing court on behalf of the Bureau of Prisons to reduce the minimum term of the inmate's sentence to time served.  If the Director, Bureau of Prisons, grants a request under 18 U.S.C. 3582(c)(1)(A), the Director will contact the U.S. Attorney in the district in which the inmate was sentenced regarding moving the sentencing court on behalf of the Director of the Bureau of Prisons to reduce the inmate's term of imprisonment to time served.**

**b.  Upon receipt of notice that the sentencing court has entered an order granting the motion under 18 U.S.C. 4205(g), the Warden of the institution where the inmate is confined shall schedule the inmate for hearing on the earliest Parole Commission docket.**

Institution staff prepare an amended Sentence Data Summary for use at this hearing. Staff provide a copy of the most recent progress report to the Parole Commission.

**Upon receipt of notice that the sentencing court has entered an order granting the motion under 18 U.S.C. 3582(c)(1)(A), the Warden of the institution where the inmate is confined shall release the inmate forthwith.**

**c.  In the event the basis of the request is the medical condition of the inmate, staff shall expedite the request at all levels.**

A request for an expedited review permits the review process to be expedited, but does not lessen the requirement that documentation be provided.

9.  **DENIAL OF REQUEST**

**§571.63  Denial of request.**

**a.  When an inmate's request is denied by the Warden, the inmate will receive written notice and a  statement of reasons for the denial.  The inmate may appeal the denial through the Administrative Remedy Procedure (28 CFR part 542, subpart B).**

**b.  When an inmate's request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) is denied by the General Counsel, the General Counsel shall provide the inmate with a written notice and statement of reasons for the denial.  This denial constitutes a final administrative decision.**

**c.  When the Director, Bureau of Prisons, denies an inmate's request, the Director shall provide the inmate with a written notice and statement of reasons for the denial within 20 workdays after receipt of the referral from the Office of General Counsel.  A denial by the Director constitutes a final administrative decision.**

**d.  Because a denial by the General Counsel or Director, Bureau of Prisons, constitutes a final administrative decision, an inmate may not appeal the denial through the Administrative Remedy Procedure.**

Under 18 USC 3582 (c) (1), an inmate may file a request for a reduction in sentence with the sentencing court after receiving a BP-11 response under subparagraph (a), the denial from the General Counsel under subparagraph (d), or the lapse of 30 days from the receipt of such a request by the Warden of the inmate's facility, whichever is earlier.

10.  **INELIGIBLE OFFENDERS**

**§571.64  Ineligible offenders.**

**The Bureau of Prisons has no authority to initiate a request under 18 U.S.C. 4205(g) or 3582(c)(1)(A) on behalf of state prisoners housed in Bureau of Prisons facilities or D.C. Code offenders confined in federal institutions.  The Bureau of Prisons cannot initiate such a motion on behalf of federal offenders who committed their offenses prior to November 1, 1987, and received non- parolable**

**sentences.**

## 11. TRACKING REDUCTION IN SENTENCE REQUESTS

To ensure consistent handling and documentation of RIS requests, Wardens must identify a staff member to serve as an institution RIS Coordinator (IRC) and an alternate.  The principal responsibility of the IRC is to receive and document RIS requests and other RIS-related information in the RIS electronic tracking database.

For each RIS request, the following information is entered into the RIS tracking database by the IRC:

- Inmate's full name.
- Federal register number.
- Date of birth and age.
- Institution.
- Date RIS request received by institution.
- Reason for RIS request.
- Whether staff assisted the inmate with submitting the RIS request.
- Whether the request was submitted by a third party (attorney, partner, family member).
- Disposition of request (e.g., approval or denial).
- Reason for disposition.
- Date of disposition of request.

At the Central Office (CO) level, information regarding RIS requests is entered into the database by RIS Coordinators in the Office of General Counsel, the Health Services Division, and the Correctional Programs Division.  The following information is entered into the RIS tracking database by CO staff:

- Date RIS request received by CO.
- Director's final decision.

## 12. ANNUAL REPORT

Under 18 U.S.C. § 3582 (d)(3), not later than December 21, 2019, and once every year thereafter, the Director of the Bureau of Prisons shall submit to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives a report on requests for sentence reductions pursuant to subsection (c)(1)(A), which shall include a description of, for the previous year—

(A) the number of prisoners granted and denied sentence reductions, categorized by the criteria

relied on as the grounds for a reduction in sentence;

(B) the number of requests initiated by or on behalf of prisoners, categorized by the criteria relied on as the grounds for a reduction in sentence;

(C) the number of requests that Bureau of Prisons employees assisted prisoners in drafting, preparing, or submitting, categorized by the criteria relied on as the grounds for a reduction in sentence, and the final decision made in each request;

(D) the number of requests that attorneys, partners, or family members submitted on a defendant's behalf, categorized by the criteria relied on as the grounds for a reduction in sentence, and the final decision made in each request;

(E) the number of requests approved by the Director of the Bureau of Prisons, categorized by the criteria relied on as the grounds for a reduction in sentence;

(F) the number of requests denied by the Director of the Bureau of Prisons and the reasons given for each denial, categorized by the criteria relied on as the grounds for a reduction in sentence;

(G) for each request, the time elapsed between the date the request was received by the warden and final decision, categorized by the criteria relied on as the grounds for a reduction in sentence;

(H) for each request, the number of prisoners who died while their request was pending and, for each, the amount of time that had elapsed between the date the request was received by the Bureau of Prisons, categorized by the criteria relied on as the grounds for a reduction in sentence;

(I) the number of Bureau of Prisons notifications to attorneys, partners, and family members of their right to visit a terminally ill defendant as required under paragraph (2)(A)(ii) and, for each, whether a visit occurred and how much time elapsed between the notification and the visit;

(J) the number of visits to terminally ill prisoners that were denied by the Bureau of Prisons due to security or other concerns, and the reasons given for each denial; and

(K) the number of motions filed by defendants with the court after all administrative rights to appeal a denial of a sentence reduction had been exhausted, the outcome of each motion, and the time that had elapsed between the date the request was first received by the Bureau of Prisons and the date the defendant filed the motion with the court.

## 13.  ACA AGENCY ACCREDITATION PROVISIONS

None.

## REFERENCES

*Directives Referenced*
P5162.05        Categorization of Offenses (3/16/09)

*Federal Regulations*
■   Rules cited in this Program Statement are contained in 28 CFR 571.60 through 571.64.

■   Rules referenced in this Program Statement are contained in 28 CFR 542.10 through 542.16
    and 572.40.

*U.S. Code Referenced*
■   Title 18, United States Code, Section 4205(g).
■   Title 18, United States Code, Section 3582.

*BOP Forms*
BP-A0339      CIM Case Information Summary
BP-A0192      Release of Information Consent

*Records Retention Requirements*
Requirements and retention guidance for records and information applicable to this program
are available in the Records and Information Disposition Schedule (RIDS) system on Sallyport.

# Exhibit 7

Samson Adeyemi June 8, 2020 Reply in Support
of his Motion of Compassionate Release

**The New York Times** | https://nyti.ms/2G2z3X1

# Frail, Old and Dying, but Their Only Way Out of Prison Is a Coffin

**By Christie Thompson**

March 7, 2018

Kevin Zeich had three and a half years to go on his prison sentence, but his doctors told him he had less than half that long to live. Nearly blind, battling cancer and virtually unable to eat, he requested "compassionate release," a special provision for inmates who are very sick or old.

His warden approved the request, but officials at the federal Bureau of Prisons turned him down, saying his "life expectancy is currently indeterminate."

Congress created compassionate release as a way to free certain inmates, such as the terminally ill, when it becomes "inequitable" to keep them in prison any longer. Supporters view the program as a humanitarian measure and a sensible way to reduce health care costs for ailing, elderly inmates who pose little risk to public safety. But despite urging from lawmakers of both parties, numerous advocacy groups and even the Bureau of Prisons' own watchdog, prison officials use it only sparingly.

Officials deny or delay the vast majority of requests, including that of one of the oldest federal prisoners, who was 94, according to new federal data analyzed by The Marshall Project and The New York Times. From 2013 to 2017, the Bureau of Prisons approved 6 percent of the 5,400 applications received, while 266 inmates who requested compassionate release died in custody. The bureau's denials, a review of dozens of cases shows, often override the opinions of those closest to the prisoners, like their doctors and wardens.

Advocates for the program say the bureau, which oversees 183,000 inmates, denies thousands of deserving applicants. Roughly half of those who died after applying were convicted of nonviolent fraud or drug crimes.

Could we survive aging, but not outliving our way out of prison? As old coffin. The New York Times



Mr. Zeich during his time in prison. When he made the request for compassionate release, he was nearly blind, battling cancer, and virtually unable to eat. Jenna Schoenefeld for The New York Times

"It makes sense to release prisoners who present very little danger to society. It's the humane thing to do, and it's the fiscally responsible thing to do," said Senator Brian Schatz of Hawaii, a Democrat. "The Bureau of Prisons has the theoretical authority to do this, but they basically do none of it."

Case files show that prison officials reject many prisoners' applications on the grounds that they pose a risk to public safety or that their crime was too serious to justify early release. In 2013, an inspector general reported that nearly 60 percent of inmates were denied based on the severity of their offense or criminal history. The United States Sentencing Commission has said that such considerations are better left to judges — but judges can rule on compassionate release requests only if the Bureau of Prisons approves them first.

Late last month, Mr. Schatz introduced legislation — co-sponsored with Senators Mike Lee of Utah, a Republican, and Patrick Leahy of Vermont, a Democrat — that would let prisoners petition the courts directly if the bureau denies or delays their requests.

Many are turned down for not meeting medical requirements. Mr. Zeich, who was serving 27 years for dealing methamphetamine, requested compassionate release three times, but was repeatedly told he was not sick enough. On his fourth try, his daughter, Kimberly Heraldez, finally received a phone call in March 2016 saying her father would soon be on a plane, headed to her home in

California.

Early the next morning, she was awakened by another call. Her father had died.

Mr. Zeich's ashes now sit in a container in her closet alongside the splitting cardboard box of the possessions he had in prison: an insulin pump, glasses, stacks of medical records, and an album filled with photos of Ms. Heraldez and her three children.

"We brought him home," Ms. Heraldez said, "but not the way we wanted to."

## 'I Begged Them'

When Anthony Bell applied for compassionate release in October 2014, he had served all but one of a 16-year sentence for selling cocaine.

Prison doctors treating his lupus and liver failure estimated that he had less than six months to live. It took about that long for the bureau to hand down its response: Denied.

After reading Mr. Bell's medical records, officials concluded that he had more than 18 months to live. Two days later, he died.

"I begged them to please get him home," said Mr. Bell's sister, Denise Littleford, of Gaithersburg, Md. "And while the blood was still warm in his body, instead of sending him home in a body bag."

Compassionate release dates back to an overhaul of federal sentencing laws in the 1980s. While abolishing federal parole, Congress supplied a safety valve, giving judges the power to retroactively cut sentences short in "extraordinary and compelling" circumstances. But a court could do so only if the Bureau of Prisons filed a motion on an inmate's behalf.

For years, the agency approved only prisoners who were near death or completely debilitated. While nonmedical releases were permitted, an inspector general report found in 2013, not a single one was approved over a six-year period.



Mr. Zeich's last letter to his daughter, Ms. Heraldez.  Jenna Schoenefeld for The New York Times

The report said the program should be expanded beyond terminal illness cases and used more frequently as a low-risk way to reduce overcrowding and health care spending. The Bureau of Prisons widened the criteria to explicitly include inmates over 65 and those who are the sole possible caregiver for a family member. Then Attorney General Eric H. Holder Jr. promoted the changes as part of his "Smart on Crime" initiative to "use our limited resources to house those who pose the greatest threat."

But the bureau, which is part of the Justice Department, has yet to fully embrace those changes. Of those inmates who have applied for nonmedical reasons, 2 percent (50 cases) have been approved since 2013, according to an analysis of federal prison data. And although overall approval numbers increased slightly between 2013 and 2015, they have since fallen.

At a 2016 sentencing commission hearing, Bureau of Prisons officials said they believed the program should not be used to reduce overcrowding. And even the principal deputy assistant to Mr. Holder, Jonathan Wroblewski, said the program was not an "appropriate vehicle for a broad reduction" in the prison population. "Every administration has taken the position that part of our responsibility is to ensure that public safety is not undermined," he said.

After the hearing, the commission released new guidelines encouraging prison officials to determine only whether inmates fit the criteria for release — that is, if they are old enough, sick or disabled enough, or if they are the sole possible caregiver for someone on the outside. Whether the prisoner poses a risk to the public should be left to a judge to decide, the commission said.

Mark Inch, who was appointed director of the Bureau of Prisons by Attorney General Jeff Sessions last August, has made no public statements about the program. The bureau declined to make Mr. Inch available for an interview and did not respond to emailed questions.

## Dying in Shackles

The inmates who meet the criteria for compassionate release tend to be among the oldest and frailest in the federal prison system, whose population is getting older and more expensive. The Bureau of Prisons spent $1.3 billion on health care in fiscal year 2016. Roughly 12 percent of prisoners are 55 or older, and of those, many will spend their final years behind bars. Some are dying in shackles.

When Andrew Schiff arrived at a medical facility for inmates to say his goodbyes, his dying 87-year-old father was unconscious and on a respirator. Yet he was cuffed to his hospital bed and under 24-hour watch by an armed guard, according to Mr. Schiff. "There's no humanity in there," he said.



Irwin Schiff, second from left, during a prison visit from his son, Andrew, and his grandchildren, Eliza and Ethan.

His father, Irwin Schiff, had less than two years left on his sentence for tax fraud. He had tried and failed for two years to win compassionate release.

To win approval, an inmate must get the blessing of the prison warden, and must have an acceptable home waiting. Doctors at the facility assess whether the applicant meets the medical criteria, such as being completely disabled or having fewer than 18 months to live.

If the warden signs off, the application gets passed on to the Bureau of Prisons' central office, which has its own medical director review the records. Even after the central office approves, the deputy attorney general may object. If approved, the request is passed on to a judge, who makes the ultimate decision. An analysis of federal prison data shows that it takes over six months on average for an inmate to receive an answer from the bureau. Almost 400 of the applications the bureau received between 2013 and 2017 are still awaiting a decision.

## Pushing for Change

Most state prison systems have some version of compassionate release, sometimes known as medical parole. Nationally, prisons are facing an explosion in elderly inmates, but officials can still be wary of the idea of letting them out early. Recently, a Senate committee in South Dakota turned down the prison system's request to establish a similar program, citing concern over releasing violent offenders.

In recent months, both Democratic and Republican lawmakers have called on the Bureau of Prisons to speed up the federal process and grant more requests. Senator Richard Shelby of Alabama, a Republican, pressed the bureau for details on how it was improving the process in a report he submitted with the 2018 appropriations bill. A bipartisan group of senators, led by Mr. Schatz of Hawaii, wrote a letter last August saying they were "deeply concerned" that the bureau was failing to carry out its duties under the program.

The Justice Department's Office of Legislative Affairs issued a response in January, citing approval rates that were slightly higher than those reflected in the data provided by the Bureau of Prisons to The Marshall Project and The New York Times. The bureau did not explain this discrepancy.

The January letter stated that cases were most commonly denied because inmates did not meet the criteria or lacked a stable place to live if they were released. But in 2016, officials turned down one of the oldest federal prisoners, 94-year-old Carlos Tapia-Ponce, on the grounds that his crime, a role in a large-scale cocaine trafficking operation, was too serious. He died the following month.

Tommy Leftwich died in prison last September. He had been serving 12 years for making meth when he was diagnosed with advanced liver cancer. The bureau said in October 2016 that his early release would "minimize the severity of his offense and pose a risk to the community," noting a history of drug offenses and impaired driving.

Wayne "Akbar" Pray, 69, who has served nearly 30 years of a life sentence for running a New Jersey cocaine operation in the 1980s, first applied for compassionate release under the elderly inmate provision in 2013. His supporters included his warden, the current and former mayors of Newark, the local N.A.A.C.P., and several former members of Newark law enforcement.

In January, the bureau denied his request, pointing to the severity of his crime and his conduct in prison.

According to his disciplinary history, Mr. Pray's last violation was 20 years ago, for "improperly storing property and failure to follow sanitation procedures."