**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO.  06-124 |
| | : | |
| SAMSON ADEYEMI | : | |

# MEMORANDUM

**KEARNEY, J.**                                                               **July 6, 2020**

For the past thirty-six years, sentencing policy set by Congress seeks finality in sentences.  Federal judges are not quasi-parole boards.  But Congress allows a judge to later modify a final sentence for extraordinary and compelling reasons if consistent with applicable policy statements from the United States Sentencing Commission. Over thirteen years ago, the Sentencing Commission identified four extraordinary and compelling reasons to reduce a final sentence, including the incarcerated person's terminal medical condition, age/physical deterioration/time in custody, and family circumstances.  To ensure flexibility, and at issue today, is its fourth reason: a sentence may be reduced for an extraordinary and compelling reason "other than, or in combination with" these three defined grounds as determined by the Director of the Bureau of Prisons.  While the Sentencing Commission specifically defines the first three fact conditions, only the Director sets factors to understand what "other" reasons might warrant compassionate release.

These principles have stood firm for decades.  But the December 2018 passage of the First Step Act and the onset of COVID-19 pandemic in our federal prisons the last four months test our understanding of these policies. As Judge Brody observed in the early days of the pandemic, "nothing could be more extraordinary and compelling than this pandemic."[1] But neither Congress nor the Sentencing Commission can timely amend policy today while

medically vulnerable incarcerated persons face COVID-19 outbreaks in our federal prisons while serving sentences which Congress declared in December 2018 to be too long.

The United States argues we can do nothing about this admitted injustice until Congress or the Sentencing Commission give us the green light. It argues only the Bureau of Prisons can apply the flexibility in the catch-all provision and we are bound by thirteen year old policies not yet amended to address the First Step Act's purpose of streamlined review by federal judges especially considering the undeniable risk of COVID-19 harm for medically vulnerable incarcerated persons. We agree federal judges do not set policy and are not parole boards. We also agree neither Congress nor the Sentencing Commission has yet declared a policy allowing an amendment to law affecting the length of some sentences to alone constitute an "other" extraordinary and compelling reason to modify a final sentence from fourteen years ago even if the offender would no longer be in jail if Congress decreed the 2018 amendment is retroactive.

But we do not agree sentencing policy marginalizes judges' ability to address "other" reasons so long as we are consistent with the Sentencing Commission's policy. We may consider these issues consistent with federal law and policy since December 2018. After the incarcerated person exhausts his request for compassionate release with the Bureau of Prisons, we may apply the same long-established factors determined by the Director of the Bureau to find extraordinary and compelling reasons for compassionate release other than, or in combination with, the three defined grounds. Even if we find other extraordinary and compelling reasons applying the Director of the Bureau's defined factors, the Sentencing Commission directs we carefully apply Congress's defined factors for all sentences and determine whether releasing the incarcerated person creates a danger to others or the community.

After extensive briefing and a hearing where we evaluated witness credibility, we today find sentencing policy warrants granting Samson Adeyemi's motion to modify a formerly statutorily mandated thirty-two year sentence for driving a getaway car after two accomplices robbed Taco Bell's and McDonald's drive-through windows on one January 2006 evening as an immigrant nineteen-year-old pre-med college student with no criminal history. His accomplices committing the robberies pleaded guilty and returned home to their community years ago. Mr. Adeyemi sits working and studying in FCI-Fort Dix suffering from chronic asthma which cannot be adequately addressed given the COVID-19 outbreak there. As the United States concedes, Mr. Adeyemi is serving a statutory sentence which Congress now defines as excessive. Applying present sentencing policy including applying the factors governing the Director of the Bureau's determination as to "other" reasons in this exceptional case, we today grant compassionate release to Mr. Adeyemi and return him to his community under five years of supervised release.

## I.      Background

### A.      Samson Adeyemi's past and future.

#### 1.      Mr. Adeyemi had a model childhood before January 3, 2006.

Mr. Adeyemi was born in London, England to parents who emigrated from Nigeria.[2] Mr. Adeyemi's parents brought him and his three younger sisters to Philadelphia when he was nine years old.[3] Mr. Adeyemi's parents and sister describe him as a sweet, kind, and gentle individual.[4] He was and remains very close to his family:[5] He used to walk his sister to and from elementary school to keep her safe when she experienced bullying.[6] Mr. Adeyemi mentored children at the Christ Apostle Church, acted as a counselor at a summer camp, and worked at an Applebee's restaurant.[7] Mr. Adeyemi has suffered from asthma since childhood.[8]

Mr. Adeyemi has a family history of severe asthma, including a cousin who died from an asthma attack.[9]  His grandfather also has asthma.[10]

As a nineteen-year-old in January 2006, Mr. Adeyemi needed only twenty credits to graduate from Lincoln University with a bachelor's degree in biology.[11]  He hoped to apply to medical school.[12]

### 2.   Two non-violent hours as a driver in a getaway car on January 3, 2006 leads to a thirty-two-year sentence required by Congress's former sentencing policy.

Mr. Adeyemi's life changed during visits to two fast food restaurants on January 3, 2006. Mr. Adeyemi drove to a Taco Bell, placed an order at the drive-in window, and paid for his food.[13]  He drove off before the cashier turned back to hand him his change.[14]  A masked man, holding an inoperable firearm held together by a rubber band,[15] then stood at the take-out window and ordered the cashier to empty the cash register.[16]  She gave him $622.[17]  Mr. Adeyemi then drove this masked man and another accomplice away.[18]  They repeated the same crime approximately two hours later at a McDonald's, stealing $230.21.[19]  Mr. Adeyemi did not physically steal the money or brandish the inoperable firearm.[20]  He ordered and paid for his meals.   Neither he, nor his brazen accomplices, physically injured anyone.[21]  But his accomplices' conduct threatened physical harm and undoubtedly caused mental distress in addition to the fast food chains losing less than $860.  And Mr. Adeyemi drove the car allowing his brazen masked accomplices to get away.  Mr. Adeyemi had never been arrested before January 3, 2006.[22]

A grand jury indicted Mr. Adeyemi's three accomplices for seven robberies, five more than the two where Mr. Adeyemi drove the getaway car.[23]  Each of the co-conspirators accepted a plea deal and testified against Mr. Adeyemi at trial, identifying him as the getaway driver in the

two robberies.[24]   Two of the co-conspirators served a 96-month sentence and the Bureau of Prisons released them from prison in 2013, and the third co-conspirator served a 129-month sentence and the Bureau of Prisons released him from prison in 2015.[25]

Our grand jury also separately indicted Samson Adeyemi for conspiracy to interfere with interstate commerce by robbery, two substantive counts of Hobbs Act robbery of the Taco Bell and McDonald's, two counts of possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. section 924(c), and aiding and abetting.[26]

Mr. Adeyemi chose to seek the jury's verdict rather than pleading guilty.   The jury unanimously found Mr. Adeyemi guilty of the charges relating to these two robberies.[27]   Judge Davis sentenced Mr. Adeyemi to 385 months' imprisonment, five years of supervised release, and restitution of the stolen funds plus fees for a total $1,003.[28]   Judge Davis varied downward from the recommended sentencing guidelines of 425 to 435 months imprisonment.[29]   But Judge Davis had to follow Congress's sentencing policy of a mandatory minimum seven-year sentence for the first possession of a firearm in furtherance of a crime of violence under section 924(c) and a mandatory minimum consecutive sentence of twenty-five years for the second section 924(c) crime even though both crimes occurred on the same fated night.[30]

As counsel before us today concede, Mr. Adeyemi would not face the mandatory consecutive twenty-five-year sentence for a second section 924(c) firearm charge in the same case if before us today.   In 2018, Congress amended section 924(c) to ensure the twenty-five year consecutive term for a successive section 924(c) offense does not apply unless the defendant had a previous, final section 924(c) conviction at the time of the offense.[31] The amendment replaced the phrase "second or subsequent conviction under this subsection" with "violation of

this subsection that occurs after a prior conviction under this subsection has become final."[32] Congress did not make this amendment retroactive.

### 3. Mr. Adeyemi's present and future.

Mr. Adeyemi's current release date is May 2, 2034.[33]

The Bureau of Prisons currently holds Mr. Adeyemi in custody at the Federal Correctional Institute in Fort Dix, New Jersey ("FCI Fort Dix"). Mr. Adeyemi works as a janitor in the prison.[34] He earlier worked for UNICOR, a competitive employment program in the prison, where he made materials for the army and cutlery for the prison.[35] With the money he earned, Mr. Adeyemi fully repaid the restitution and special fees owed.[36] Mr. Adeyemi completed numerous business, self-improvement, art, and health classes while incarcerated.[37] Also while incarcerated, Mr. Adeyemi committed four disciplinary infractions: possession of a cell phone in 2017, possession of a television remote control taken from staff in 2015, unknown disruptive conduct in 2015, and failure to follow safety regulations in 2011.[38] All agree these disciplinary infractions are not violent in nature.[39]

Mr. Adeyemi accepts full responsibility for his crimes.[40] He acknowledges his January 3, 2006 actions were wrong and he should have made different decisions.[41] If released, he swears, "I will speak of my experience and I hope that my story will serve as a warning to other people who may be tempted to do something utterly stupid. I am determined to do better and to contribute to society. I am still young. I could still go to college and redeem myself by leading a productive life."[42]

If we grant Mr. Adeyemi's motion, he plans to move in with his mother and two sisters in their three-bedroom home in Norristown in this District.[43] Mr. Adeyemi's mother is a behavioral therapist and his sisters work at pharmaceutical companies.[44] His family intends to support him

financially while he seeks employment, speaks of his experience to others, and finishes the twenty credits to attain his college degree.[45]

**B.      COVID-19 affecting Mr. Adeyemi.**

The new, or novel, "coronavirus disease 2019," known as COVID-19, is a respiratory disease spreading through respiratory droplets produced when an infectious person, even those who are asymptomatic, talks, coughs, or sneezes.[46]  "Spread is more likely when people are in close contact with one another (within about 6 feet)."[47]   COVID-19 spreads "easily and sustainably in the community ('community spread') in many affected geographic areas. Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected."[48]

COVID-19, which has now spread throughout the world, poses a serious global public health risk.  As of July 5, 2020, the Centers for Disease Control and Prevention reported a total of 2,841,906 cases of COVID-19 in the United States with 129,576 total deaths caused by the virus.[49]   People over age sixty-five and those of any age with serious underlying medical conditions may be at higher risk for severe illness from COVID-19, including those with serious heart conditions, moderate to severe asthma, diabetes, chronic lung disease, or a weakened immune system.[50]

Correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons [and] staff[.]"[51]  Even people without symptoms can infect others.[52]  While most of the country socially distances to avoid community spread, incarcerated persons cannot follow the Center for Disease Control's guidelines to mitigate the spread of the virus and face a heightened risk of contagion.[53]  According to public health experts, incarcerated individuals "are at special risk of infection, given their living

situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[54]

As of June 16, the five largest known clusters of COVID-19 in this country grew inside correctional institutions.[55]  In the previous month, the number of known infected incarcerated people doubled and prison deaths increased by seventy-three percent.[56] Testing remains of paramount importance, as one in seven virus tests conducted on incarcerated people have come back positive, and the vast majority of positive people in prison are asymptomatic--yet still shed the virus.[57]  Though states around the country slowly reopen, the exponentially increasing infection rate in prisons shows the worst is yet to come.[58]

FCI Fort Dix "is the most heavily populated BOP facility" in the country.[59]  It is facing a significant outbreak of COVID-19. As of July 5, 2020, the Bureau of Prisons reports thirty-nine incarcerated persons and five staff members have tested positive for COVID-19 at FCI Fort Dix.[60]  The Bureau of Prisons housed each person who tested positive in the minimum security camp, separate from the low-security facility where Mr. Adeyemi is housed.[61]  No incarcerated person has tested positive to date in the low-security facility—but FCI Fort Dix had only conducted one test out of the over 2,700 people living in the low-security facility as of May 27, 2020.[62] As of that same date, the Bureau of Prisons had no plans to test people housed in the low-security prison.[63]

Mr. Adeyemi lives in a building with about 265 men, sleeps in a dormitory with nine other men, and shares a bathroom with almost 100 men.[64] His restroom often runs out of soap and is cleaned, at most, once a day.[65]  In his building, people gather in large groups of up to one hundred, and long lines form by the telephones.[66] The Bureau of Prisons did not provide the masks for a long time, and it prohibited incarcerated persons inmates from wearing anything

over their faces for several weeks.[67] A few weeks ago, Mr. Adeyemi and other people in his building received three masks, but they have to wash the masks themselves and must purchase soap from the commissary.[68] Mr. Adeyemi has not received cleaning supplies to wipe down surfaces.[69]

The Centers for Disease Control and Prevention enumerates various medical conditions causing higher risk for severe illness from COVID-19, including moderate to severe asthma.[70] People suffering from asthma may experience higher risks of serious illness because "COVID-19 can affect [their] respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and serious illness."[71]

Mr. Adeyemi regularly uses steroid and albuterol inhalers to control his asthma.[72] He used to take an albuterol rescue inhaler daily while incarcerated until a medical professional told him to reduce his dosage.[73] The Bureau of Prisons designated Mr. Adeyemi as a "chronic care" inmate.[74] It defines "chronic" as "[a] disease or condition that requires monitoring or treatment for greater than 12 months."[75] The Warden at FCI Fort Dix, in denying Mr. Adeyemi's request for compassionate release, classified Mr. Adeyemi's asthma as "mild" to "intermittent."[76]

Mr. Adeyemi experienced exercise-induced brochospasms while held in custody in 2013 and 2016.[77] He also has a medical history of coughing and chest pain.[78] But his most recent check-up on January 21, 2020 revealed healthy vital signs.[79] The United States also cites a doctor's notes from Mr. Adeyemi's October 2019 checkup: "Asthma is well controlled. Last use of albuterol inhaler was 3 months ago. He denies any wheezing or problems related to exercise. Denies night time [sic] symptoms, cough and no difficulties with [activities of daily living]. Discussed proper inhaler use technique. Last refill of Albuterol was 10/2018."[80]

Mr. Adeyemi cannot adequately self-manage his asthma during the COVID-19 lockdown. Mr. Adeyemi's asthma care includes regular exercising to help keep his lungs open.[81] He managed his asthma pre-pandemic by jogging outdoors for twenty minutes three times a week.[82] If he jogs more than twenty minutes he risks an asthma attack.[83] Because of FCI Fort Dix's lockdown to control the spread of COVID-19, Mr. Adeyemi has not jogged outdoors since mid-March.[84] Mr. Adeyemi's lung capacity decreases without exercise, which worsens his asthma.[85]

Mr. Adeyemi retains the ability to exercise, but he must risk exercising in a poorly ventilated indoor basement gym, with other incarcerated prisoners exercising and breathing heavily without masks, to do so.[86] Mr. Adeyemi cannot wear a mask while exercising because he swears his reduced lung capacity would prevent him from breathing effectively.[87] The facility does not clean the gym and he has not witnessed the implementation of precautionary measures to prevent the spread of the virus in the gym.[88] Despite the heightened risk of viral spread in such an environment, Mr. Adeyemi exercises in the gym a few times a week to keep his asthma symptoms under control.[89] Mr. Adeyemi swears: "Although I am very concerned about contracting Covid-19 there, I feel like not exercising at all could lead to worse consequences for me, given that physical activity is a big part of my asthma care."[90]

## II.     Analysis

Mr. Adeyemi moves for compassionate release with the aid of experienced federal trial counsel on the grounds his asthma puts him at risk of severe illness from COVID-19 in a prison experiencing an outbreak and the December 2018 change in sentencing law under section 924(c) constitute extraordinary and compelling reasons. The United States, while recognizing the injustice in this sentence and conceding our evaluation of section 3553(a) factors strongly favor a

reduced sentence for Mr. Adeyemi, eloquently argues the federal judiciary's hands are tied and we must look away and deny compassionate release in the hope Congress or the Sentencing Commission will solve the injustice. Given rapid COVID-19 outbreaks in FCI Fort Dix with risk to Mr. Adeyemi, we owe him and our developing sentencing law in this pandemic era more than just looking away in the hope Congress or the Sentencing Commission may do something at some time when they reconvene presumably after our society addresses COVID-19. The pandemic in Fort Dix requires we study these issues now.

We begin with our national sentencing policy defined by our elected representatives. Since 1984, Congress permits us to reduce a final sentence only if we find (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under section 3553(a) warrant a reduction.[91] The Sentencing Commission requires us to also find "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[92] Before December 2018, the Bureau of Prisons alone could file compassionate release motions. But the First Step Act (in addition to alleviating the 924(c)-mandatory stacking for two crimes in two hours) amended section 3852(c)(1)(A) governing compassionate release to allow incarcerated persons to directly petition district courts after a short administrative exhaustion period.[93]

Congress did not define "extraordinary and compelling reasons" except to provide "rehabilitation…alone" does not suffice.[94] It left the definition to the Sentencing Commission. Before the First Step Act's amendment of section 3852(c)(1)(A), the Sentencing Commission issued commentary to its policy statement providing four categories of "extraordinary and compelling reasons."[95] The first category includes incarcerated persons suffering from terminal

illnesses, such as metastatic solid-tumor cancer, amyotrophic lateral sclerosis, end-stage organ disease, and advanced dementia, or those suffering from medical conditions, impairments, or deteriorations due to age that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."[96]   The second category includes incarcerated persons who are at least sixty-five years old, experience a serious deterioration in physical or mental health because of the aging process; and have served at least ten years or seventy-five percent of their term of imprisonment, whichever is less.[97]   The third extraordinary and compelling reason may arise where the primary caregiver of the incarcerated person's minor child or children died or became incapacitated or where the incarcerated person's spouse became incapacitated and he is the only available caregiver for the spouse.[98]

Mr. Adeyemi's present condition does not meet the first three categories.  Mr. Adeyemi argues he presents extraordinary and compelling reasons for release under Note 1(D), or the "catchall" provision: "Other reasons – **As determined by the Director of the Bureau of Prisons**, there exists in the defendant's case an extraordinary and compelling reason **other than, or in combination with**, the reasons described in" the previous three categories.[99]

Neither Congress nor the Sentencing Commission have ever defined "other" reasons, let alone after the 2018 change in the law on stacking sentences or considering COVID-19 risk in 2020 to medically vulnerable, but not terminal, incarcerated persons.

The United States reminds us Mr. Adeyemi faces two initial hurdles in his argument for extraordinary and compelling reasons under the catchall provision: whether we may independently evaluate extraordinary and compelling reasons, and whether those reasons exist in his case. The first issue is whether, given the preamble in Note 1(D) "[a]s determined by the

Director of the Bureau of Prisons," we can begin to consider extraordinary and compelling reasons "other than, or in combination with," the three categories of reasons defined by the Sentencing Commission.  The United States argues we cannot consider an extraordinary and compelling reason unless it is determined by the Director of the Bureau of Prisons.  But the Sentencing Commission has not updated its policy statement or commentary since the First Step Act because the Commission has lacked a quorum of members to expand on the First Step Act's changes.[100]  Absent a policy statement recognizing the purposes of the First Step Act as it affects "other" extraordinary and compelling reasons for compassionate release, Mr. Adeyemi's counsel urges us to disregard the policy statement as out of date as many of our colleagues have done.

We prefer to look to a grounded source of understanding "other" reasons consistent with sentencing policy.  As instructed by the Sentencing Commission, the Director of the Bureau of Prisons promulgates reasons the Director determines to be extraordinary and compelling in Program Statement 5050.50.  The Director, for example, provides detailed criteria corresponding to the Commission's Notes 1(A) through (C).[101]  The Director also provides a non-exclusive list of nine factors to consider in assessing whether an incarcerated person presents "other" extraordinary and compelling circumstances,[102] corresponding to the Commission's Note 1(D).[103]

If we conclude we can independently consider extraordinary and compelling reasons, the second issue is whether Mr. Adeyemi has shown extraordinary and compelling reasons.  Many of the reported cases to date have not addressed the variety of issues raised by experienced counsel presented to us.  We consider Mr. Adeyemi's health conditions putting him at risk at a facility with a significant COVID-19 outbreak and his lengthy sentence under a statute Congress recently amended to reflect our sentencing policy.

But our inquiry does not end there.  We can also apply the Sentencing Commission policy statement section 1B1.13 as it exists today, following the introductory phrase "[a]s determined by the Director of the Bureau of Prisons." The Commission's Note 1(D) allows for compassionate release for "other reasons."   And the Bureau of Prisons published Program Statement 5050.50 enumerating nine factors which may, altogether, create "other" extraordinary and compelling reasons as described by Note 1(D). These factors include the nature of the defendant's offense, the defendant's personal and criminal history, and whether release would minimize the severity of the offense.[104]

Mr. Adeyemi's circumstances, including the concerns raised by his health condition amidst a COVID-19 outbreak in his prison and his lengthy sentence, fulfill the factors outlined under the Director's Program Statement 5050.50 for "other" extraordinary and compelling reasons.

We conclude Mr. Adeyemi has shown the purposes of sentencing are satisfied by reducing the sentence to time served under the section 3553(a) factors and finally does not pose a danger to the community through five years of supervised release.

A.    **Mr. Adeyemi's arguments, which rest on our finding the introductory phrase "as determined by the Director of the Bureau of Prisons" of the Commission's Note 1(D) is outdated, do not persuade us.**

We first address Mr. Adeyemi's arguments his asthma condition makes him at heightened risk from the COVID-19 outbreak in his prison and Congress's 2018 non-retroactive amendment to the sentencing law constitute extraordinary and compelling reasons.  We find we may independently determine extraordinary and compelling reasons under Sentencing Commission commentary Note 1(D) as federal law requires we are unbound by the phrase "as determined by the Director of the Bureau of Prisons."   But Mr. Adeyemi does not meet his

burden of convincing us his two reasons, unmoored by statutory directives, the Commission's commentary, or the Bureau of Prisons' guidance, are sufficiently extraordinary and compelling on their own.

>    **1.      We may independently assess whether extraordinary and compelling reasons for a sentence reduction exist under the catchall provision.**

Mr. Adeyemi argues we may independently determine extraordinary and compelling reasons under Sentencing Commission commentary Note 1(D), or the catchall provision, because the language "as determined by the Director of the Bureau of Prisons" conflicts with the plain language of the First Step Act's amendment of the compassionate release statute.

The United States disagrees in a two-tiered argument. First, the United States argues the Sentencing Commission's policy statement binds us in full. Second, the United States contends even if the Director of the Bureau of Prisons does not retain sole authority to determine extraordinary and compelling reasons under Note 1(D), we still cannot determine extraordinary and compelling reasons under the catchall provision and we should strike the entirety of Note 1(D) if we find the introductory phrase no longer applies. We consider the United States' arguments and disagree.

>    **i.      The catchall provision's introductory phrase conflicts with federal law and does not bind us.**

The crux of the parties' disagreement lies in whether we follow the commentary to the Sentencing Commission's policy statement verbatim—specifically, whether the catchall provision's introductory phrase, "[a]s determined by the Director of the Bureau of Prisons," binds us and requires we stay on the sidelines.

Before the passage of the First Step Act, incarcerated people seeking compassionate release could only petition the Bureau of Prisons, not the district courts directly.[105]  The Bureau

of Prisons then decided whether to file a motion for a reduced sentence—and it rarely filed such motions.[106]  From 1984 to 2013, the Bureau of Prisons used the compassionate release process to release, on average, twenty-four people per year.[107]  In 2013, the Office of the Inspector General reported the Bureau of Prisons inconsistently implemented and poorly managed the compassionate release program, resulting in overlooked eligible inmates and terminally ill inmates dying while their requests were pending.[108]

In the First Step Act, Congress sought to increase the use of compassionate release by removing the Bureau of Prisons as the middleman.[109]  Congress implemented a short administrative exhaustion period, allowing those seeking compassionate release to move the district court if the wardens of their prisons do not respond to their requests for compassionate release within thirty days or if they exhaust the administrative appeal process after a rejection, whichever comes first.[110]  People seeking compassionate release can directly petition the courts instead of relying on the Bureau of Prisons under the First Step Act's changes. The section of the First Step Act amending the compassionate release provision is entitled *Increasing the Use and Transparency of Compassionate Release*.[111]  Before its passage in the First Step Act, this section initially stood alone as the Granting Release and Compassion Effectively Act of 2018, which "explicitly sought to 'improve the compassionate release process of the Bureau of Prisons.'"[112]

### The majority and minority views on federal judges' authority to define "other" reasons.

Mr. Adeyemi argues the First Step Act's amendments to the compassionate release statute clearly removed sole decision-making authority from the Bureau of Prisons, and the Sentencing Commission's failure to amend the policy statement and commentary since passage of the First Step Act should not preclude eligible defendants from compassionate relief envisioned and enacted by our legislative body.  The First Step Act rendered several provisions

16

of the Commission's policy statement and commentary outdated, including the introductory phrase of the policy statement ("Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A)…"), commentary Note 4 ("A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons"), and commentary Note 1(D). Mr. Adeyemi argues the Sentencing Commission's commentary to its policy statement must evolve to follow Congressional directives. Under the outdated compassionate release statute, the Director of the Bureau of Prisons oversaw every compassionate release motion; the First Step Act imbued the district courts with power formerly reserved only for the Bureau of Prisons. Ultimately, Mr. Adeyemi contends, the First Step Act's amendment to the compassionate release statute superseded the Sentencing Commission's policy statement allowing only the Director of the Bureau of Prisons to decide extraordinary and compelling reasons.

The United States argues the Sentencing Commission's policy statement and accompanying commentary remain applicable and fully binding despite the First Step Act's amendment to the compassionate release statute. The text of section 3582(c)(1)(A)(i) as amended allows us to reduce the sentence only if "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[113] The United States argues we cannot decide this issue relying upon *United States v. Dillon*,[114] where the Supreme Court concluded identical statutory language bound courts to the Commission's policy statements, and policy statement section 1B1.13 Note 1(D) is authoritative.[115] The United States also argues 28 U.S.C. section 994(t) affords the Sentencing Commission the exclusive power to define extraordinary and compelling reasons.[116] Section 994(t) instructs the Sentencing Commission to

"describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."[117]

The United States contends the First Step Act's amendments to the compassionate release statute do not abrogate Sentencing Commission commentary we can still reasonably interpret.[118] The United States explains the catchall provision remains consistent with the amended statute because the Bureau of Prisons may provide its expert opinion on circumstances qualifying for compassionate release.[119]

As it appears the United States has not often raised this *Dillon* argument before,[120] many courts evaluating compassionate release motions in our pandemic era have not evaluated whether federal judges have the ability to independently define "extraordinary and compelling reasons," despite the fact the incarcerated persons' circumstances do not fall into an enumerated provision of the commentary to Sentencing Commission's policy statement section 1B1.13. These courts impliedly assume they may independently evaluate what constitutes an extraordinary and compelling reason under the catchall provision. Even the United States has conceded this on numerous occasions, agreeing "extraordinary and compelling reasons" exist although the defendant does not fit cleanly into the three enumerated categories of the Sentencing Commission's commentary to policy statement section 1B1.13.[121] The Committee on Criminal Law of the Judicial Conference recently promulgated a model *pro se* form for compassionate release to direct incarcerated persons to include relevant information to the courts, which instructed movants to check boxes for medical conditions, age reasons, family reasons, or, significantly, a box for "other extraordinary and compelling reasons for my release."[122] This option stands in for Note 1(D). A vast majority of judges considering whether courts may

independently evaluate extraordinary and compelling reasons to reduce sentences have concluded they can.[123]

Relying on the view held by minority of judges in reported opinions, the United States cites *United States v. Lynn*, where Judge Steele held he could not independently determine extraordinary and compelling reasons warranting release.[124]  Assuming but not concluding the First Step Act intended to increase the use of compassionate release, the judge disagreed "any circumstance that fails to maximize the use of compassionate release contravenes the purpose of the Act's amendment of section 3582(c)(1)(A)."[125]  The judge instead reasoned Congress's amendment to allow a defendant to move for compassionate release would itself increase the use of compassionate release.[126]  The judge found he lacked authority to decide the policy statement was not "applicable," as section 994(a)(2)(C) permits the Commission, not the courts, to determine what constitutes "an appropriate use of the provision."[127]

Agreeing with the view of the majority of judges issuing opinions, our colleague Judge Brody in *United States v. Rodriguez* later held she could independently determine extraordinary and compelling reasons under the compassionate release statute and the accompanying Commission policy statement and commentary.[128]  Judge Brody considered the Bureau of Prisons' failure to properly implement the compassionate release program and Congress's passage of the First Step Act "[i]n an effort to improve and increase the use of the compassionate-release process."[129]  Though the Sentencing Commission failed to update its policy statement and commentary after the First Step Act, the Commission's inclusion of the catchall provision in its commentary to policy statement section 1B1.13 "implicitly recogniz[ed] that it is impossible to package all 'extraordinary and compelling' circumstances into three neat boxes."[130]  Judge Brody found no "applicable" policy statement to apply, as "the Sentencing

Commission simply has not issued a policy statement that addresses prisoner-filed motions post-First Step Act."[131]   Because many parts of the policy statement and commentary clearly contradicted the First Step Act, she concluded "the policy statement is now clearly outdated"[132]

Judge Brody refuted *Lynn*, arguing the opinion failed to appreciate how significantly the First Step Act altered "the landscape of compassionate-release motions and created a procedural gap that the Sentencing Commission's policy statement never had a chance to address."[133]   This procedural gap exists because the Commission drafted the policy statement believing every motion to reach the court would be assessed under the flexible catchall provision.[134]   In passing the First Step Act, Congress envisioned situations where courts would decide motions "where nobody in the [Bureau of Prisons] ever decided whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to all motions."[135]   But the interpretation in *Lynn* would have "the perverse effect of penalizing defendants who take advantage of the First Step Act's fast-track procedures" because the Bureau of Prisons would not, and the court would be powerless to, consider their motions under the catchall provision.[136] "Adopting the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and shifting definition of the term 'extraordinary and compelling.'"[137]

### How do the teachings in United States v. Dillon affect our role?

We agree with Judge Brody's extensive analysis of the purposes of the First Step Act and the unnecessary procedural gap caused by the United States' position.[138]   But the judges' opinions in *Lynn* and *Rodriguez* did not evaluate whether *United States v. Dillon*, which makes Sentencing Commission policy statements authoritative, prohibits us from straying from the Sentencing Commission's pre-First Step Act commentary.

The Sentencing Reform Act of 1984 established the Sentencing Commission and made its promulgated guidelines binding.[139]  In *United States v. Booker*, the Supreme Court held the Sentencing Commission's guidelines imposing enhanced sentences based on facts not found by a jury or admitted by the defendant were merely advisory to remedy Sixth Amendment concerns with a mandatory sentencing regime.[140]  In *Dillon*, the Supreme Court held *Booker*'s reasoning inapplicable to section 3582(c)(2) sentence modification proceedings when the Commission adopts a retroactive guideline amendment lowering a guideline range because, as a congressional act of lenity, the reduction in sentence under the statute is not constitutionally compelled.[141]  The Supreme Court evaluated the same language in section 3582(c)(2) we evaluate today in section 3582(c)(1)(A)(i), allowing courts to reduce a defendant's sentence if "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[142]  Mr. Adeyemi concedes *Dillon*'s holding applies to section 3582(c)(1)(A)(i), making the Sentencing Commission's policy statements generally binding on us—unless the policy statements contain provisions contrary to federal law.[143]

But Mr. Adeyemi argues portions of the Sentencing Commission's commentary to policy statement section 1B1.13—including the introductory phrase providing only the Director of the Bureau of Prisons authority to define extraordinary and compelling reasons under the catchall provision—is not authoritative because it contravenes federal law.[144]  In *Stinson v. United States*, the Supreme Court made Commission commentary explaining a guideline binding unless it violates the Constitution or a federal law or is plainly erroneous or inconsistent with the guideline.[145]  The parties agree *Stinson*'s holding applies to Commission commentary explaining a policy statement, such as the commentary to policy statement section 1B1.13, as "[t]he

principle that the Guidelines Manual is binding on federal courts applies as well to policy statements."[146]

In *United States v. LaBonte*, the Supreme Court applied *Stinson* to invalidate Sentencing Commission's commentary contradictory of the plain language of a Congressional directive.[147] In section 994(h), Congress directed the Commission to "assure" its sentencing guidelines "specify a sentence to a term of imprisonment at or near the maximum term authorized" for certain categories of defendants.[148]   The Commission implemented this directive by promulgating the Career Offender Guideline, assigning offense levels based on the "offense statutory maximum."[149]   The Commission amended its commentary to preclude consideration of statutory enhancements when calculating the statutory maximum.[150]   But "[t]he Commission…was not granted unbounded discretion."[151]   Analyzing the statutory language of section 994(h), Justice Thomas reasoned "maximum term authorized" meant the "highest" sentence allowed by statute and concluded the Commission's revised commentary was "at odds" with section 994(h)'s plain language and had to "give way."[152]   In doing so, the Supreme Court reversed the Court of Appeals' finding the statute's language was ambiguous and the Commission appropriately exercised discretion in drafting its commentary.   Justice Thomas reasoned the Court of Appeals' conclusion would "largely eviscerate the penalty enhancements" enacted in other statutes, finding "Congress surely did not establish enhanced penalties for repeat offenders only to have the Commission render them a virtual nullity."[153]

Mr. Adeyemi contends the words "as determined by the Director of the Bureau of Prisons" in Note 1(D) contradicts the plain language of section 3582(c)(1)(A) as amended.[154] Section 3582(c)(1)(A)(i) provides in part: "the court… may reduce the term of imprisonment… if it finds that… extraordinary and compelling reasons warrant such a reduction."[155]   The plain

language of the statute requires the court—not the Director of the Bureau of Prisons—to "find" extraordinary and compelling reasons. Only after this sentence does Congress require the court to make decisions "consistent with applicable policy statements issued by the Sentencing Commission."[156] In addition, the December 2018 amendment allowing incarcerated people to directly petition the courts for compassionate release as long as they fulfilled a minimal exhaustion requirement "remov[ed] the [Bureau of Prisons'] exclusive 'gatekeeper' role."[157] Mr. Adeyemi argues this significant change intended to remedy the Bureau of Prisons' failure to implement the compassionate release program as intended by Congress and authorized the courts to grant compassionate release motions without the intervention of the Bureau of Prisons— including the determination of extraordinary and compelling reasons.[158] Mr. Adeyemi also highlights the language in a different section of the compassionate release statute, which requires the Director of the Bureau of Prisons to determine the defendant does not pose a danger to the community, to demonstrate Congress knew how to specifically limit power to the Director of the Bureau of Prisons.[159] Congress's decision to not add a similar provision reserving the determination of extraordinary and compelling reasons to the Director of the Bureau of Prisons indicates it did not intend to limit the court's authority in such a manner.

The United States concedes *Dillon*'s directive making commentary binding can give way under *Stinson* and *LaBonte* if the commentary is contrary to federal law. For example, the United States agrees the First Step Act's amendment to section 3582(c)(1)(A) requires we are not strictly bound by the text of Note 4 to policy statement section 1B1.13, which provides "[a] reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A)."[160] But the United States does not agree Note 1(D)'s introductory phrase conflicts with the First Step Act's amendment to section

3582(c)(1)(A).  The United States instead contends the statute still allows the Director of the Bureau of Prisons to file compassionate release motions with the courts, so the Director may retain authority to identify extraordinary and compelling reasons for release in Note 1(D).[161] Further, the Director of the Bureau of Prisons, as the expert on correctional issues, "play[s] an important role in identifying circumstances warranting relief."[162]  But the Director would still play an important role in the process even if we read Note 1(D) to allow us to independently determine extraordinary and compelling reasons—just not sole discretion.  And the Bureau of Prisons has not typically offered its expertise even when it held exclusive authority to do so.  The Bureau of Prisons chose not to provide its expertise when it did not respond to Mr. Adeyemi's petition for compassionate release on the grounds of his lengthy sentence under a now-defunct statute.[163]

We agree with Mr. Adeyemi and the majority of judges who have reviewed the judge's authority to consider "other" reasons. The First Step Act's amendment of the compassionate release statute removed sole authority from the Bureau of Prisons, imbuing judges with the ability to decide compassionate release motions if the Bureau of Prisons denies or defers the motion. The new compassionate release regime mandates concurrent authority between the courts and the Director of the Bureau of Prisons. This significant amendment requires the Sentencing Commission to alter policy statement section 1B1.13 and its resulting commentary, including the introductory phrase of the policy statement ("Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A)…"), commentary Note 4 ("A reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons)", and the introductory phrase to commentary Note 1(D). Because the Commission has been unable to alter its policy statement and commentary due to lack of a quorum, we cannot

imply the Commission intends us to follow an outdated commentary through its inaction.[164]  And we are not hamstringed because the Sentencing Commission has failed to update the pertinent guidance.[165]   The plain language of section 3582(c)(1)(A)(i), not just Congress's intent to improve and increase compassionate release, contradicts the introductory phrase of Note 1(D) to the Commission's policy statement.

Following Justice Thomas's reasoning in *LaBonte*, Congress did not streamline compassionate release motions only to have the Commission fail to update its policy statements, creating a procedural gap which infringes on the purpose of the First Step Act's amendment and penalizes the incarcerated person who qualifies for compassionate release based on "other" reasons. Judge Brody's sound reasoning remains persuasive considering federal law now contradicts the United States' and a minority of reviewing courts' view: "[i]t would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond in such a situation [under the First Step Act] could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard. But under the minority view, that is exactly what would happen: prisoners in this situation would never have the chance for the BOP to assess their claim under the catchall provision and would never get the chance for this kind of flexible review in the district court, since under the minority view, the court would be constrained to the specific criteria in subsections (A)-(C) of the policy statement."[166]

> **ii.     We determine extraordinary and compelling reasons under the catchall provision.**

The United States contends we should simply invalidate Note 1(D) if we conclude the introductory phrase "as determined by the Director of the Bureau of Prisons" contradicts the First Step Act's amendments to the compassionate release statute and we should not "assume a

plenary power" to determine what qualifies as extraordinary and compelling circumstances warranting release.[167] The United States argues allowing courts broad power to define "extraordinary and compelling reasons" would restore the parole power and indeterminate sentencing contravening the goals of the Sentencing Reform Act of 1984, which the First Step Act of 2018 partially amended.[168]  Illustrating what it deems the inevitable outcome of Mr. Adeyemi's interpretation, the United States posits judges could impose a mandatory sentence and then, disagreeing with Congress, reduce the sentence by declaring it is "extraordinary" and unwarranted.[169]  We agree to an extent; we are hesitant to find "other" reasons unmoored to sentencing policy and practice.

But by overreaching on this all-or-nothing theory, the United States cannot see the forest for the trees. Section 3582(c)(1)(A)(i) provides "the court…may reduce the term of imprisonment… if it finds that…extraordinary and compelling reasons warrant such a reduction."[170]  The plain statutory language allows the *court*–not the Commission or the Bureau of Prisons—to determine whether extraordinary and compelling reasons exist. Congress's subsequent instruction we must only reduce sentences consistent with applicable Commission policy statements does not alter this conclusion.  Congress instead requires courts to consult the Commission's policy statements, leaving the ultimate decision to judges.

We would not "rewrite" the catchall provision to "insert" ourselves:[171] The catchall provision, without its introductory phrase, would mirror the phrasing of the other three categories of extraordinary and compelling reasons we may consult. Following the plain language of section 3582(c)(1)(A)(i), we determine whether extraordinary and compelling reasons exist by consulting Notes 1(A) through (C) as well as Note 1(D), after concluding the introductory phrase violates federal law.[172]

We also note the United States' inconsistent position on how we should read the sections of the Commission's commentary contradicting federal law.  The United States agrees the First Step Act's amendment to section 3582(c)(1)(A) requires we are not strictly bound by the text of Note 4 to policy statement section 1B1.13, which provides "[a] reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A)."[173]  The United States contends we should not disregard the entirety of Note 4, but we should strike the word "only" from its text because it is "'at odds' with the current statute and is therefore repealed and invalid."[174]  Though it seeks to save as much of Note 4 as possible, the United States argues we must strike the entirety of Note 1(D) if the introductory phrase violates federal law.[175]

Because the Sentencing Commission has not amended its policy statement or commentary after the passage of the First Step Act, and Note 1(D) contradicts the First Step Act's amendment to section 3582(c)(1)(A)(i), we may independently determine extraordinary and compelling reasons in line with the rest of the Commission's commentary not rendered contradictory to federal law.  The United States' fear this reading will "throw[] the matter open to the roughly 673 district judges to identify any circumstances any wants" is overblown.[176]  We do not throw the Sentencing Commission's commentary to the wind; we extrapolate the narrowness of the reasons enumerated in Note 1(A) through (C) to conclude we may only reduce a defendant's sentence in, as indicated by the language itself, *extraordinary and compelling* circumstances. We make this decision in line with the majority of district courts considering the issue, and amidst the United States' contradictory position in several cases conceding extraordinary and compelling reasons when the incarcerated movants do not fit into the categories in Notes 1(A) through (C) nor into the categories enumerated in the Bureau of

Prisons' program statement 5050.50.[177]  We will not prejudice Mr. Adeyemi by refusing to hear his arguments in the middle of a pandemic because we must wait for the Sentencing Commission to update its policy statement and commentary to ensure its promulgated guidance complies with federal law.

        2.      **Mr. Adeyemi's two arguments, on their own, do not constitute extraordinary and compelling reasons.**

After deciding we may independently determine extraordinary and compelling reasons warranting compassionate release, we next determine whether extraordinary and compelling reasons exist under the analytical framework suggested by Mr. Adeyemi.  Mr. Adeyemi argues his lengthy sentence under a now-defunct sentencing statute and his health conditions placing him at higher risk of severe illness if he contracted COVID-19 in a prison suffering a significant outbreak constitute, together, extraordinary and compelling reasons for release. The United States disagrees on both fronts, arguing Congress did not make its changes to the sentencing statute retroactive precluding relief in the form of reduced sentence and Mr. Adeyemi's health conditions do not place him in the official high-risk category for COVID-19.

Mr. Adeyemi has the burden to prove extraordinary and compelling reasons exist.[178]  We evaluate Mr. Adeyemi's arguments for extraordinary and compelling reasons separately. Through the framework of ignoring the Bureau of Prisons' descriptions of extraordinary and compelling reasons suggested by Mr. Adeyemi, we find neither argument enough in the singular to reach the high bar articulated by Congress and the Sentencing Commission.  After we reach this conclusion, we consider whether Mr. Adeyemi's unique situation constitutes extraordinary and compelling reasons under the factors provided by the Bureau of Prisons corresponding to the Commission's Note 1(D) and conclude they do.

> i.   **Mr. Adeyemi's health conditions and inability to properly manage his illness make him at higher risk of severe illness by COVID-19 in a prison experiencing a severe outbreak but do not alone constitute an extraordinary and compelling reason for release.**

Mr. Adeyemi argues his life-long asthma places him at high risk for severe illness or death arising from a COVID-19 infection while incarcerated at a correctional facility facing a serious viral outbreak. The United States contends Mr. Adeyemi's asthma is not sufficiently severe to place him in the Centers for Disease Control and Prevention's category for higher risk individuals, concluding his health condition cannot constitute an "extraordinary and compelling" reason.

Our Court of Appeals emphasized the necessity of an individualized analysis: "We do not mean to minimize the risks that COVID-19 poses in the… prison system, particularly for inmates… But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."[179] Our Court of Appeals also instructs: "[T]he existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence…While the COVID-19 pandemic has given rise to exceptional and exigent circumstances that require the prompt attention of the courts, it is imperative that they continue to carefully and impartially apply the proper legal standards that govern each individual's particular request for relief."[180]

Mr. Adeyemi seeks release from the low-security facility at FCI Fort Dix, "the most heavily populated BOP facility" in the country.[181] Mr. Adeyemi describes filthy, crowded living conditions rendering social distancing impossible.[182] Several courts have granted compassionate release motions of defendants housed at FCI Fort Dix.[183]

The minimum security camp at FCI Fort Dix faces a severe outbreak of COVID-19.[184] Though everyone testing positive is housed in the minimum security camp,[185] the Bureau of Prisons seems to have only conducted one test out of the over 2,700 people living in the low-security facility as of May 27, 2020.[186]  As of that same date, the Bureau of Prisons had no plans to test people housed in the low-security prison.[187]  The United States concedes lack of widespread testing at the prison coupled with the current outbreak makes it possible the virus will find its way into the low-security facility.[188]

Although conceding lack of widespread testing creates the possibility Mr. Adeyemi contracts COVID-19, the United States argues Mr. Adeyemi's asthma is not today sufficiently severe to make him at higher risk of severe illness if he contracted COVID-19. The United States argues Mr. Adeyemi's asthma is only "intermittent" or "mild" asthma, or not severe enough to place Mr. Adeyemi within the Centers for Disease Control and Prevention's higher risk group of people with "moderate to severe asthma."[189]  According to the National Heart, Lung, and Blood Institute's Asthma Care Quick Reference Guide provided by the United States, Mr. Adeyemi suffers from mild progressive asthma, not "moderate" or "severe" asthma listed as high risk by the Centers for Disease Control and Prevention. The National Heart, Lung, and Blood Institute's Asthma Care Quick Reference Guide defines moderate asthma as suffering daily symptoms, experiencing nighttime awakenings more than one time a week, daily use of an albuterol rescue inhaler, and some limitation of normal activity.[190]

Mr. Adeyemi's asthma symptoms do not reach the "moderate" level of severity.  We see no evidence of weekly nighttime awakenings and Mr. Adeyemi seems to suffer symptoms a few times a week.[191]  Mr. Adeyemi faces minimal limitation of normal activity, as he cannot jog for more than twenty minutes without triggering an asthma attack and seasonal triggers such as grass

cutting worsen his symptoms.[192] Mr. Adeyemi experienced exercise-induced bronchospasms in 2013 and 2016.[193]  He also has a medical history of coughing and chest pain.[194]  But the United States emphasizes his most recent check-up on January 21, 2020 revealed healthy vital signs.[195] And in October 2019, an examining physician noted Mr. Adeyemi's asthma was well-controlled, he went months without using his albuterol inhaler, and did not exhibit nighttime symptoms or have issues with daily activities.[196]

Mr. Adeyemi's sworn affidavit suggests he uses his albuterol inhaler, on average, six times a week.[197]  The United States argues the medical records conclude Mr. Adeyemi does not use a maintenance inhaler daily, otherwise he would have already refilled his dose.[198]  Mr. Adeyemi's medical records show a doctor prescribed him a rescue albuterol inhaler on October 22, 2019,[199] and he swears he had two weeks left on his inhalers on May 18, 2020.[200]  The United States explains this albuterol inhaler holds 200 puffs, and if Mr. Adeyemi took six puffs a week, the inhaler would only last thirty-three weeks.[201]  But thirty-three weeks from October 22, 2019 is June 2, 2020: Mr. Adeyemi swore in his affidavit he was on track to run out of his albuterol inhaler on June 1, 2020.[202] By the United States' own math, Mr. Adeyemi uses his albuterol rescue inhaler approximately six times a week.

We are concerned we do not see Mr. Adeyemi's plea for renewed inhaler prescriptions reflected in his updated medical records.[203]  Mr. Adeyemi's control of his asthma symptoms depends on access to these medications. Without them, we do not doubt his symptoms could worsen.

We also note Mr. Adeyemi's lack of ability to self-manage his condition could lead to deterioration in his health.  Mr. Adeyemi's family history of asthma, including his cousin who died from an asthma attack, indicates the potential for worsened severity of the condition.

31

Family history of asthma generally predicts asthma occurrence and severity, and although Mr. Adeyemi does not have a descendant relationship with the cousin who had a fatal asthma incident, it indicates the potential for severe asthma in his family.[204]

As a life-long asthmatic, Mr. Adeyemi knows how to adequately self-manage his condition.  But central to his self-management is exercise—an activity he can no longer do without added risk of contagion.[205]  According to the American Lung Association, exercise "increases blood flow to your lungs, promoting blood flow to the heart which pumps oxygen through your body."[206]  A 2018 review of exercise and asthma stated "in addition to its well-known cardiovascular and metabolic benefits, physical training has been shown to be beneficial for asthmatic adults and children in improving asthma control and asthma-related quality of life."[207]  Mr. Adeyemi typically jogs to control his asthma symptoms, but he has not jogged outside since mid-March and, during oral argument, he reported he cannot run on the treadmills in the indoor basement gym.[208]  Mr. Adeyemi swears: "Although I am very concerned about contracting Covid-19 there, I feel like not exercising at all could lead to worse consequences for me, given that physical activity is a big part of my asthma care."[209]  His inability to self-manage his asthma through jogging puts him at risk of a worsening his asthma symptoms.  If released, Mr. Adeyemi argues he could manage his asthma safely through exercise in his mother's fenced-in private backyard.[210]

In *United States v. Gorai*, Judge Mahan granted an incarcerated asthmatic's motion for compassionate release because he could not properly manage his asthma in a prison "already overburdened by its COVID-19 response."[211]  Discussing Note 1(A) to Sentencing Commission policy statement section 1B1.13, the court reasoned "[t]he presence of COVID-19 ... necessitates a more expansive interpretation of what self-care means."[212]  Judge Mahan held Mr. Gorai's

asthma, the severity of which was not discussed, placed him at greater risk of severe illness from COVID-19 and his "representations regarding his medical needs establish that he has been unable to self care while incarcerated."[213]   Similarly, in *United States v. White*, Judge Leitman released an asthmatic inmate because his unclassified level of asthma placed him in a high-risk category for severe illness from COVID-19 and his condition "substantially diminish[ed] his ability to provide self-care within those environments."[214]

Mr. Adeyemi's asthma does not currently fit the Centers for Disease Control and Prevention's high-risk category, even though he risks regression due to inability to exercise and a potential lag in medication prescription refills.   While we find the Centers for Disease Control and Prevention's guidelines on high-risk populations helpful, we also consider applicable studies from the medical community at large.   The recent study from Rush University Medical Center in Chicago associating people between the ages of twenty and fifty-nine with any level of asthma with longer time on ventilators suggests Mr. Adeyemi faces a higher risk of severe illness if he contracted COVID-19.[215]   The study did not associate asthma with a higher rate of death from the virus, but it suggests younger people with asthma "could develop a sustained pulmonary failure with COVID-19 infection, leading to prolonged mechanical ventilation."[216]   The study does not restrict its finding to only moderate-to-severe asthma.

In these early months of addressing the COVID-19 spread in prisons, courts disagree on granting compassionate release motions by incarcerated people suffering from asthma as their sole medical condition. Mr. Adeyemi refers to numerous courts deeming asthma unqualified as "moderate to severe" an extraordinary and compelling reason warranting release.[217]   In *United States v. Medina*, Judge Pauley granted compassionate release to a defendant who had admitted to only "mild" asthma with a "minimal impact" on his life before sentencing.[218]   Judge Pauley

granted the motion through an order, and we do not have the benefit of his reasoning.[219]   In *United States v. Norris*, Judge Underhill released an asthmatic who "uses an Albuterol inhaler to treat his symptoms."[220]   Because "[h]ealth officials have recognized that individuals with chronic respiratory disease are deemed at greater risk of COVID-19," Judge Underhill concluded Mr. Norris's asthma constituted an extraordinary and compelling reason warranting release.[221]

The United States cites several cases denying compassionate release to defendants failing to produce evidence of moderate to severe asthma[222] or suffering from only mild asthma.[223]   In *United States v. Howell*, Judge Underhill concluded, "[b]ecause the [Centers for Disease Control and Prevention] has identified only moderate to severe asthma as a comorbidity that elevates the likelihood of serious illness from COVID-19, Howell's failure to specify the extent of his condition is fatal to his motion."[224]   In *United States v. Ramos*, Judge Schofield denied compassionate release to an incarcerated person suffering from asthma who receives adequate treatment and does not have frequent asthma attacks.[225]   Some of the cases cited by the United States conclude ordering compassionate release would also conflict with the other factors under section 3582(c)(1)(A)(i), such as posing a danger to safety of the community[226] or the section 3553(a) factors.[227]

We conclude Mr. Adeyemi's asthma is not sufficiently severe to place him in the "high-risk" category as defined by the Centers for Disease Control and Prevention and does not on its own constitute an extraordinary and compelling reason warranting release.   Though Mr. Adeyemi cannot adequately self-manage his asthma through jogging during the COVID-19 lockdown at FCI Fort Dix, the deterioration of his symptoms is, at this point, hypothetical.

We will not reduce Mr. Adeyemi's sentence based only on his symptoms of mild asthma.

ii. **Though Mr. Adeyemi's lengthy sentence due to "stacking" section 924(c) firearm charges would be greatly reduced if we sentenced him today, this alone does not constitute an extraordinary and compelling reason warranting release.**

Mr. Adeyemi argues he would be released under current law because the provision requiring the stacking of an additional twenty-five years onto his sentence is now defunct, constituting an extraordinary and compelling reason warranting his compassionate release. The United States makes three arguments in response: Congress did not make the change to section 924(c) retroactive, barring us from considering the change on this motion; Mr. Adeyemi's argument, if successful, would lead to the reinstatement of a parole power in the courts; and, Mr. Adeyemi's argument, if successful, would undermine the finality of sentencing.

As an initial matter, we consider Mr. Adeyemi's change in sentencing law argument under the Commission's Note 1(D) to the policy statement. We concluded above we can independently determine extraordinary and compelling reasons warranting compassionate release under this catchall provision. The policy statement commentary Note 1(D) explicitly provides we may grant compassionate release if "there exists in the defendant's case an extraordinary and compelling reason *other than, or in combination with*, the reasons described in" the previous three categories—clarifying we may consider reasons outside of medical, age, and family circumstances.[228] We may consider whether a change in sentencing law, particularly "in combination with" other factors, constitutes an extraordinary and compelling reason for release.

If we sentenced Mr. Adeyemi today, he would not face the mandatory consecutive twenty-five-year sentence for a second section 924(c) firearm charge in the same case. But at the time of Mr. Adeyemi's sentencing, Congress mandated a seven-year sentence for the first possession of a firearm in furtherance of a crime of violence under section 924(c) and a mandatory minimum consecutive sentence of twenty-five years for the second section 924(c)

crime, even if the second crime occurred in the same case.[229]   Because a jury convicted Mr. Adeyemi of two robberies on January 3, 2006—despite the fact Mr. Adeyemi and his co-conspirators committed the robberies two hours apart—the law required Judge Davis impose the seven-year sentence for the first possession of a firearm in furtherance of a crime of violence and a mandatory consecutive twenty-five year sentence for the second possession of a firearm in furtherance of a crime of violence.

In December 2018, Congress amended section 924(c) to ensure the twenty-five year consecutive term for a successive section 924(c) offense does not apply unless the defendant had a previous, final section 924(c) conviction at the time of the offense.[230]   Judge Dearie described the amendment: "[I]t it was an extraordinary development in American criminal jurisprudence. A modern-day dark ages—a period of prosecutorial section 924(c) windfall courts themselves were powerless to prevent—had come to an end."[231]   Legislators, in addition to courts, have lauded the First Step Act's windfall change to sentencing law.[232]   Though Mr. Adeyemi currently serves a 385-month sentence, he would be sentenced to a 168-month sentence today.[233]   This extreme disparity, the additional fourteen years Mr. Adeyemi faces under his current sentence, and the difference between Mr. Adeyemi's sentence and the much-shorter sentences of his co-conspirators who committed five additional robberies altogether constitute the basis for Mr. Adeyemi's change in sentencing law argument.[234]

Despite the large disparities between those sentenced before and after the First Step Act, Congress did not make the change to section 924(c) retroactive. "[W]hen a statute imposes a newer, more lenient penalty, the change applies retroactively only if Congress intends it to."[235] In the First Step Act's amendment of section 924(c), Congress explicitly provided: "This section, and the amendments made by this section, shall apply to any offense that was committed before

36

the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment."[236]

But Congress's decision to not make the amendment to section 924(c)'s stacking provision retroactive does not control our analysis as to whether this change in law could constitute an extraordinary and compelling reason for release. Retroactive application of the First Step Act's amendment to the section 924(c) stacking provision is a different analysis seeking a different remedy than the relief sought by Mr. Adeyemi here. As Judge Campbell reasoned, "[i]t is not unreasonable for Congress to conclude that not all defendants convicted under § 924(c) should receive new sentences, even while expanding the power of the courts to relieve some defendants of those sentences on a case-by-case basis."[237] Judge Bryan posited, "Section 3582(c)(1)(A) provides a safety valve against what otherwise would be a harsh, unjust, and unfair result stemming from a non-retroactivity clause."[238]

Mr. Adeyemi cites numerous cases compassionately releasing defendants originally sentenced under the now-defunct section 924(c) stacking provision.[239] In *United States v. Haynes*, Judge Dearie found not only the First Step Act's elimination of "the § 924(c) sentencing weaponry that prosecutors employed to require" lengthy sentences constituted an extraordinary and compelling reason, but also considered the "brutal impact" of Mr. Haynes's forty-six year sentence, his sentence's "drastic severity" compared to his co-defendant's ten-year term, the harshness of his sentence compared to similar sentences today, and the extent to which his sentence penalized him for exercising his right to trial.[240] The judge held Congress's decision to not make the amendment to the stacking provision retroactive does not preclude us from considering extraordinary cases on an individual basis, and that decision "spare[d] the courts an avalanche of applications and inevitable re-sentencings, no doubt in many cases that do not

feature the same grave characteristics presented here."[241]   Judge Dearie concluded: "What happened to Mr. Haynes is something Congress has now made clear should never have occurred."[242]

In *United States v. Redd*, Judge Trenga concluded extraordinary and compelling reasons warranted the release of a defendant sentenced under the pre-First Step Act section 924(c) stacking provision.[243] Judge Trenga considered the "gross disparity between the sentence Mr. Redd received and the sentence he would have received after the First Step Act."[244] Viewing the First Step Act's amendment to section 924(c) as "a legislative rejection of the need to impose sentences under [the originally enacted] § 924(c)" as well as "a legislative declaration of what level of punishment is adequate," Judge Trenga concluded extraordinary and compelling reasons for compassionate release existed.[245]   It reasoned the lack of retroactivity does not "justify withholding sentencing relief given the overall purpose of the First Step Act amendments, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria."[246]

We also find Judge Seeborg's reasoning in *United States v. Quinn* instructive. Mr. Quinn moved for compassionate release because of the change to the section 924(c) stacking provision and, generally, the ongoing pandemic.[247]   Judge Seeborg granted compassionate release, reasoning the First Step Act's amendments to the compassionate release statute specifically empowered courts "to conduct an individualized assessment of a defendant's case and approve a sentence reduction when warranted."[248]   It noted the purpose of the First Step Act complies with "allowing courts to consider such gross sentencing disparities, rather than forcing judges to interpret lack of retroactivity as a complete bar to relief based on subsequent changes to sentencing."[249]   Judge Seeborg also found Congress titled the portion of the First Step Act

amending section 924(c) "Clarification of Section 924(c)"—which does not explain why Congress did not make the change retroactive, but does "bolster[] the argument that unnecessarily harsh results under the prior version can, on a case-by-case basis, be grounds for a reduction."[250]

Mr. Adeyemi contends he does not seek retroactive application of the change in the law, which would categorically release every similarly situated person without an individualized analysis by a court—instead, he seeks compassionate release warranted by "a unique combination of extraordinary and compelling reasons, including the stacking amendment."[251] Mr. Adeyemi argues the watershed change to the sentencing law acts as a referendum on the inappropriateness of sentences imposed under the stacking provision.[252]   He also argues Congress broadened judges' ability to decide compassionate release motions in the same piece of legislation it amended section 924(c)'s stacking provision, providing judges a means of remedying lengthy sentences despite the lack of retroactivity of the amendment.[253]

The United States disagrees, arguing Congress's decision to not make the changes to section 924(c) retroactive precludes us from considering Mr. Adeyemi's sentence under the defunct section 924(c) stacking provision as an extraordinary and compelling reason for compassionate release.[254]   The United States cites *United States v. Saldana*, where the Court of Appeals for the Tenth Circuit upheld the denial of a compassionate release motion by a defendant who did not face stacked sentences under section 924(c).[255]   Mr. Saldana instead argued post-sentencing case law suggested his state conviction no longer constituted a "crime of violence" under the Sentencing Guidelines, entitling him to a shorter sentence.[256]   The court of appeals found the district court committed no error in denying the motion based on a post-sentencing change in case law.[257]   The court of appeals concluded without discussion district

courts may only consider extraordinary and compelling reasons under one of the enumerated categories provided by the Sentencing Commission—not the catchall provision.[258]  We do not find this case instructive because we already extensively analyzed and concluded we may independently determine extraordinary and compelling reasons under the catchall provision and because Mr. Adeyemi's argument is significantly different than Mr. Saldana's. Mr. Adeyemi argues Congress's amendment to the section 924(c) stacking provision, combined with Mr. Adeyemi's health condition during a pandemic, constitutes extraordinary and compelling reasons—he does not base his argument in changes in case law.

We are persuaded Congress's directive to not make changes to section 924(c) retroactive does not preclude us from considering this as an argument for a compassionate release motion. A retroactive amendment to section 924(c) would have required the release of all defendants similarly situated to Mr. Adeyemi, while compassionate release motions permit sentence reductions on an individualized basis, only in the most extraordinary circumstances and only if the defendant meets specific criteria such as the 3553(a) factors and would not endanger the community.   Congress, in passing the First Step Act, made both a significant change to sentencing law and expanded power to the courts to decide compassionate release motions in the first impression.  "When interpreting a statute we also consider 'the design of the statute as a whole and its object and policy,'"[259] "and avoid constructions that produce 'odd' or 'absurd results' or that are 'inconsistent with common sense.'"[260]  As instructed by our Court of Appeals, we read the changes in the First Step Act as a whole, and we conclude Congress did not intend the lack of retroactivity to completely bar the consideration of harsh sentences illegal under today's law in our compassionate release analysis.

The United States also argues reducing Mr. Adeyemi's sentence based on the changes to the section 924(c) stacking provision would, contrary to Congressional intent, grant a parole power in the judiciary.  The United States contends the Sentencing Reform Act of 1984 abolished the parole system and reducing Mr. Adeyemi's sentence through compassionate release would restore the very system Congress eliminated.[261]  For example, the United States suggests a judge could impose a mandatory sentence, wait until the judgment is final, and then declare the sentence extraordinary and reduce it.

The United States cites Judge Bartle's decision in *United States v. Gibbs*, which also does not deal with the First Step Act's amendment to the stacking provision in section 924(c).[262] Judge Bartle considered whether a defendant's rehabilitation and a change in sentencing law making his mandatory life sentence more discretionary constituted an extraordinary and compelling reason.[263]  Judge Bartle concluded he could consider these arguments under the catchall provision.[264]  But Judge Bartle did not analyze the defendant's argument based on change in sentencing law because he concluded the present guidelines would still allow for Mr. Gibbs's original life sentence, and denied the motion because he held Congress disallowed compassionate release based on rehabilitation grounds alone.[265]  Judge Bartle reasoned, "Gone are the days of the parole system under which a prisoner's rehabilitation after incarceration was a ticket to early release. If Gibbs and the cases he cites are correct, the effect will be to return to a parole system which Congress has discarded."[266]  Judge Bartle discussed the return of the parole system with regard to compassionate release based on rehabilitation alone—which the statute explicitly disallows.[267]  We agree with Judge Bartle based on the facts and arguments before him.  But because we discuss entirely different reasons for compassionate release, we do not find *Gibbs* instructive.

In *United States v. Marks*, Judge Larimer granted compassionate release to a defendant who, originally sentenced under the section 924(c) stacking provision, would receive a much shorter sentence if sentenced after the First Step Act.[268]   Discussing Mr. Marks's original "excessive" sentence, Judge Larimer explained Congress amended section 924(c) "with bipartisan support … recogniz[ing] the inequities and harsh consequences of the stacking provisions."[269]   Judge Larimer recognized the First Step Act's changes to section 924(c) were not retroactive, but reasoned the amendment "provides at least some indication of Congress's view of whether such 'stacking' generally produces just and desirable results."[270]   Recognizing Congress provided "rehabilitation … *alone*" cannot constitute an extraordinary and compelling reason, the court reasoned this statutory directive "implies that rehabilitation is a factor that a court may consider, in conjunction with other relevant circumstances."[271]   Judge Larimer concluded Mr. Marks' remarkable rehabilitation in addition to his sentence under the outdated section 924(c) stacking provision together constituted extraordinary and compelling reasons warranting release.[272]   The court recognized it does not have parole powers and "may not, as a matter of course, alter a defendant's sentence for reasons of mercy or sympathy."   But Congress "expanded courts' powers to modify defendants' sentences," and granting compassionate release for change in the stacking provision of section 924(c) lies within those powers.[273]   The United States appealed the court's decision and the appeal is pending.

Mr. Adeyemi contends Congress, in abolishing the parole commission, did not intend to prevent the judiciary from considering extraordinary and compelling reasons based on length of sentence.   In response to the United States' argument his position would illegally reinstate parole power in the courts, he cites legislative history from the Senate Committee passing the 1984 Act abolishing the Parole Commission and first enacting the compassionate release statute.[274]   The

legislative history suggests, contrary to the United States' argument, Congress abolished the parole commission not to prevent courts from exercising the function of reevaluating defendants' sentences under rare circumstances, but to save money and allow the courts to deal with the few defendants with sentences worthy of reduction. As Judge Trauger noted in *United States v. Young*, this committee report shows "the Senate Committee stressed its belief that some individual cases might still warrant an eventual reduction of a sentence, a possibility that § 3582(c) was intended to address."[275]   Further, the Senate Committee recognized the compassionate release statute would provide courts the ability to evaluate "some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment"—suggesting Congress, in 1984, considered compassionate release as a mechanism to provide relief for defendants in Mr. Adeyemi's position.[276]

The United States finally argues holding the First Step Act's amendment to section 924(c)'s stacking provision an extraordinary and compelling reason would undermine the finality of sentences. The United States quotes *Teague v. Lane*, where the Supreme Court discusses the concept of finality of sentences, "which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect."[277]   We recognize the importance of finality of sentences. But Congress created the compassionate release statute in 1984 and provided courts the ability to hear and decide petitions through the First Step Act.  We presume our legislative body considered the impact, if any, on deterrence of crime when passing these pieces of legislation.  The province of the judiciary is not to second-guess policy decisions of Congress; we will not decline to apply a duly enacted statute on the grounds our policy preferences are superior to Congress's.  Our interpretation of the

compassionate release statute to potentially include change in sentencing law as an extraordinary and compelling reason does not require a different conclusion.

While we agree with Mr. Adeyemi and the majority of judges on many of the arguments stated above, we cannot conclude the December 2018 change in section 924(c)'s stacking law singularly constitutes an extraordinary and compelling reason warranting compassionate release. Our skepticism at the United States' arguments of retroactivity, parole system, and finality of sentencing does not end the inquiry. We remain concerned about the impact of a decision releasing Mr. Adeyemi solely because of a change in the law when Congress made clear the change is not retroactive.  Though we recognize the injustice of Mr. Adeyemi's sentence, we cannot play the role of the legislator.  Congress did not provide us a clear directive we can find the amendment to section 924(c) as an extraordinary and compelling reason alone warranting release.  We will not craft a new sentencing policy by holding otherwise.  When or if Congress passes a new law making the changes to section 924(c)'s stacking provision retroactive, or when or if the Sentencing Commission concludes change in law can constitute an extraordinary and compelling reason, we will join the many judges reducing the sentences of incarcerated persons in Mr. Adeyemi's position based solely on the change in the stacking sentences.  Until then, we will not stray from the duties vested in the judicial branch by the United States Constitution.

### B.    Mr. Adeyemi's circumstances fulfill the Bureau of Prisons' Program Statement enumerating factors determining "other" extraordinary and compelling reasons.

We agree with the United States as to Mr. Adeyemi not showing health conditions severe enough to place him in the high risk group for COVID-19 and we decline to usurp the role of the legislative branch in enacting sentencing policy by holding the amendment eliminating section 924(c)'s stacking provision is, by itself, an extraordinary and compelling reason.

We are thus left with analyzing whether Mr. Adeyemi has shown "other" reasons under Note 1(D) "as determined by the Director of the Bureau of Prisons."  The United States is correct as to our inability to predict how the Sentencing Commission will eventually address this term consistent with the sentencing law after the First Step Act.  As we found above, we are no longer bound to the Bureau of Prisons' decisions.[278]  But consistent with sentencing policy <u>as of today</u>, we may consider the factors the Bureau of Prisons employs when evaluating requests for compassionate release under the Sentencing Commission's section 1B1.13 Note 1(D).

Under the Sentencing Commission's policy statement section 1B1.13 Note 1(D), the Commission envisioned "other" circumstances warranting release outside of health, age, and family reasons.[279]  In January 2019 after the passage of the First Step Act, the Bureau of Prisons issued Program Statement 5050.50 to expand on the enumerated reasons for release, but it also listed "other" factors the Bureau of Prisons should consider in determining whether extraordinary and compelling reasons exist.[280]  Though the Program Statement does not explicitly describe these factors as corresponding to Note 1(D), we agree with the reasoning of the Court of Appeals for the Tenth Circuit holding the factors determine whether "other" extraordinary and compelling factors warranting release exist.[281]  These 2019 factors are unchanged from the Bureau of Prisons' March 2015 program statement.[282]

The Bureau of Prisons' enumerated factors to determine the existence of extraordinary and compelling reasons include: The nature and circumstances of the defendant's offense, his criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustment, disciplinary infractions, personal history derived from the presentence investigation report, length of sentence and amount of time served, current age and age at the time of offense and sentencing, release plans, and "[w]hether release would minimize the

severity of the offense."[283]  We consider each of these factors and conclude Mr. Adeyemi fulfills each and every one.  Relying on the Bureau of Prisons' own criteria for "other" extraordinary and compelling circumstances warranting compassionate release, we grant Mr. Adeyemi's compassionate release motion.

We first consider the "[n]ature and circumstances of the inmate's offense."[284]  Mr. Adeyemi acted as the getaway driver in two robberies stealing $850 and Mr. Adeyemi did not commit an act of violence.[285]  Mr. Adeyemi's co-conspirators also did not physically injure anyone during the robberies.[286]  Though his co-conspirators used an inoperable firearm, Mr. Adeyemi did not personally brandish the gun.[287]  Mr. Adeyemi was not even physically present during the robberies; he had driven his car around the corner while the co-conspirators threatened the cashiers and retrieved the stolen cash.[288]  The nature and circumstances of Mr. Adeyemi's offense, while serious, display a low level of culpability and no personal display of violence.

The next factor applied by the Bureau of Prisons under its authority, Mr. Adeyemi's criminal history,[289] mandates finding an extraordinary and compelling reason warranting release: He had no prior criminal history before he made the life-altering mistake of participating in the two robberies in two hours on January 3, 2006 at the age of nineteen. [290]

The Bureau of Prisons' program statement next instructs the consideration of comments from victims.[291]  The probation office mailed letters to the individuals present at the time of the robberies but no one submitted affidavits under the Mandatory Victim Restitution Act of 1996.[292]  The presentence investigation report explains the probation office visited each victim, but none of the victims present for the robberies of McDonald's or Taco Bell wanted to provide a victim impact statement.  Because no victims of Mr. Adeyemi's crimes submitted comments, this factor has no weight.

The next factor to consider is unresolved detainers.[293]   The presentence investigation report displays no detainers on Mr. Adeyemi.  He has no other crimes.

Under the next Bureau of Prisons' Program Statement factor, we consider supervised release violations.[294]  Mr. Adeyemi complied with all the terms of his pretrial release while he continued to attend college while out on bond.[295]  He has never been on supervised release.

We next consider the factor of "[i]nstitutional adjustment."[296] Mr. Adeyemi has spent almost fourteen years in prison productively. Mr. Adeyemi works as a janitor at FCI Fort Dix.[297] He earlier worked for UNICOR, a competitive employment program in the prison, where he made materials for the United States Army and cutlery for the prison.[298]  With the money he earned, Mr. Adeyemi fully repaid the restitution and special fees owed.[299]  Mr. Adeyemi has also taken numerous business, self-improvement, art, and health classes while incarcerated.[300]  Mr. Adeyemi's demonstrated desire to improve himself and prepare for release weighs toward finding extraordinary and compelling reasons.  We also consider Mr. Adeyemi's concerns about his health amidst a COVID-19 outbreak at FCI Fort Dix.  Mr. Adeyemi suffers from mild asthma but faces the risk of the exacerbation of his symptoms if he does not receive a refill of his inhalers and if he cannot adequately self-manage through exercise. Mr. Adeyemi's affidavit and medical records suggest continued imprisonment at FCI Fort Dix could cause worsened asthma and place Mr. Adeyemi at a higher risk of severe illness from COVID-19.

The next factor to consider is disciplinary infractions.[301]  During his incarceration of fourteen years in a low-security prison, Mr. Adeyemi committed four disciplinary infractions: possession of a cell phone in 2017, possession of a television remote control stolen from staff in 2015, disruptive conduct in 2015, and failure to follow safety regulations in 2011.[302]  These are not violent offenses.[303]  Mr. Adeyemi maintained a clean disciplinary record for the past three

years.

Mr. Adeyemi's personal history also factors toward finding extraordinary and compelling reasons exist.[304]  Mr. Adeyemi immigrated from London when he was nine years old with his parents and three younger sisters.  His parents described him as "a sweet, kind, and gentle individual."  Mr. Adeyemi submitted an affidavit from his sister, describing Mr. Adeyemi's kind disposition and close and loving relationship with his mother and family.[305]  At the time of his arrest, he needed twenty credits to graduate from Lincoln University at nineteen years old with a degree in biology.[306]  Mr. Adeyemi worked at Applebee's, mentored children at the Christ Apostle Church, and planned to apply to medical school.[307]  Mr. Adeyemi's personal history suggests his crimes are a serious aberration from his typically upstanding character, and weigh in favor of finding extraordinary and compelling reasons.

We next consider his "[l]ength of sentence and amount of time served."[308]  Judge Davis, who sentenced Mr. Adeyemi to the mandatory minimum plus a nominal sentence of one month totaling 385 months, declined to follow the sentencing guidelines suggesting 425 to 435 months' imprisonment.[309]  Mr. Adeyemi has served 165 months of his sentence.[310]  But Mr. Adeyemi's situation is unique: He serves a sentence which would never be imposed under current law. The parties agree Mr. Adeyemi would receive 168 months' imprisonment under current law.[311]  Mr. Adeyemi argues he would be released by now with good time credits.  Due to the extenuating circumstances surrounding Mr. Adeyemi's sentence, we conclude this factor weighs in favor of finding extraordinary and compelling reasons.

Mr. Adeyemi's age at sentencing and current age also weigh in favor of finding extraordinary and compelling reasons.[312]  Mr. Adeyemi was only twenty years old at sentencing.[313]  He is now thirty-four years old.[314]  While in prison, Mr. Adeyemi demonstrated

he will return as a productive member of society. Mr. Adeyemi swore, "[W]hat I did on January 3, 2006 was wrong. I have had a lot of time to reflect on this during the 13.5 years I have spent in prison. I should never have driven that car to the Taco Bell and the McDonald's on January 3, 2006. I agree with what Judge Davis said on the day of my sentencing, that I was unwise and stupid and that I should have known better because even though I was young in January 2006, I was not a child. If Your Honor grants me compassionate release, I will speak of my experience and I hope that my story will serve as a warning to other people who may be tempted to do something utterly stupid. I am determined to do better and to contribute to society. I am still young. I could still go to college and redeem myself by leading a productive life."[315] Mr. Adeyemi's youth at the time of his crime and his dedication to education and work while incarcerated suggest Mr. Adeyemi would return as a productive member of society if compassionately released.

The Bureau of Prisons also instructs we consider release plans.[316] Mr. Adeyemi's release plans include moving in with his mother and sisters in their three-bedroom home in Norristown.[317] Mr. Adeyemi's mother is a behavioral therapist and his sisters work at pharmaceutical companies.[318] His family intends to support him financially while he seeks employment and pursues college studies.[319] In addition, Mr. Adeyemi's health concerns in prison would be ameliorated upon release: He can adequately socially distance in his mother's home and safely exercise to manage his symptoms of asthma.[320]

We lastly consider "[w]hether release would minimize the severity of the offense."[321] Release could not minimize the severity of Mr. Adeyemi's offense because Congress already repudiated the lengthy sentence. Through the First Step Act's amendment to section 924(c)'s stacking provision, Congress communicated its view such "stacking" of sentences does not

produce just nor desirable results. Not only would Mr. Adeyemi's release not minimize the severity of the offense, it would also comply with Congressional directives on the appropriateness of sentences under section 924(c). In addition, Mr. Adeyemi has relatively low culpability compared to his co-conspirators who committed five additional robberies, but he received thirty-two years while judges sentenced the other men who pleaded guilty rather than pursue their day in court to eight to ten years.[322] This factor could not weigh any more heavily in favor of finding extraordinary and compelling reasons for release.

Considering each factor enumerated by the Bureau of Prisons' most recent program statement as of January 2019, we conclude Mr. Adeyemi fulfills each one. We ultimately conclude Mr. Adeyemi has shown extraordinary and compelling reasons—not due to Mr. Adeyemi's health conditions alone, nor due to a change in sentencing law, but under the combination of the factors approved and applied by the Bureau of Prisons. We analyze the Bureau of Prisons' Program Statement 5050.50's section on "other" extraordinary and compelling reasons, a section first promulgated in March 2015 to expand on the Sentencing Commission's policy statement and updated in January 2019, and conclude Mr. Adeyemi's unique circumstances fall into the Bureau of Prisons' enumeration of "other" extraordinary and compelling circumstances.

### C.  The 3553(a) factors warrant a sentence reduction.

Though we conclude extraordinary and compelling reasons exist, our inquiry is not over. Congress permits us to reduce Mr. Adeyemi's sentence upon determining extraordinary and compelling reasons "after considering the factors set forth in section 3553(a) to the extent that they are applicable."[323]  Mr. Adeyemi argues the section 3553(a) factors weigh in favor of his compassionate release. The United States does not disagree.

Section 3553(a) instructs courts to impose a sentence "sufficient, but not greater than necessary" to accomplish the goals of sentencing.[324]  The applicable factors we consider include: "the nature and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence imposed, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[325]

  **1. Mr. Adeyemi's history and characteristics and the nature and circumstances of Mr. Adeyemi's offense.**

Under the "the nature and circumstances of the offense and the history and characteristics of the defendant" prong, and the need for the sentence "to provide the defendant with needed…medical care" prong,[326] we consider Mr. Adeyemi's risk of severe illness if infected by COVID-19 at FCI Fort Dix.[327]  As discussed at length, Mr. Adeyemi is housed in an overcrowded prison with an outbreak of the virus, and his asthma, which risks exacerbation due to lockdown measures, could cause a more severe reaction to COVID-19.  We incorporate our discussion above about Mr. Adeyemi's clean criminal history, admirable educational and work accomplishments, and close relationship with his family.

As to the "nature and circumstances" of Mr. Adeyemi's offense,[328] Mr. Adeyemi acted as the getaway driver in the robberies and did not commit any act of violence.[329]  Mr. Adeyemi did not personally brandish a gun.[330]  Judge Davis, who sentenced Mr. Adeyemi to the mandatory minimum plus a nominal sentence of one month, declined to follow the sentencing guidelines suggesting 425 to 435 months' imprisonment.[331]  Judge Davis explained, "I don't think he's a repeat offender."[332]  Mr. Adeyemi's productive use of his time in prison bolsters this conclusion.

In *United States v. Somerville*, Judge Ranjan granted compassionate release to a defendant who served almost a decade in prison for felon in possession of a firearm and

possession of heroin with intent to sell.[333]  Though Mr. Somerville had a "significant" history of drug dealing, Judge Ranjan held the nature and circumstances of the defendant's offense weighed toward release because, among other things, the defendant's "crime…while serious, did not involve violence."[334]  In *United States v. Rodriguez*, Judge Brody held the section 3553(a) sentencing factors warranted a reduction of sentence for a defendant who had an "extensive criminal history," non-violent predicate offenses, and good conduct during his seventeen years of imprisonment.[335]

In comparison, Mr. Adeyemi has no criminal history, his predicate crimes are non-violent, and in his almost-fourteen years in prison he received only four minor disciplinary infractions.  He used his time in prison to continue his education and pay back his restitution and fees. A loving and supporting family await his return to society. Mr. Adeyemi's history and characteristics and the nature of his offense weigh toward release.

### 2.     The need for the sentence imposed on Mr. Adeyemi.

Congress instructs us to consider "the need for the sentence imposed" to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" to "afford adequate deterrence to criminal conduct;" and to "protect the public from further crimes of the defendant."[336]

Mr. Adeyemi has served thirteen years and eight months of his thirty-two year and one month sentence.[337]  But, as analyzed by Judge Ranjan in *Somerville*, "the harshness of [the defendant's] sentence here did not result from any individualized consideration of his background and characteristics by the sentencing judge."[338]  Instead, in *Somerville* and here, Congress mandated the sentencing judges impose the harsh mandatory minimum sentences.[339] Congress has since reduced the mandatory minimum Mr. Adeyemi could receive to 168

months.[340]   Mr. Adeyemi is a couple months shy of 168 months' imprisonment, and he points

out, due to good time credits, he would have already been released.[341]   Though Congress did not

make this change retroactive, this change in the law comports with our opinion time served

would reflect the seriousness of the offense, promote respect for the law, provide just punishment

for the offense, and afford adequate deterrence to criminal conduct.[342]

In *United States v. Pena*, Judge Nathan in the Southern District of New York reduced Mr.

Pena's eighty-four month sentence to fifty-six months, finding the time he "served in prison has

already achieved much of the original sentence's retributive, deterrent, and incapacitative

purpose."[343]   Mr. Pena had organized "a violent armed robbery that terrorized multiple victims,

including children."[344]   Each of the victims "testified that the robbery was deeply traumatic for

them and their families, and that the violent incident had caused irreversible pain and

suffering."[345]    In comparison, Mr. Adeyemi's 165 months' imprisonment for a robbery

producing no such victim testimony certainly "reflect[s] the seriousness of the offense" and

"provide[s] just punishment for the offense."[346]   In addition, Mr. Adeyemi's lengthy sentence is

sufficient to  "protect the public from further crimes of the defendant."[347]

Mr. Adeyemi has shown remorse for his crime and explained his hopes to become a

productive member of society.[348]   We conclude the length of Mr. Adeyemi's sentence is

"sufficient, but not greater than necessary" to accomplish the goals of sentencing.[349]

### 3.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

A reduction of Mr. Adeyemi's sentence would "avoid unwarranted sentencing disparities

among defendants with similar records who have been found guilty of similar conduct."[350]

Each of Mr. Adeyemi's three co-conspirators already completed his sentence.[351] Although they received significantly shorter sentences, they committed five additional robberies not attributable to Mr. Adeyemi.[352] The co-conspirators brandished the firearm during the robbery while Mr. Adeyemi sat in the car.[353] The co-conspirators also fled the scene of a robbery upon the arrival of the police; Mr. Adeyemi voluntarily went to the police station.[354] Despite Mr. Adeyemi's comparatively low culpability, he received thirty-two years while the other men were sentenced to eight to ten years.[355] Mr. Adeyemi's co-conspirators took plea deals, testified against Mr. Adeyemi at his trial, and received shorter sentences for doing so.[356] The United States offered Mr. Adeyemi a plea deal which would have included "at least" the same cooperation agreement offered to his co-conspirators, indicating the United States did not believe Mr. Adeyemi deserved a longer sentence than the others.[357]

In *United States v. Marks*, Judge Larimer reduced a defendant's sentence from forty to twenty years, explaining, "even twenty years is more than that imposed on Marks's codefendants… None of those codefendants were minor participants in the offense. I recognize that those defendants pleaded guilty, while Marks elected to proceed to trial. The point is that his sentence remains a hefty one, and for all the reasons stated above, in my discretion, I find that it is appropriate here [to reduce his sentence.]"[358] In *United States v. Haynes*, Judge Dearie considered the defendant's "striking" "contrasts between Haynes's sentence of 46 ½ years and the average sentences imposed on defendants convicted of robbery and other crimes" in granting his compassionate release motion.[359] The court pointed to the Sentencing Commission's 2019 data showing "the average national sentence imposed for the crime of robbery is 109 months (9 years plus 1 month)."[360]

Reducing Mr. Adeyemi's sentence to time served will alleviate the vast sentencing disparity with his co-conspirators and with other defendants with similar records found guilty of similar crimes. We conclude the section 3553(a) factors strongly point toward Mr. Adeyemi's release.

### D.     Releasing Mr. Adeyemi does not pose a danger to the safety of any other person or to the community.

The Sentencing Commission policy statement section 1B1.13 provides we may reduce a term of imprisonment only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[361] Section 3142(g) instructs us to consider factors such as the nature and circumstances of Mr. Adeyemi's crime; Mr. Adeyemi's character, including his family ties, employment, and criminal history; and any danger posed to the community by his release.[362] Mr. Adeyemi argues, and the United States concedes, he does not pose a danger to the safety of the community. We agree.

As discussed above, Mr. Adeyemi had no criminal history before visiting the Taco Bell and McDonalds on January 3, 2006.[363] Mr. Adeyemi acted as the getaway driver and did not commit an act of violence.[364] After his arrest, Mr. Adeyemi complied with all the terms of his pretrial release.[365] Mr. Adeyemi's sentencing judge did not believe he would commit another crime, and imposed a sentence below the sentencing guidelines.[366] During his almost fourteen years of incarceration, Mr. Adeyemi has received four disciplinary infractions, none of which involved violence.[367] He repaid the restitution and fees imposed at sentencing.[368] He currently works as a janitor at the prison.[369]

Mr. Adeyemi's sister swears to his kind disposition and close and loving relationship with his mother and family.[370] Upon release, Mr. Adeyemi will move in with his mother and sisters in their three-bedroom home in Norristown.[371] Mr. Adeyemi's mother is a behavioral

therapist and his sisters work at pharmaceutical companies.[372]  His family intends to support him financially while he seeks employment and pursues college studies.[373]

Mr. Adeyemi's strong family ties, proven desire to continue his education, and previously clean criminal history suggest he does pose a danger to others.  While Mr. Adeyemi's crime was serious, we recognize he did not brandish the inoperable gun or physically demand the money from the restaurants.  Like *United States v. Pena*, where Judge Nathan compassionately released Mr. Pena because he organized a violent robbery but did not participate physically,[374] we conclude Mr. Adeyemi's failure to physically participate in the robbery "suggests some diminished level of culpability."[375]  Mr. Adeyemi has submitted sufficient evidence showing he will lead a productive, nonviolent life when he returns to society.

## III.   Conclusion

The Sentencing Commission provides three specific extraordinary and compelling reasons why an incarcerated person may warrant compassionate release.  It also provides, as determined by the Director of the Bureau of Prisons, an incarcerated person may warrant compassionate release for "other" grounds, or in combination with the three specific grounds. The United States argues only the Director may make this decision.  We disagree.  This interpretation is contrary to federal law.  Samson Adeyemi moves for compassionate release admitting he does not meet the first three specified grounds but his lifelong asthma combined with Congress's change to the stacking of sentences in December 2018 are "other" extraordinary and compelling reasons.  We disagree these two reasons alone establish extraordinary and compelling reasons.  We instead look to the time-tested grounds applied by the Director of the Bureau of Prisons.  In applying those grounds, we find Samson Adeyemi has established extraordinary and compelling reasons for compassionate release.  As the United States concedes,

he also poses no danger and a reduction in sentence is consistent with our sentencing factors in section 3553(a).   We grant Mr. Adeyemi's motion for compassionate release and reduce his sentence to time served plus the five years of supervised release under conditions in the accompanying Order.[376]

---

[1] *U.S. v. Rodriguez*, No. 03-271, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020).

[2] ECF Doc. No. 180-1 at ¶ 7.

[3] *Id.* at ¶ 7; ECF Doc. No. 180-2 at ¶ 7.

[4] ECF Doc. No. 180-1 at ¶¶ 8-9.

[5] ECF Doc. No. 180-2 at ¶ 28.

[6] ECF Doc. No. 180-1 at ¶ 9.

[7] ECF Doc. No. 180-2 at ¶¶ 32-33; ECF Doc. No. 181 at 14.

[8] ECF Doc. No. 180-2 at ¶ 11.

[9] *Id.* at ¶ 15.

[10] *Id.*

[11] *Id.* at ¶ 31.

[12] *Id.*

[13] ECF Doc. No. 7 at ¶¶ 1-2.

[14] *Id.* at ¶ 4.

[15] ECF Doc. No. 181-6 at 9-10, 13.

[16] ECF Doc. No. 7 at ¶ 3.

[17] *Id.* at ¶ 4.

[18] *Id.*

[19] ECF Doc. No. 188 at 3.

[20] ECF Doc. No. 181 at 2.

[21] *Id.*

[22] *Id.* at 14.

[23] *Id.* at 3.

[24] ECF Doc. No. 188 at 4.

[25] ECF Doc. No. 181 at 3.

[26] ECF Doc. No. 7.

[27] ECF Doc. No. 78.

[28] *Id.*

[29] ECF Doc. No. 180 at 3; ECF Doc. No. 181-6 at 30.

[30] ECF Doc. No. 180 at 3-4; ECF Doc. No. 188 at 4-5.

[31] *See* First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5222, § 403.

[32] *Id.*

[33] ECF Doc. No. 188 at 5.

[34] ECF Doc. No. 180-2 at ¶ 47.

[35] *Id.* at ¶ 45.

[36] *Id.* at ¶ 46.

[37] *Id.* at ¶ 44.

[38] ECF Doc. No. 188 at 5.

[39] ECF Doc. No. 180-2 at ¶ 41.

[40] *Id.* at ¶ 6.

[41] *Id.*

[42] *Id.*

---

[43] ECF Doc. No. 181 at 16.

[44] *Id*.

[45] *Id*.

[46] Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last visited July 5, 2020).

[47] Centers for Disease Control and Prevention, *Coronavirus 2019 Basics*, https://www.cdc.gov/coronavirus/2019-ncov/faq.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ffaq.html#Coronavirus-Disease-2019-Basics (last visited July 5, 2020).

[48] *Id.*

[49] Centers for Disease Control and Prevention, *Cases of Coronavirus Disease (COVID-19) in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 5, 2020).

[50] Centers for Disease Control and Prevention, *People who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 9, 2020).

[51] Centers for Disease Control and Prevention, *Guidance for Correctional Detention*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited June 9, 2020).

[52] Monica Ghandi, et al, *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19*, The New England Journal of Medicine, April 24, 2020, https://www.nejm.org/doi/full/10.1056/NEJMe2009758 ("[L]ive coronavirus clearly sheds at high concentrations from the nasal cavity even before symptom development…asymptomatic persons are playing a major role in the transmission of SARS-CoV-2.").

[53] *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007) (noting "[t]he probability of transmission of potentially pathogenic organisms [in prisons] is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").

[54] "Achieving A Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

---

[55] Timothy Williams, *et al.*, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide*, June 16, 2020, available at https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *U.S. v. Pena*, No. 15-551, 2020 WL 2301199, at *3 (S.D.N.Y. May 8, 2020).

[60] Bureau of Prisons, *COVID-19: Coronavirus*, https://www.bop.gov/coronavirus/ (last visited July 5, 2020).

[61] ECF Doc. No. 188 at 10.

[62] *Wragg v. Ortiz*, No. 20-5496, 2020 WL 2745247, at *4 (D. N.J. May 27, 2020); ECF Doc. 188 at 10.

[63] *Wragg*, 2020 WL 2745247, at *8.

[64] ECF Doc. No. 180-2 at ¶¶ 18, 22, 24.

[65] *Id.* at ¶ 24.

[66] *Id.* at ¶ 19.

[67] *Id.* at ¶ 20.

[68] *Id.*

[69] *Id.*

[70] Centers for Disease Control and Prevention, *People who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 9, 2020).

[71] *Id.*

[72] ECF Doc. No. 180 at ¶ 5; ECF Doc. No. 188 at 16.

[73] ECF Doc. No. 180-2 at 3.

[74] ECF Doc. No. 181 at 8.

[75] Bureau of Prisons, "Care Level Classification for Medical and Mental Health Conditions or Disabilities," May 2019, p. 3, available at https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.

[76] ECF Doc. No. 189 at 25.

[77] *Id*. at 27.

[78] *Id*.

[79] ECF Doc. No. 197 at 39.

[80] *Id*. at 44.

[81] ECF Doc. No. 181 at 8-9.

[82] ECF Doc. No. 180-2 at ¶ 13.

[83] *Id.*

[84] *Id*. at ¶ 14.

[85] *Id*. at ¶ 13.

[86] *Id*. at ¶ 14.

[87] *Id*.

[88] *Id*.

[89] *Id*.

[90] *Id*.

[91] 18 U.S.C § 3852(c)(1)(A)(i).

[92] U.S.S.G. § 1B1.13.

[93] The parties do not dispute Mr. Adeyemi fulfilled the administrative exhaustion requirement. 18 U.S.C. § 3852(c)(1)(A). Mr. Adeyemi sought compassionate release from the Bureau of Prison in an April 12, 2020 letter to the Warden of FCI Fort Dix, asserting the same grounds for release he argues now. ECF Doc. No. 180-2 at 11. The Warden denied his request for compassionate release, acknowledging only Mr. Adeyemi's argument based on asthma and concluding he did not suffer from a debilitating medical condition. ECF Doc. No. 189 at 25.

---

[94] 28 U.S.C. § 994(t).

[95] U.S.S.G. § 1B1.13 cmt. n.1(A)-(D).

[96] *Id.*, cmt. n.1(A).

[97] *Id.*, cmt. n.1(B).

[98] *Id.*, cmt. n.1(C).

[99] *Id.*, cmt. n.1(D) (emphasis added).

[100] The Editorial Board, *At Long Last, a Measure of Justice for Some Drug Offenders*, The New York Times, June 11, 2019, https://www.nytimes.com/2019/06/11/opinion/first-step-act-drug-offenders.html (last accessed June 19, 2020).

[101] U.S. Department of Justice, Federal Bureau of Prisons, *Program Statement* 5050.50, Jan. 17, 2019, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last accessed July 2, 2020) (These criteria include terminal medical conditions, incurable illness or debilitating injuries causing complete disablement or confinement to a bed or chair for more than 50% of waking hours, or is elderly and suffers from chronic or serious medical conditions).

[102] *Id.* at 12 (Listing nine factors: The nature and circumstances of the defendant's offense, his criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustment, disciplinary infractions, personal history derived from the presentence investigation report, length of sentence and amount of time served, current age and age at the time of offense and sentencing, release plans, and "[w]hether release would minimize the severity of the offense.").

[103] *See U.S. v. Saldana*, 807 F. App'x 816, 819 (10th Cir. 2020).

[104] U.S. Department of Justice, Federal Bureau of Prisons, *Program Statement* 5050.50.

[105] ECF Doc. No. 189 at 8.

[106] *U.S. v. Rodriguez*, No. 03-271, 2020 WL 1627331, at *2 (E.D. Pa. Apr. 1, 2020).

[107] *Id.* (citing *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n*, 2016, statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

[108] *Id.*

[109] *Id.* ("In an effort to improve and increase the use of the compassionate-release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive 'gatekeeper' role.").

[110] 18 U.S.C § 3852(c)(1)(A).

[111] First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194.

[112] *U.S. v. Brown*, 411 F. Supp. 3d 446, 450 n.3 (S.D. Iowa 2019).

[113] 18 U.S.C § 3852(c)(1)(A)(i).

[114] *U.S. v. Dillon*, 560 U.S. 817, 827 (2010).

[115] ECF Doc. No. 188 at 6-7.

[116] ECF Doc. No. 194 at 3.

[117] 28 U.S.C. § 994(t).

[118] ECF Doc. No. 188 at 21.

[119] ECF Doc. No. 192 at 6-7.

[120] The United States asked we read its brief in *U.S. v. Clausen*, No. 00-291-02, ECF Doc. No. 271 (May 15, 2020), for a full *Dillon*-based argument. As we told all counsel during oral argument, we read both parties' briefs in *Clausen*. The issues remain pending in *Clausen* as the parties recently briefed exhaustion required by the First Step Act.

[121] The Department of Justice issued internal guidance on May 18, 2020 directing the United States to concede extraordinary and compelling reasons exist when defendants present certain health conditions, including those in the Centers for Disease Control and Prevention's high-risk groups. *See* ECF Doc. No. 189 at 13-14. Though the internal guidance suggests these conditions fall under Note 1(A), many conditions the United States conceded constitute extraordinary and compelling reasons are not health conditions "from which [the incarcerated person] is not expected to recover," as required in Note 1(A). Instead, these concessions fall more naturally into the catchall provision. *See, e.g., U.S. v. Anderson*, No. 15-30015, 2020 WL 2521513, at *1 (C.D. Ill. May. 18, 2020) ("The Government does not oppose Defendant's compassionate release motion" where the defendant had hypertension, hyperlipidemia, and obesity); *U.S. v. Pinkerton*, No. 15-30045-3, 2020 WL 2083968, at *1 (C.D. Ill. Apr. 30, 2020) ("The Government does not oppose Defendant's compassionate release motion" where defendant had hypertension, diabetes, and neuropathy); *U.S. v. Williams*, No. 17-121-1, 2020 WL 1974372, at *1 (D. Conn. Apr. 24, 2020) ("The Government…does not object" where the defendant has asthma, hypertension, and diabetes); *U.S. v. Perez*, No. 17-513-3, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) ("The Government does not object to Perez's release on the merits, conceding that Perez has a

'heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues,'" where defendant had ongoing pain and vision problems from two reconstructive surgeries). *Contra U.S. v. Young*, No. 00-02-1, 2020 WL 1047815, at *2 (M.D. Tenn. Mar. 4, 2020) ("The government also concedes that, because the Sentencing Commission's policy statement 'has not been amended to reflect that, under the First Step Act, a defendant may now move for compassionate release after exhausting administrative remedies,' the existing policy statement, while providing 'helpful guidance,' 'is not ultimately conclusive given the statutory change.'"); *see U.S. v. Murphy*, No. 15-20411, 2020 WL 2507619, at *3 (E.D. Mich. May 15, 2020) ("[T]he Government argues that Murphy is not eligible for compassionate release because there are no extraordinary or compelling reasons to grant a sentence reduction. Murphy has not met any condition described in U.S.S.G. § 1B1.13: his asthma has not reached a 'terminal' phase with an 'end of life trajectory,' and he is not unable to 'self-care' due to a medical condition 'from which he is not expected to recover.'").

[122] The Committee on Criminal Law of the Judicial Conference, *Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A)*, available at http://jnet.ao.dcn/sites/default/files/pdf/Pro-se_Motion_for_Compassionate_Release_Attachments_Final.pdf.

[123] *See, e.g., U.S. v. Schafer*, No. 18-6152, 2020 WL 2519726, at *4 (W.D.N.Y. May 18, 2020) ("The anachronistic nature of Application Note 1 is demonstrated by the catch-all provision's sole reference to the BOP Director, but this Court agrees with those other courts that have concluded that the discretion afforded the BOP Director under that catch-all provision also extends to a court considering a compassionate release motion, consistent with the expansion of § 3582(c)(1)(A) relief under the First Step Act"); *U.S. v. Pabon*, No. 17-165-1, 2020 WL 2112265, at *2 (E.D. Pa. May 4, 2020) ("The policy statement may provide helpful guidance but it doesn't limit the Court's independent assessment of whether extraordinary and compelling reasons exist"); *U.S. v. Marks*, No. 03-6033, 2020 WL 1908911, at *7 (W.D.N.Y. Apr. 20, 2020) ("In short, when a defendant brings a motion for sentence reduction based on extraordinary and compelling circumstances, the court effectively steps into the shoes of the BOP director, and makes its own determination"); *U.S. v. Young*, No. 00-02-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release"); *U.S. v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)"); *U.S. v. Cantu*, 423 F. Supp. 3d 345, 351 (S.D. Tex. 2019) ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582").

[124] *U.S. v. Lynn*, No. 89-72, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).

[125] *Id*. at *3.

[126] *Id*.

64

[127] *Id.* at *4; 28 U.S.C. § 994(a)(2)(C) ("*The Commission*, by affirmative vote of at least four members of the Commission, and pursuant to its rules and regulations and consistent with all pertinent provisions of any Federal statute *shall promulgate and distribute to all courts of the United States* and to the United States Probation System *(2) general policy statements* regarding application of the guidelines or any other aspect of sentencing or sentence implementation that in the view of the Commission would further the purposes set forth in section 3553(a)(2) of title 18, United States Code, including *the appropriate use of (C) the sentence modification provisions set forth in sections* 3563(c), 3564, 3573, and *3582(c) of title 18*") (emphasis added).

[128] *Rodriguez*, 2020 WL 1627331, at *2.

[129] *Id.* at *2.

[130] *Id.* at *3.

[131] *Id.* at *4.

[132] *Id.*

[133] *Id.*

[134] *Id.* at *4-5.

[135] *Id.* at *5.

[136] *Id.*

[137] *Id.* at *6.

[138] We recognize Mr. Rodriguez presented different facts, as he qualified for home confinement in one more year after serving seventeen years of a twenty-year sentence for drug distribution and illegally possessing a firearm. He presented as a diabetic at FCI-Elkton which had then reported two positive COVID-19 cases. The United States argued we could not rely upon (what it perceived) as dicta in Judge Brody's decision addressing federal judges' ability to independently review extraordinary and compelling reasons. We disagree with the United States. Judge Brody could not have been clearer: "[w]ithout the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence." *Id.* at *11. We interpret Judge Brody's holding as soundly based on her view the combination of the First Step Act with COVID-19 in prisons is the exact type of extraordinary and compelling reason envisioned by the flexibility in the catch-all provided by the Sentencing Commission. Mr. Adeyemi's asthma, length of prison service to date, and rehabilitation also would not suffice pre-COVID but for the now-escalated risk in FCI-Fort Dix and the United States conceding he meets every other

condition of release including under the same factors the Director applies in determining whether "other" reasons exist.

[139] *U.S. v. Booker*, 543 U.S. 220, 233-34 (2005).

[140] *Id.*

[141] *U.S. v. Dillon*, 560 U.S. 817, 828 (2010).

[142] 18 U.S.C § 3852(c)(1)(A)(i); *id.* § 3852(c)(2).

[143] ECF Doc. No. 193 at 1; ECF Doc. No. 195 at 1.

[144] ECF Doc. No. 193 at 1.

[145] *Stinson v. U.S.*, 508 U.S. 36, 45-47 (1993).

[146] *Id.* at 42; ECF Doc. No. 192 at 4 n.1; ECF Doc. No. 193 at 3.

[147] *U.S. v. LaBonte*, 520 U.S. 751 (1997).

[148] 28 U.S.C. § 994(h).

[149] *LaBonte*, 520 U.S. at 753-54.

[150] *Id.*

[151] *Id.* at 753.

[152] *Id.* at 757-58.

[153] *Id.* at 756, 760.

[154] Mr. Adeyemi also argues the introductory phrase in Note 1(D) also violates 28 U.S.C. § 994(a)(2)(C) and 28 U.S.C. § 994(t). But these statutes merely instruct the Sentencing Commission to promulgate policy statements under section 3582(c)—they are not, on their face, at odds with Note 1(D).

[155] 18 U.S.C § 3852(c)(1)(A)(i).

[156] *Id.*

[157] *Rodriguez*, 2020 WL 1627331, *2.

[158] ECF Doc. No. 193 at 5-6.

[159] 18 U.S.C. 3582(c)(1)(A)(ii) ("the court . . . may reduce the term of imprisonment . . . if it finds that (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and *a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community*, as provided under section 3142(g)") (emphasis added).

[160] ECF Doc. No. 192 at 7.

[161] *Id.* at 6.

[162] *Id.* at 6-7.

[163] ECF Doc. No. 184 at 3-4; ECF Doc 189 at 25.

[164] *See U.S. v. Marks*, No. 3-6033, 2020 WL 1908911, at *6 (W.D.N.Y. Apr. 20, 2020) ("the Sentencing Commission's failure to update or revise the relevant criteria may not be the result of a deliberate decision by the Commission. As several district courts have pointed out, the Commission currently has only two voting members, two shy of the four that it needs to amend the Guidelines… While it seems likely that Congress intended that the Sentencing Commission issue updated criteria, as a practical matter that simply cannot happen right now."), *appeal docketed*, No. 20-1404 (2d Cir. April 23, 2020).

[165] *See, e.g., U.S. v. Dixon*, 648 F.3d 195, 200-01 (3d Cir. 2011) (holding sentencing courts must follow the Fair Sentencing Act of 2010, not the 1986 Act, during the three months Congress provided the Sentencing Commission to update its guidelines after the Act passed).

[166] *Rodriguez*, 2020 WL 1627331, at *5.

[167] ECF Doc. No. 188 at 21.

[168] *Id.* at 23 n.8.

[169] *Id.* at 22-23.

[170] 18 U.S.C § 3852(c)(1)(A)(i).

[171] ECF Doc. No. 192 at 7.

[172] The United States' reliance on section 994(t) ("The Commission… shall describe what should be considered extraordinary and compelling reasons for sentence reduction…") and Section 994(a)(2)(C) (directing the Commission to adopt policy statements about "the appropriate use of… the sentence modifications provisions set forth in" section 3582(c)) do not require a contrary conclusion. ECF Doc. No. 188 at 21-22. These statutes do not undermine the language

in section 3582(c)(1)(A)(i) authorizing courts to determine extraordinary and compelling reasons in consultation with applicable policy statements.

[173] ECF Doc. No. 192 at 7.

[174] *Id.*

[175] *Id.*

[176] ECF Doc. No. 194 at 4.

[177] *See, e.g.*, *U.S. v. Perez*, No. 17-513-3, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) ("The Government does not object to Perez's release on the merits, conceding that Perez has a 'heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues,'" where defendant had ongoing pain and vision problems from two reconstructive surgeries).

[178] *See, e.g., U.S. v. Epstein*, No. 14-287, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020) (noting a defendant possesses the burden to establish extraordinary and compelling exist to justify compassionate release)

[179] *U.S. v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

[180] *U.S. v. Roeder*, 807 F. App'x 157, 161 (3d Cir. 2020).

[181] *U.S. v. Pena*, 2020 WL 2301199, No. 15-551, at *3 (S.D.N.Y. May 8, 2020).

[182] ECF Doc. No. 180-2 at ¶ 24.

[183] *See, e.g., U.S. v. Al-Jumail*, 2020 WL 2395224, at *4 (E.D. Mich. May 12, 2020) (granting compassionate release from Fort Dix, concluding: "Even if the Court were to accept the argument that the BOP and FCI Fort Dix are taking precautions to ensure the safety of prisoners, Defendant's risk of contracting COVID-19 is not speculative. There have been numerous cases of COVID-19 at FCI Fort Dix"); *U.S. v. Pena*, 2020 WL 2301199, *3 (S.D.N.Y. May 8, 2020) (granting compassionate release from Fort Dix, noting "[f]or [defendant] to wait an additional three weeks [at Fort Dix] . . . could be the difference between life and death."); *U.S. v. Williams*, 2020 WL 1974372 (D. Conn. Apr. 24, 2020) (granting compassionate release from Fort Dix).

[184] Bureau of Prisons, *COVID-19: Coronavirus*, https://www.bop.gov/coronavirus/ (last visited June 9, 2020).

[185] ECF Doc. No. 188 at 10.

[186] *Wragg v. Ortiz*, No. 20-5496, 2020 WL 2745247, at *4 (D.N.J. May 27, 2020); ECF Doc. 188 at 10.

[187] *Wragg*, 2020 WL 2745247, at *8.

[188] ECF Doc. No. 188, at 12.

[189] Centers for Disease Control and Prevention, *People who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 9, 2020).

[190] U.S. Department of Health and Human Services National Heart, Lung, and Blood Institute, "Asthma Care Quick Reference," p. 5, available at https://www.nhlbi.nih.gov/files/docs/guidelines/asthma_qrg.pdf (last visited June 15, 2020).

[191] ECF Doc. No. 180-2 at ¶ 9.

[192] *Id*. at ¶¶ 9, 12.

[193] ECF Doc. No. 189 at 27.

[194] *Id*.

[195] ECF Doc. No. 188 at 15.

[196] ECF Doc. No. 197 at 44.

[197] ECF Doc. No. 180-2 at ¶ 12.

[198] ECF Doc. No. 188 at 16.

[199] ECF Doc. No. 189 at 23.

[200] ECF Doc. No. 180-2 at ¶ 12.

[201] ECF Doc. No. 188 at 16-17.

[202] ECF Doc. No. 180-2 at ¶ 12.

[203] ECF Doc. No. 197.

[204] *See* Wylie Burke, *Family history as a predictor of asthma risk*, AM. J. PREVENTIVE MED. (Feb. 2003), https://doi.org/10.1016/S0749-3797(02)00589-5; *see also* V. H. Ratageri et al., *Factors associated with severe asthma*, INDIAN PEDIATRICS (Oct. 2000) PMID: 11042705. ("On univariate analysis factors associated with significant risk for development of asthma included family history of asthma.").

[205] ECF Doc. No. 180-2 at ¶ 13.

[206] American Lung Association, *Being Active with Asthma*, available at https://www.lung.org/lung-health-diseases/lung-disease-lookup/asthma/living-with-asthma/managing-asthma/asthma-and-exercise (last visited June 17, 2020).

[207] Andreanne Côté, Julie Turmel, & Lois-Phillipe Boulet, *Exercise and Asthma*, SEMINAR ON RESPIRATORY CRITICAL CARE MED. (Feb. 10, 2018) doi:10.1055/s-0037-1606215. *See also* Teal Hallstrand et al., *Aerobic Conditioning in Mild Asthma Decreases the Hyperpnea of Exercise and Improves Exercise and Ventilatory Capacity*, CHEST (Nov. 2000), https://doi.org/10.1378/chest.118.5.1460.

[208] ECF Doc. No. 180-2 at ¶ 14.

[209] *Id*.

[210] ECF Doc. No. 181 at 9.

[211] *U.S. v. Gorai*, No. 18-22, 2020 WL 1975372, at *3 (D. Nev. Apr. 24, 2020).

[212] *Id*. at *2 (quoting *U.S. v. Esparza*, No. 7-294, 2020 WL 1696084, at *2 (D. Idaho Apr. 7, 2020)).

[213] *Id*. at *3.

[214] *U.S. v. White*, No. 13-20653-1, 2020 WL 2557077 (E.D. Mich. May 20, 2020).

[215] Rush University Medical Center News, "Asthma Associated With Longer Time on Ventilators for Younger COVID-19 Patients," May 15, 2020, at https://www.rush.edu/news/press-releases/asthma-associated-longer-time-ventilators-younger-covid-19-patients. ("Our findings suggest that younger individuals with asthma may require extra attention, as they could develop a sustained pulmonary failure with COVID-19 infection, leading to prolonged mechanical ventilation.").

[216] *Id*.

[217] *See, e.g., U.S. v. Schafer*, No. 18-6152, 2020 WL 2519726 (W.D.N.Y. May 18, 2020); *U.S. v. Echevarria*, No. 17-44, 2020 WL 2113604 (D. Conn. May 4, 2020); *U.S. v. Hernandez*, No. 18-834-4, 2020 WL 1684062 (S.D.N.Y. Apr. 20, 2020); *U.S. v. Tran*, No. 8-197, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020).

[218] *U.S. v. Medina*, No. 09-983, ECF Doc. No. 241 (S.D.N.Y. May 8, 2020); ECF Doc. No. 181-13 at 10.

[219] ECF Doc. No. 181-13 at 2-3.

[220] *U.S. v. Norris*, No. 17-106, 2020 U.S. Dist. LEXIS 70219, at *3 (D. Conn. Apr. 16, 2020).

[221] *Id*. at *4.

[222] *U.S. v. David*, No. 17-04, 2020 WL 2526568, at *5 (W.D. Wash. May 18, 2020); *U.S. v. Echols*, No. 15-125-1, 2020 WL 2309255, at *3 (N.D. Miss. May 8, 2020) ("The only evidence of asthma Echols presents is…an unsworn statement from his brother that Echols 'has severe asthma.'"), *appeal docketed*, No. 20-60418 (5th Cir. May 8, 2020).

[223] *See, e.g., U.S. v. Murphy*, No. 15-20411, 2020 WL 2507619, at *3 (E.D. Mich. May 15, 2020); *U.S. v. Davis*, No. 18-10013, 2020 WL 2488574, at *4 (C.D. Ill. May 14, 2020); *U.S. v. Miller*, No. 18-30034, 2020 WL 2093370, at *1 (C.D. Ill. May 1, 2020).

[224] *U.S. v. Howell*, No. 17-151, 2020 WL 2475640, at *3-*4 (D. Conn. May 12, 2020).

[225] *U.S. v. Ramos*, No. 14-484, 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020).

[226] *David*, 2020 WL 2526568, at *5; *Howell*, 2020 WL 2475640, at *4.

[227] *Murphy*, 2020 WL 2507619, at *3; *Davis*, 2020 WL 2488574, at *4; *Ramos*, 2020 WL 1685812, at *2.

[228] U.S.S.G. § 1B1.13 cmt. n.1(D) (emphasis added).

[229] ECF Doc. No. 180 at 3-4; ECF Doc. No. 188 at 4-5.

[230] *See* First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5222, § 403.

[231] *U.S. v. Haynes*, No. 93-1043, 2020 WL 1941478, at *5 (E.D.N.Y. Apr. 22, 2020).

[232] *See, e.g.,* Senator Chuck Grassley Website, "Prepared Floor Remarks by U.S. Senator Chuck Grassley of Iowa, The First Step Act: One Year Anniversary of Senate Passage," Dec. 18, 2019 ("Our criminal justice system is based on the rule of law. That means when you commit a crime, you should be punished. But the punishment should fit the crime. If the penalty is too harsh, it doesn't do any more to deter criminal activity and it's a bad value for taxpayers. Overly harsh penalties can also make it harder for prisoners who are trying to change their lives to turn over a new leaf.").

[233] ECF Doc. No. 188 at 18.

[234] ECF Doc. No. 181 at 3.

[235] *U.S. v. Hodge*, 948 F.3d 160, 163 (3d Cir. 2020) (citing *Dorsey v. U.S.*, 567 U.S. 260, 272 (2012)).

[236] First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5222, § 403(b).

[237] *U.S. v. Maumau*, No. 8-758-11, 2020 WL 806121, at *7 (D. Utah Feb. 18, 2020).

[238] *U.S. v. McPherson*, No. 94-5708, 2020 WL 1862596, at *5 (W.D. Wash. Apr. 14, 2020).

[239] *See, e.g., U.S. v. Wade*, No. 99-257-3, 2020 WL 1864906, at *6 (C.D. Cal. Apr. 13, 2020); *U.S. v. Decator*, No. 95-0202, 2020 WL 1676219, at *5 (D. Md. Apr. 6, 2020); *U.S. v. Young*, No. 00-2-1, 2020 WL 1047815, at *8 (M.D. Tenn. Mar. 4, 2020); *U.S. v. O'Bryan*, No. 96-10076-3, 2020 WL 869475, at *1 (D. Kan. Feb. 21, 2020); *U.S. v. Maumau*, No. 8-758-11, 2020 WL 806121, at *7 (D. Utah Feb. 18, 2020); *U.S. v. Urkevich*, No. 3-37, 2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019).

[240] *Haynes*, 2020 WL 1941478, at *5.

[241] *Id*. at *16.

[242] *Id*.

[243] *U.S. v. Redd*, No. 97-6, 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020).

[244] *Id*.

[245] *Id*.

[246] *Id*. at *9.

[247] *U.S. v. Quinn*, No. 91-608-1, 2020 WL 3275736, at *1 (N.D. Cal. June 17, 2020).

[248] *Id*. at *4.

[249] *Id*.

[250] *Id*.

[251] ECF Doc. No. 189 at 6.

[252] We also recognize the House Committee on the Judiciary, reporting out the bill that would later become the First Step Act, noted:

> Section 5. Clarification of Section 924(c) of Title 18, United States Code. This section expands the enhanced penalties for violent firearms offenders to ***those with prior firearm convictions. It also revises section 924(c) of title 18 to address inappropriate "stacking" of Federal firearms charges.*** As the law currently reads, defendants who are convicted of a first offense under that section receive a mandatory, consecutive, minimum penalty of 5 years. For each "second or subsequent offense," the penalty jumps to 25 years. ***In some cases, courts have interpreted "second or subsequent" to include multiple***

*charges in the same indictment. In "stacking" charges this way, some defendants have received inappropriately lengthy sentences.* This section clarifies that an enhancement under 924(c) can only apply after a defendant has had an intervening conviction under 924(c) or under State law for the same conduct. This section also reduces the enhanced penalty from 25 to 15 years. This "stacking" fix applies retroactively, though the sentence reduction does not.

H.R. REP. 114-888, 2016 WL 7471588, at *20 (emphasis added).

[253] ECF Doc. No. 189 at 6.

[254] ECF Doc. No. 188 at 19.

[255] *U.S. v. Saldana*, 807 F. App'x 816, 819 (10th Cir. 2020).

[256] *Id.*

[257] *Id.*

[258] *Id.* at 819-21.

[259] *U.S. v. Jackson*, Nos. 19-2499, 19-2517, 2020 WL 3563995, at *10 (3d Cir. July 1, 2020) (Hardiman, J. dissenting) (quoting *U.S. v. Schneider*, 14 F.3d 876, 879 (3d Cir. 1994)).

[260] *Id.* at *10 (Hardiman, J. dissenting) (quoting *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008)).

[261] ECF Doc. No 188 at 2.

[262] *U.S. v. Gibbs*, No. 96-539-02, ECF Doc. No. 1263 (E.D. Pa. Mar. 5, 2020).

[263] *Id.* at 4. Judge Bartle held the introductory phrase in Note 1(D) to Sentencing Commission policy statement § 1B1.13 "is now out of date in light of the First Step Act which for the first time allows a prisoner, after exhausting administrative remedies, to move for compassionate release." *Id.* at 6 n.3.

[264] *Id.*

[265] *Id.* at 6-7.

[266] *Id.* at 7.

[267] 28 U.S.C. § 994(t).

[268] *U.S. v. Marks*, No. 3-6033, 2020 WL 1908911, at *16 (W.D.N.Y. Apr. 20, 2020), *appeal docketed*, No. 20-1404 (2d Cir. April 23, 2020).

---

[269] *Id*. at *2.

[270] *Id*. at *7.

[271] *Id*. at *8.

[272] *Id*. at *16.

[273] *Id*. at *16-17.

[274] S. Rep No. 98-225, at 55–56 (1983) ("The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and *some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment*. The Committee believes, however, that it is unnecessary to continue the expensive and cumbersome parole commission to deal with the relatively small number of cases in which there may be justification for reducing a term of imprisonment. The bill, as reported, provides instead…for court determination, subject to consideration of Sentencing Commission standards, of the question whether there is justification for reducing a term of imprisonment in situations such as those described.") (emphasis added).

[275] *U.S. v. Young*, No. 00-02-1, 2020 WL 1047815, at *3 (M.D. Tenn. Mar. 4, 2020).

[276] S. Rep No. 98-225, at 55–56 (1983).

[277] *Teague v. Lane*, 489 U.S. 288, 309 (1989).

[278] We are mindful we are not bound by the factors enumerated by the Bureau of Prisons' Program Statement 5050.50 as Judge Brody pointed out in *Rodriguez*, 2020 WL 1627331, at *6 n.12. But absent another means of determining "other" extraordinary and compelling reasons, we may turn to the experts in the Bureau of Prisons to aid our analysis.

[279] U.S.S.G. § 1B1.13.

[280] U.S. Department of Justice, Federal Bureau of Prisons, *Program Statement 5050.50*, Jan. 17, 2019, at 12, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last accessed July 1, 2020).

[281] *U.S. v. Saldana*, 807 F. App'x 816, 819 (10th Cir. 2020).

[282] U.S. Department of Justice, Federal Bureau of Prisons, *Program Statement 5050.49*, Mar. 25, 2015, available at https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf (last accessed July 1, 2020).

[283] *Id*. at 12.

[284] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[285] ECF Doc. No. 181 at 14; ECF Doc. No. 188 at 4.

[286] ECF Doc. No. 181 at 15.

[287] *Id.* at 14-15; ECF Doc. No. 188 at 3.

[288] ECF Doc. No. 7 at ¶¶ 4, 8.

[289] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[290] ECF Doc. No. 181 at 14.

[291] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[292] ECF Doc. No. 181-16 at 3.

[293] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[294] *Id.*

[295] ECF Doc. No. 181 at 15.

[296] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[297] ECF Doc. No. 180-2 at ¶ 47.

[298] *Id*. at ¶ 45.

[299] *Id*. at ¶ 46.

[300] *Id*. at ¶ 44.

[301] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[302] ECF Doc. No. 188 at 5.

[303] ECF Doc. No. 180-2 at ¶ 41.

[304] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[305] ECF Doc. No. 180-1 at ¶¶ 8-9.

[306] ECF Doc. No. 181 at 14.

[307] ECF Doc. No. 180-2 at ¶ 31; ECF Doc. No. 181 at 14.

[308] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[309] ECF Doc. No. 181 at 2.

[310] ECF Doc. No. 188 at 5.

[311] *Id.* at 18; ECF Doc. No. 189 at 5 n.8.

[312] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[313] ECF Doc. No. 181-6 at 14.

[314] ECF Doc. No. 181 at 1.

[315] ECF Doc. No. 180-2 at 2.

[316] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[317] ECF Doc. No. 181 at 16.

[318] *Id.*

[319] *Id.*

[320] *Id.* at 9.

[321] Federal Bureau of Prisons, *Program Statement 5050.50*, at 12.

[322] *Id.*

[323] 18 U.S.C. § 3582(c)(1)(A).

[324] 18 U.S.C. § 3553(a).

[325] *Id.* § 3553(a)(6).

[326] *Id.* § 3553(a)(1), (a)(2)(D).

[327] *See U.S. v. Pawlowski*, No. 17-390-1, 2020 WL 2526523, at *7 (E.D. Pa. May 18, 2020).

[328] 18 U.S.C. § 3553(a)(1).

[329] ECF Doc. No. 181 at 14; ECF Doc. No. 188 at 4.

[330] ECF Doc. No. 181 at 14-15; ECF Doc. No. 188 at 3.

[331] ECF Doc. No. 181 at 2.

[332] ECF Doc. No. 181-6 at 30.

[333] *U.S. v. Somerville*, No. 12-225, 2020 WL 2781585, at *12-13 (W.D. Pa. May 29, 2020).

[334] *Id*. at *12.

[335] *Rodriguez*, 2020 WL 1627331, at *1.

[336] 18 U.S.C. § 3553(a)(2)(A)-(C).

[337] ECF Doc. No. 181 at 2.

[338] *Somerville*, 2020 WL 2781585, at *13.

[339] *Id*.

[340] ECF Doc. No. 189 at 5 n.8.

[341] *Id*. at 5.

[342] *See U.S. v. Curtis*, No. 3-533, 2020 WL 1935543, at *4 (D.D.C. Apr. 22, 2020) ("That a defendant sentenced today, identical in every way to the defendant in this case, would face 15.5–19.5 years' imprisonment is strong evidence that defendant's 17 years' imprisonment adequately reflects the 'seriousness of [his] offense' and "'provide[s] just punishment for the offense.'").

[343] *U.S. v. Pena*, No. 15-551, 2020 WL 2301199, at *8 (S.D.N.Y. May 8, 2020).

[344] *Id*. at *1.

[345] *Id*.

[346] 18 U.S.C. § 3553(a)(2)(A)-(C).

[347] *Id.* § 3553(a)(2)(C).

[348] ECF Doc. No. 180-2 at 2.

[349] 18 U.S.C. § 3553(a).

[350] *Id.* § 3553(a)(6).

[351] ECF Doc. No. 181 at 18.

[352] *Id.*

[353] *Id.*

[354] *Id.*

[355] *Id.*

[356] *Id.*

[357] ECF Doc. No. 181-6 at 18.

[358] *Marks*, 2020 WL 1908911, at *17.

[359] *Haynes*, 2020 WL 1941478, at *2-3.

[360] *Id.*

[361] U.S.S.G. § 1B1.13(2).

[362] 18 U.S.C. § 3142(g).

[363] ECF Doc. No. 181 at 14.

[364] *Id.*; ECF Doc. No. 188 at 4.

[365] ECF Doc. No. 181 at 15.

[366] ECF Doc. No. 181-6 at 30.

[367] ECF Doc. No. 188 at 5.

[368] ECF Doc. No. 181 at 15-16.

[369] *Id.*

[370] ECF Doc. No. 180-1 at ¶¶ 8, 9.

[371] ECF Doc. No. 181 at 16.

[372] *Id.*

[373] *Id.*

[374] *U.S. v. Pena*, No. 15-551, 2020 WL 2301199, at *1 (S.D.N.Y. May 8, 2020).

[375] *Id.* at *3.

[376] Today's Order does not moot Mr. Adeyemi's pending habeas petition. ECF Doc. No. 158. *U.S. v. Scripps*, 961 F.3d 626 (3d Cir. 2020). The district court sentenced the defendant in *Scripps* to "108 months' imprisonment . . . and three years' supervised release[.]" *Id.* at 630. The incarcerated person petitioned for section 2255 habeas relief while incarcerated, "challeng[ing] the validity of his sentence[.]"  Our colleague Judge DuBois denied his petition, and before our Court of Appeals ruled on his appeal of the denial, he completed his prison sentence and began serving his term of supervised release.  Our Court of Appeals held the section 2255 habeas petition remained ripe for decision because it challenged his sentence, "which include[d] his term of imprisonment and his term of supervised release." *Id.* at 631.

Our colleague Judge Pratter held a section 2255 petition to be ripe two months ago where, like Mr. Adeyemi, the incarcerated person sought relief under *Johnson v. U.S.*, 135 S. Ct. 2551 (2015), from a section 924(c) sentence. *U.S. v. Cobb*, Nos. 06-186-1, 16-1508, 2020 WL 2198978 (E.D. Pa. May 6, 2020). Judge Pratter sentenced the defendant in *Cobb* to, among other things, a term of imprisonment and a term of "five years of supervised release" under section 924(c).  The incarcerated person filed a section 2255 petition arguing the district court should apply the Supreme Court's decision in *Johnson* to "correct his sentence" as it "violated [his] due process of law[.]"  The United States moved to dismiss the petition for mootness because the Bureau of Prisons released the incarcerated person and he began serving supervised release. Judge Pratter denied the United States' motion to dismiss, reasoning the formerly incarcerated person's challenge to "his § 924(c) conviction and sentence" included his term of supervised release which a court could reduce under section 2255.

One exception may arise where the incarcerated person does not challenge the entire sentence. For example, our Court of Appeals denied review of a habeas petition for mootness where the petitioner on supervised release did not expressly challenge his entire conviction and sentence. *Buczek v. Werlinger*, 513 F. App'x 126 (3d Cir. 2013). In *Buczek*, the petitioner moved for habeas relief only to restore "27 days of Good Conduct Time" which had been revoked at a disciplinary hearing.  Judge Gibson denied the petition, and the petitioner appealed.  Our Court of Appeals denied review of the petition because the Bureau of Prisons already released the formerly incarcerated person and Good Conduct Time can only reduce the original term of imprisonment, not the term of supervised release.

Today's Order granting Mr. Adeyemi's compassionate release does not render his section 2255 petition moot because he challenges his conviction and sentence, of which supervised release is a part. Judge Davis's sentence included a term of five years of supervised release. ECF Doc. No. 78 at 3. Mr. Adeyemi challenged his "conviction and sentence" in his section 2255 petition. ECF Doc. No. 158 at 2. Our Court of Appeals held a formerly incarcerated person's 2255 petition is

ripe if it challenges the entire sentence even though the petitioner remains on supervised release. Mr. Adeyemi challenges the entire sentence in his section 2255 petition.